UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 15-22925-CIV-ALTONAGA/O'SULLIVAN

JOSHUA BROUGHTON,

      Petitioner,

v.

MICHAEL D. CREWS,

      Respondent.

_____/

## REPORT AND RECOMMENDATION

THIS MATTER came before the Court on the Petition for Relief from a Conviction or Sentence by a Person in State Custody (DE# 1, 8/4/15) (hereinafter "Petition"). The instant petition was referred to the undersigned by the Honorable Cecilia M. Altonaga for a Report and Recommendation in accordance with 28 U.S.C. § 636(b). See Order of Reference to Magistrate Judge (DE# 4, 8/5/15). Having carefully considered the applicable filings and the law, the undersigned respectfully RECOMMENDS that the Petition for Relief from a Conviction or Sentence by a Person in State Custody (DE# 1, 8/4/15) be **DENIED** for the reasons set forth below.

# BACKGROUND[1]

## A.    State Court Pre-Trial Proceedings

### i.    The Original Information

The instant case involved the armed robbery of a married couple by two men on December 14, 2007 in the High Pines area of Miami-Dade County, Florida. Joshua Broughton (hereinafter "petitioner") was arrested on suspicion of being one of the robbers.

On or about January 16, 2008, the petitioner and a co-defendant Anthony Sanders (hereinafter "co-defendant" or "Mr. Sanders") were charged by Information in Case No. F07-44274 in the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida. The Information charged the petitioner with: two counts of robbery using a deadly weapon or firearm in violation of Florida Statute § 812.13(2)(A) (Counts 1 and 2); two counts of kidnapping with a weapon in violation of Florida Statute §§ 787.01(2) and 775.087 (Counts 3 and 4); possession of a firearm by a convicted felon in violation of Florida Statute §§ 790.23(1) and 775.087 (Count 5), unauthorized use of a credit card in violation of Florida Statute § 817.481(3)(B) (Count 6) and dealing in stolen property in violation of Florida Statute § 812.019(1) (Count 7). See Information (Ex. I). The Information charged the co-defendant with the same crimes as the petitioner except the co-defendant was not charged with possession of a firearm by a

---

[1] The respondent filed an appendix. See Appendix to Response to Petition for Writ of Habeas Corpus (DE# 14-1, 9/18/15). Citations to the appendix will be designated by the letters "Ex." corresponding to the exhibits filed in the appendix. The page numbers in the citations will be the page numbers printed on the document and not the CM/ECF page numbers. The undersigned will refer to the petitioner's exhibits as "Petitioner's Ex. ___."

convicted felon (Count 6). Id.

**ii.    The Arthur Hearing**

The Court held an Arthur hearing[2] on April 10, 2008. See Arthur Hearing

Transcript (Ex. N). During the Arthur hearing, the State called Detective Orlando Lopez,

a Miami-Dade police officer from the robbery unit, to testify. Id. at 4. Detective Lopez

testified that on December 14, 2007, he responded to a call about an armed robbery

that had taken place that night. Id. at 5. As part of his investigation, Detective Lopez

spoke to Steven Marin. Mr. Marin and his wife, Maria, were the two victims of the armed

robbery. Id. The State introduced an affidavit from Mr. Marin and Detective Lopez

summarized the contents of the affidavit as follows:

> Mr. Marin and his wife were . . . to attend a Christmas party at a nearby
> location. There were many vehicles parked on the street that night so they
> had to park a bit away from where the actual party was. When they
> arrived [Mr. Marin] parked his vehicle on the side of the road. He exit[ed]
> his vehicle and began to walk towards the house at which time he
> encountered two individuals. First an individual who would later become
> known to me, I will say by description -- or may I mention his name?
>
> Q. You can describe and give his name.
>
> A. Okay. An individual who was thin build with short hair, a black male
> who would later become known to me as Mr. Broughton and another
> individual who was of darker complexion with dread-locks, a bit taller and
> a bit bigger in size who would become known to me as Mr. Anthony
> Sanders. Referring back to my report, Mr. Anthony Sanders.
>
> Q. Okay. So after they encountered these two, after the victims
> encountered these two males, what happened?

---

[2] An Arthur hearing is a bond hearing in state court. In State v. Arthur, 390 So.2d
717 (Fla. 1980), the Florida Supreme Court held that a trial court has the discretion to
grant or deny bail for a person accused of an offense punishable by life, or a capital
offense, when the proof of guilt is evident or the presumption great. The burden is on
the State to make that showing. Id.

A. Mr. Marin and also after speaking to his wife we got the same account said that this individual known to me as Mr. Broughton now had a firearm with him, he pointed it at them and stated not to move and if they moved they were going to die that night. That is not a direct quote, but something to that effect. Demanded property, demanded money and demanded them not to move.

Q. What property was taken from the victims?

A. There was jewelry taken and there was a watch taken. There were car keys taken and that was done with Mr. Sanders actually taking the property while Mr. Broughton was holding the gun at the victims. Once this property was taken from the victims Mr. Broughton insisted that there must be a purse because he didn't notice that there was a purse on Mrs. Marin, so they, Mr. Broughton and Mr. Sanders ordered the victims back to their vehicle, perhaps maybe 15 yards now away from where they were standing and took them back to the vehicle at gunpoint and ordered the trunk to be opened, looking for a purse. Not finding a purse what they did find was a set of hair clippers that comes in a briefcase type attache box and that was removed out of the trunk by Mr. Sanders.

***

A. There was one other item. There was a cell phone, specifically a Palm Trio (phonetic) phone.

Q. That was taken from who?

A. From Mr. Marin.

Q. How did you get to a point in your investigation where you got subjects?

A. What occurred was we were going to try to see what we could do with the phone while leaving it on and Mr. Marin who uses his phone quite a bit for business he received many, many phone calls. He was unable to alert all the people he knows as to don't call the phone, so what happened is what -- a certain friend of his or a certain associate of his had called this phone and said, hey, someone answered your phone. This was on the date of the 16th, the date of the incident is the 14th. . . . He said someone answered your phone. Mr. Marin took the risk of calling himself and I made contact with somebody who actually answered his phone. That individual was able to provide who he was and he said, listen, I am just a college student down here on holiday and I picked up this phone at a pawn shop and I am willing to cooperate with authorities. The college

4

student provided his name and I was able to meet with him on the 16th.

Id. at 6-9.

Detective Lopez also testified that he met with Samuel Lamy,[3] the college student, and obtained a written statement. Mr. Lamy told Detective Lopez that he had visited a local pawnshop because he had been interested in purchasing a cell phone. See Arthur Hearing Transcript (Ex. N at 9). Detective Lopez testified that George Garcia was the employee of the pawnshop who dealt with Mr. Lamy. Id. at 10. Mr. Garcia told Detective Lopez that he had worked at the pawnshop on December 14th or 15th and that:

> two individuals known to him . . . one person named Dread and a person named Twin had come to the pawnshop and he said that Dread was in possession of a watch that he wanted to sell. George, Mr. Garcia, said that he wasn't interested in that watch. He described the watch. It was a similar description to that taken from Mr. Marin on the day of the robbery.
>
> Q. Did he offer anything else to the pawnshop that day?
>
> A. He offered a phone.
>
> Q. What type of phone?
>
> A. It was a Palm Trio phone from Verizon and Mr. Garcia stated to me that he wasn't interested in the phone either because they didn't deal with Verizon phones. So he said that in that instance and where he is talking with Dread, Dread and Twin about this property and him not wanting to take it and in comes Mr. Lam[y] lord [sic] and behold asking for a Verizon P.D.A[.] phone [sic] asking, which is exactly what Dread had and Dread who later became known as Mr. Sanders, Dread told Mr. Garcia that he is selling the phone. He has what Mr. Lam[y] wants. So Mr. Garcia says in order to get Dread off of his back he went ahead and acted as an intermediary and actually allowed that deal to go through where Mr.

---

[3] Mr. Lamy's name is spelled differently throughout the record. He is sometimes referred to as "Sammy Lammy." This Report and Recommendation will refer to him as "Mr. Lamy."

Lam[y] paid $80 for the phone. He said that he gave the $80 to Dread and there was no paperwork generated from that pawn shop.

Id. at 11-12.

Detective Lopez worked with pawnshop detectives and was able to show Mr. Garcia photographs of several individuals. See Arthur Hearing Transcript (Ex. N at 12). Mr. Garcia was able to identify co-defendant Sanders as the individual known as "Dread." Id. Detective Lopez further testified as follows:

Q. How is it that you discovered what Dread and Twin did with the Palm Trio phone?

A. Initially [Mr. Garcia] was able to provide nicknames, but he also remembered that Dread, specifically Mr. Sanders, had pawned a gold chain. So I went to work with the pawn shop detectives at the Northside District Station in order to get their assistance and they were able to look back in the record and found, if you will, a person of interest who had pawned a chain around that time that possibly matched that description, so --

Q. The description of Dread?

A. The description of Dread. So we first went with that angle and there were a few pictures shown to Mr. Garcia, some of which he said no, that is not it, that is not it, that is not it and then he was able to find a photograph of -- we were able to show a photograph of Mr. Sanders and he said, "that is Dread. That is the person who came in with the property on that day." And so now we are left looking for Twin.

Id.

Detective Lopez testified that he:

left the Northside District at that time in order to handle another case and Detective Holmes and Detective Brooklyn of the Northside District station were able to continue on with the showing of the pictures in search of this individual known to him as Twin. However, Mr. Garcia remembered during that time, hey, the man's name is Broughton. So I said, okay. He was careful to point out that Mr. Broughton has a brother by the name of Jamel or Jamelle who pawns very frequently there and he said "don't confuse him with his brother because it is not Jamel it is going to be the other

6

Broughton that I don't remember his first name and I know that they call him Twin."

I said, "well, do they call him Twin because he is a twin?"

He said, "no, he is not a twin as far as I know, but they just call him twin."

I was careful to point that out because I wanted to make sure that that wasn't the case, okay. Okay. So the pictures continued to be shown to Mr. Garcia with these last names of Broughton. We delved into the criminal history of certain Broughton's [sic] that we saw in the system and we were able to find Mr. Broughton's photograph and it was shown to Mr. Garcia and he said "that is the twin that was there with Dread on the day that they tried to bring the property in."

Arthur Hearing Transcript (Ex. N. at 13).

Detective Lopez then created a six-picture, color photo lineup and showed it to the robbery victims. See Arthur Hearing Transcript (Ex. N at 14-15). Mr. Marin identified the petitioner as one of the robbers. Id. at 15. Mrs. Marin also identified the petitioner "as the individual who had the gun on the night of the incident and demanded the property." Id. at 16.

The petitioner's counsel cross-examined Detective Lopez at the Arthur hearing. On cross-examination, Detective Lopez acknowledged that the responding officer prepared an offense incident report that included only a basic description of the robber that was later identified as the petitioner. The report reflected that the victims described the robber as being a black male with "short black hair, a fade . . . and he was of dark complexion." Arthur Hearing Transcript (Ex. N at 18). The description provided by the victims as summarized in the offense incident report did not include a reference to height or weight. Id.

Detective Lopez testified that when he spoke to the victims about the robber who

was holding the gun, they provided him with "a description of 5'6" or 5'8", medium to dark complexion, short hair with a fade and everything else that was on [the offense incident] report for the individual who would later become known to [Detective Lopez] as Mr. Broughton and they gave [Detective Lopez] a description for the other individual." Ex. N at 19.

Detective Lopez testified that after the petitioner was identified as a suspect in the robbery, he was interviewed by an officer. See Arthur Hearing Transcript (Ex. N at 19). Detective Lopez further testified that although the petitioner was cooperative, he denied having anything to do with the robbery. Id. at 20. Specifically, the petitioner stated in his interview that:

> he had knowledge of the crime based on the fact that he met with Mr. Sanders at a gas station later on the evening of the incident after the incident had occurred, that Mr. Sanders had told him that he had been involved in a robbery and Mr. Sanders had let him in on some of the things he was able to take from that robbery and one of those items was a wedding band and Mr. Broughton's father was interested in a wedding band and was able to purchase that wedding band from Mr. Sanders, [Detective Lopez] believe[d the wedding band] was [purchased] for approximately $40 and [Mr. Broughton] was cooperative in so far as to having nothing to do with the incident.

Id.

The petitioner took Detective Lopez and another officer to the petitioner's father's house. See Arthur Hearing Transcript (Ex. N at 20). The petitioner's father was cooperative and returned the wedding ring. Id.

Based on the evidence presented by the State, the trial court determined that the State had met its burden under Arthur and denied the petitioner a bond. See Ex. N at 29-30.

### iii.    The Evidentiary Hearing on the Motions to Suppress

On March 9, 2009, the trial court held an evidentiary hearing on the petitioner's and the co-defendant's motions to suppress the identifications by the witnesses and the defendants' statements to law enforcement. See Suppression Hearing Transcript (Ex. QQ).[4] The State presented the testimony of Steven Marin and Detective Orlando Lopez. Id. Mr. Marin testified about the robbery and his subsequent identification of both robbery suspects. Detective Lopez testified about his investigation including his interviews of Mr. and Mrs. Marin (the robbery victims), Katalina Cruz (a witness who observed co-defendant Sanders standing by the roadside on the night of the robbery), George Garcia (the pawnshop employee), Sammy Lamy (the person who purchased Mr. Marin's stolen cell phone inside the pawnshop) and the petitioner. Id. at 49-68, 94-96.

Detective Lopez testified that within an hour after the robbery he interviewed Mr. Marin and that Mr. Marin provided a description of the robbery suspect that was later identified as the petitioner as being a black male with medium to dark complexion, between 20 to 30 years old, approximately 5'9, approximately 165 pounds with short black hair, unshaven facial hair and wearing a shirt with blue and white horizontal stripes. See Suppression Hearing Transcript (Ex. QQ at 100-101).

Detective Lopez interviewed the petitioner on December 18, 2007. See Suppression Hearing Transcript (Ex. QQ at 106). The interview of the petitioner took place at the police station, but was not videotaped. Id. at 107. With respect to his

---

[4] The hearing also concerned the co-defendant's probation violation. See Suppression Hearing Transcript (Ex. QQ).

interview of the petitioner, Detective Lopez testified as follows:

A. . . . He explained to me that he didn't do it. He explained to me he did have information about the case but he said he didn't do it, he didn't participate in the robbery.

Q. What information did he provide to you?

A. He recalled the night of the incident, on December 14, 2007. He said that during the evening time hours, perhaps maybe close to midnight, he did [sic] exactly remember the time he ran into Sanders and Sanders –

Q. Where at?

A. At a gas station.

\*\*\*

Q. What did he do at the gas station?

A. He said he ran into Mr. Sanders. Mr. Sanders was trying to [s]ell him a . . . wrist watch and ring.

**Q. Did he purchase either one?**

**A. He did. He stated he purchased the silver ring.**

Q. How much money?

**A. He didn't tell me how much he paid Mr. Sanders for the ring. He did tell me he later took . . . the watch and sold it to his father for $40**.

\*\*\*

Q. Did anything else happen at the gas station?

A. He had the watch, he noticed Mr. Sanders had a watch. He did say he wasn't interested in buying it. He notice[d] Mr. Sanders had other pieces of jewelry.

The only thing Mr. Broughton engaged in purchas[ing], according to his statement, was the ring.

I asked him when did you see the ring next? Mr. Brought[on] said he could

take me to the ring. He went so far as to tell me he thought it was a
pos[s]ibility that his brother, Jamal Broughton's name came up earlier in
the investigation, may have possession of some of . . . the other stuff that
he saw Mr. Sanders with.

Suppression Hearing Transcript (Ex. QQ at 74-75) (emphasis added). Detective Lopez

further testified that the petitioner took him to the petitioner's father's house and that the

petitioner's father returned Mr. Marin's wedding ring to Detective Lopez. Id. at 76.

Detective Lopez testified that he recovered the hair clippers and the watch from

co-defendant Anthony Sanders' house. See Suppression Hearing Transcript (Ex. QQ at

79-80). Mr. Sanders was taken into custody. Id. at 81. Mr. Sanders signed a Miranda

waiver form and was interviewed by Detective Lopez. Id. at 81. With respect to Mr.

Sanders' interview, Detective Lopez testified as follows:

Q. What did he tell you?

A. He stated on the night of the incident he was with another individual.

**Q. Did he tell you who it was?**

**A. No.**

Q.[5] He said that the idea of them being in the area of the incident was to
break into cars. He said that he had been looking in and out of cars along
with the other individual when suddenly he heard something occurring on
the roadway. When he looked, the individual had two Hispanics stopped
at gun point. He came out, said he emerged a couple of seconds more
closer to the street to where this was happening. The individual had the
gun making demands for property. That individual told him to take the
property from the people.

He said that he took a wallet and cell phone, I believe a couple of rings
from the female victim in the case. He stated that when they finish doing

---

[5] Although the transcript denotes the letter "Q," signifying a question, it is clear
from the context that this is Detective Lopez' testimony and not a question by the
prosecutor.

that the person with the gun made instructions to the two victims directing them over to the vehicle and searching the female's purse. When they got to that car, the trunk was opened. He looked inside and what he found was a set of hair clippers that he wanted for himself. So he took that and after taking that he said that they fled the scene. He said they arrived at the scene -- left from the scene in his car which is a gold Nissan Maxima with clear windows, no tints.

***

A. . . . **He wouldn't give me the name of the person he was with.** I did ask him, if, in fact he got the hair clippers and the phone, and the wallet, I did ask him about it and I told him we had already recovered the wedding ring, wedding band at that point he didn't offer an explanation of how the wedding band could have gotten into somebody else's hand, that was it.

Id. at 84-86 (emphasis and footnote added).

Detective Lopez then identified the petitioner and the co-defendant, who were in the courtroom, as the individuals identified by Mr. Marin in the photo lineups as the robbery suspects. See Suppression Hearing Transcript (Ex. QQ at  86-87). On cross-examination, Detective Lopez acknowledged that Mr. Lamy had told him he had purchased the phone directly from Mr. Garcia and that there was no one else in the pawnshop and that Mr. Lamy and Mr. Garcia's stories conflicted:

Q. [Mr. Lamy's] story was, he walked into this pawn shop and dealt directly with [Mr.] Garcia and no one else was there?

A. That['s] correct.

Q. That is completely different from what Mr. Garcia is saying?

A. That's correct.

Id. at 89.[6]

_____

[6] At the Arthur hearing, Detective Lopez had provided an explanation for why Mr. Lamy did not report seeing the individuals nicknamed "Dread" and "Twin" in the

12

Detective Lopez testified that his interview with Mr. Sanders was not recorded.

<u>See</u> Suppression Hearing Transcript (Ex. QQ at 97-98). The interview took place at police headquarters and although Detective Lopez had the capacity and ability to record the conversation, he did not do so because Mr. Sanders declined:

> Q. At what point do you get into a discussion about whether to record the conversation?
>
> A. After he provided a statement to me, I asked him, well, you have spoken to me. **I'd like to know whether or not you'd like to memorialize your statement on tape.**
>
> **At that point, he said he didn't want to.**
>
> Q. Did anybody witness that?
>
> A. Sergeant Rodriguez.

---

pawnshop when he purchased the cell phone:

> Q. Did either Mr. Lam[y] or Mr. Garcia actually ever actually [sic] allege that it was Mr. Broughton who had the phone in his own possession, in their own possession?
>
> A. No, no. Can I -- I just want to make sure, **I just want to make clear that Mr. Garcia stated that there are two ways to come into that pawnshop. There was a way that you could drive up to it, there is also a rear entrance and there is also the front lobby and he said that [sic] we wanted to know what Mr. Lam[y] had seen as well in order to rule in or out any foul play on Mr. Lam[y]'s end. So he explained to us about the store that where Dread was and where Mr. Broughton were inside of the store would not be visible to Mr. Lam[y] if he was standing in the store.** And this is Mr. Garcia's account and it is important to know he didn't write this on his written statement, but this was something that was shared with me in an interview.
>
> Just wanted to share that. There would be a reason why Mr. Lam[y] would not see Mr. Broughton and Mr. Sanders inside of the pawnshop.

<u>Arthur</u> Hearing Transcript (Ex. N at 24-25) (emphasis added).

Q. Is he available?

A. No, he is not here.

Q. Sergeant Rodriguez witnessed the interview?

A. Yes.

Id. at 99 (emphasis added). Detective Lopez testified that he did not have the ability to record the conversation without the suspect knowing. Id. at 98.

The petitioner testified on his own behalf at the suppression hearing. See Suppression Hearing Transcript (Ex. QQ at 121-130). He testified that he was not read his Miranda rights and that he did not want to be taken out of jail or be interrogated by Detective Lopez. Id. at 122-123. The petitioner testified that he noticed a camera in the interrogation room and that he told Detective Lopez he did not want to be interrogated. Id. at 124. The petitioner's counsel made a request for Brady[7] material and the following exchange took place:

Q. There was a camera in that - -

A. I [sic] seen it when another dude was in there. I was [sic] watch him. They got her to put me in the same room. I know it was a camera in that room and I immediately said I don't want to be interrogated. If you go get the camera you will see.

[PETITIONER'S COUNSEL]: Your Honor, I want to make a Brady motion to the State to find out whether or not there is a recording to that.

**[PROSECUTOR]: I believe the witness answered that there was a video**.[8]

---

[7] See Brady v. Maryland, 373 U.S. 83 (1963).

[8] The respondent states that there must be a typographical error in the hearing transcript:

**THE COURT: That is what he said.**

THE WITNESS: I know it was a camera in there.

Id. at 124 (footnote and emphasis added). The petitioner's counsel then proceeded to question the petitioner about the petitioner's refusal to give a statement to Detective Lopez. Id. at 124-125. On cross-examination, the petitioner testified that he never gave Detective Lopez a statement. Id.

Co-defendant Anthony Sanders also testified on his own behalf at the suppression hearing. See Suppression Hearing Transcript (Ex. QQ at 132-39). He testified that he was not involved in the robbery, that he did not want to give a taped confession and that he purchased the items found at his house from a friend "off the street." Id. at 132-35. Mr. Sanders did not want to identify who that friend was:

Q. You don't want to say who that is?

A. During the trial if I have to I will.

Q. Now is the time to, this is the probation violation hearing. Now is the time to tell your side of the story, if you want to.

A. I purchased them from a friend. I am going to leave it at that.

Id. at 135-36. Mr. Sanders further testified that the purchase of these items took place

---

as the detective never said there was a recording, and the judge followed up by also stating, "That is what he said." Id. Moreover, had this actually been what the State had said, presumably defense counsel would have inquired much further into the issue at that point, especially since he had just made a Brady motion about it.

Response to Order to Show Cause (DE# 14 at 68, 9/18/15). Having reviewed the testimony, the undersigned agrees with the respondent that this appears to be an error in the transcript given that Detective Lopez testified in this same hearing that the petitioner's interview was not videotaped. See Suppression Hearing Transcript (Ex. QQ at 107).

inside the pawnshop where George Garcia worked:

Q. How did that come about?

Let's talk about that.

A. I have a bracelet, it's in the computer. I have a sub link bracelet and sub link chain which I have plenty of pictures with my girlfriend [sic] wanted to do, she wanted to pawn my bracelet for $300. It's in the computer.

Q. You have done business with Mr. Garcia, he knows you, you know him?

A. I was really introduced to him by him.

Q. By whom?

A[.] Joshua. That's how [I] met Jorge and I pawned my bracelet there, okay. When I went there to pick up my bracelet, it was a guy, they were there. He was selling the clippers, a ring, two rings and a watch. So Jorge told the guy, I will give you $50 for all that.

Q. Okay.

A. I told him the dude was there like in all, I said man, I will give you $50 for the hair clippers and the watch. Jorge looked at me upset like you can't do that.

You ain't want to buy it. I wanted to buy it, and that's how I bought it.

**Q. You bought it inside the pawn shop?**

**That is how you took possession of the clippers and the watch?**

**A. That is how I took possession of the clippers and the watch.**

Q. You brought in [sic] inside the pawn shop?

**A. Inside the pawn shop [f]rom Jorge's client.**

Q. You basically stole the sale and pissed him off?

A. He was pissed off, he told me I can't do that.

16

<u>Id.</u> at 136-37 (emphasis added).

On cross-examination by the petitioner's counsel, Mr. Sanders testified that he

bought the items from the petitioner:

> Q. I know you do not want to divulge the name of the person that you brought [sic] the items for, but it was not Joshua Broughton that you brought [sic] those items from?
>
> **A. Yes, it was Joshua.**
>
>> MR. BROUGHT[ON]: What? What you bought from me? What you bought?
>
> [Counsel for the Petitioner]: Nothing further.

<u>Id.</u> at 138-39 (emphasis added).

At the conclusion of the hearing, the trial court denied the motions in their

entirety finding that the photo lineups presented to the witnesses who identified the

petitioner and the co-defendant were not suggestive and "did not lead to irreparable

identification." Suppression Hearing Transcript (Ex. QQ at 151-53). The Court also

credited Detective Lopez over the testimony of the petitioner and the co-defendant in

finding that the statements they provided to law enforcement were voluntary. <u>Id.</u> at 153.

### iv.  The Amended Information

The day after the hearing on the motion to suppress, on or about March 10,

2009, the State filed an Amended Information. <u>See</u> Amended Information (Ex. M).[9] The

Amended Information contained all of the charges in the original information, plus an

additional count of dealing in stolen property in violation of Florida Statute § 812.019(1)

---

[9] The undersigned will use the term "Amended Information" to distinguish the second information from the first information. However the title of the "amended information" is "information."

(Count 8) against the co-defendant only. Id.

**v.     The Deposition of Co-Defendant Anthony Sanders**

On May 7, 2009, Mr. Sanders was deposed by the petitioner's counsel. See

Deposition of Anthony T. Sanders (Ex. XX).[10] During his deposition, Mr. Sanders

provided unfavorable testimony concerning Mr. Broughton's participation in the

December 14, 2007 robbery and sale of items taken from the robbery victims. Mr.

Sanders testified that on the night of the robbery, he and the petitioner were canvassing

parked cars in the neighborhood where the robbery took place in search of valuables to

steal. Id. at 11. Mr. Sanders testified that when he reunited with the petitioner, the

petitioner was holding a man and a woman at gunpoint. Id. at 11, 27-28. The petitioner

then ordered Mr. Sanders to "get the stuff" from the couple. Id. at 11. The "stuff"

comprised of the man's cell phone, his ring and the woman's jewelry. Id. at 27-28. The

petitioner then forced the man to open the trunk of his vehicle so that the petitioner

could search the car for the woman's purse. Id. at 28. The petitioner took the hair

clippers from inside the trunk. Id. He then motioned with his gun for the couple to walk

away. Id. at 11-12. Mr. Sanders and the petitioner then fled the scene. Id. at 28.

Mr. Sanders testified that he kept the hair clippers. See Deposition of Anthony T.

Sanders (Ex. XX at 28). According to Mr. Sanders, the petitioner attempted to sell the

---

[10] At the time of his deposition, Mr. Sanders had pled guilty to the Amended
Information (Ex. M) and had been sentenced to a fifteen-year term of imprisonment with
five years probation. See Deposition of Anthony T. Sanders (Ex. XX at 6). As part of his
plea agreement, Mr. Sanders agreed to testify as a state witness against the petitioner.
Id. at 6-7. The State did not call Mr. Sanders at the petitioner's trial.

wristwatch from the robbery to "George," a pawnshop employee.[11] Id. at 29. George did

not want to purchase the wristwatch. Id. The petitioner then sold the wristwatch to Mr.

Sanders for $50 and sold the cell phone from the robbery to George. Id.

When questioned in regards to his involvement in the sale inside of the

pawnshop, Mr. Sanders testified as follows:

> Q.      But on the day George claims that you went there, you weren't inside?
>
> A.      No, I didn't go inside that pawn shop. No, I did not.
>
> Q.      So you are saying the only one that went inside the pawn shop was [the petitioner]?
>
> A.      Actually, no, it was [the petitioner] and his brother.

Id. at 30. Mr. Sanders testified that the petitioner's brother accompanied the petitioner

to the pawnshop. Id. at 30-31. According to Mr. Sanders, the petitioner and the

petitioner's brother refer to themselves as "twins." Id. at 30.

**B.      The Petitioner's Trial**

The trial in this matter took place from May 11 through May 13, 2009. See Trial

Transcripts (Ex. AAA - CCC). On the first day of trial, the prosecutor announced that the

State would enter a nolle prosequi as to the charge of unauthorized use of a credit card

(Count 6). See Trial Transcript (Ex. AAA at 3). The State proceeded to trial on two

counts of robbery with a firearm (Counts 1 and 2); two counts of kidnapping with a

firearm (Counts 3 and 4) and dealing in stolen property (Count 7).

---

[11] It appears that Mr. Sanders is referring to George Garcia.

The trial court addressed the State's motion in limine:

THE COURT: Any co[-]defendant statements?

[PROSECUTOR]: Anthony Sanders gave a statement regarding the robbery. I **did not intend to call him as a witness here today, so I believe that his statement that was given to Detective Lopez should not be admitted into evidence.**

THE COURT: Okay. Yes, sir.

[COUNSEL FOR THE PETITIONER]: No, no. **I agree with you, it should not be admitted into evidence**, but –

THE COURT: Okay. Okay.

Trial Transcript (Ex. BBB at 182) (emphasis added).

Following jury selection and opening arguments, the State called its first witness, Steven Marin, on May 12, 2009. Mr. Marin testified that on the night of December 14, 2007, he and his wife were "held up" on their way to a Christmas party. See Trial Transcript (Ex. BBB at 200-01). Mr. Marin stated that he parked his car on a side street. He and his wife walked approximately 30 to 40 yards before hearing a voice saying, "'don't be stupid' or 'don't act stupid' or something in that regard." Id. at 201. Mr. Marin attested that a man with a gun approached him and his wife. Id. at 203. The man put the gun to the side of Mr. Marin's head and instructed him to give him his wallet, his wristwatch, his ring and his car keys. Id. Mr. Marin relayed that a second man came out of the bushes. Id. at 206.

During the robbery, Mr. Marin had an opportunity to look at the gunman's face. See Trial Transcript (Ex. BBB at 207). He indicated that although it was nighttime, there was "a spotlight pointing towards [them]" from a single family home. Id. at 203. Mr.

Marin described the man with the gun as "an African American young man" and the second man as an African American with dreadlocks. Id. at 206-07.

Mr. Marin handed over his property – his wallet, his wristwatch, his wedding band and his car keys – because he had a gun pointed at him. See Trial Transcript (Ex. BBB at 207-08). He believed he handed over his wallet, his keys and either the ring or the watch to the second man. Id. at 208. He also testified that his cell phone was taken. Id. at 212. Mr. Marin's wife "relinquish[ed] her jewelry, her watch, all the stuff [the second man] was asking her for." Id. at 209.

The robbers then pressed Mr. Marin and his wife for a purse or anything of value in Mr. Marin's car. See Trial Transcript (Ex. BBB at 209). The second robber tried to open the trunk of Mr. Marin's car by pressing a button on the key. Id. Mr. Marin then warned the gunman that the second man might accidentally set off the "panic" button on the key. Id. at 209-10. The gunman instructed the second man to give Mr. Marin the key and Mr. Marin opened the trunk. Id. at 210-11. The two men took a case containing hair clippers from inside the trunk. Id. at 211-12.

The robbers let Mr. and Mrs. Marin go. See Trial Transcript (Ex. BBB at 212). Mr. Marin and his wife then walked to a house and knocked on the door. Id. Once inside, they called the police. Id. When the police arrived, Mr. Marin spoke to them. Id. Mr. Marin could not remember whether he provided a description of the gunman to police on the night of the robbery. Id. at 227-29. On cross-examination, Mr. Marin admitted that he could not recall whether the gunman had gold teeth or not. Id. at 230.

A few days after the robbery, Detective Lopez showed Mr. Marin two photo lineups. See Trial Transcript (Ex. BBB at 215-16, 219-20, 222). Mr. Marin was able to

identify the gunman and the second man from the photo lineups. Mr. Marin testified that he was "certain" of his identification of the robbers. Id. at 219-20.

Sometime after the robbery, Mr. Marin's wristwatch, his wedding ring and a set of hair clippers like the one that were taken from him during the robbery were returned to him by a police officer. See Trial Transcript (Ex. BBB at 213-215). The ring had been polished. Id. at 235. Mr. Marin also recovered his cell phone. Id. at 232. Mr. Marin could not provide a replacement value for his wedding ring, but testified that it was not over $1,000. Id. at 235. He estimated that the value of his wristwatch was between $5,500 and $5,800. Id. at 236.

The State also called Katalina Cruz who testified that she observed a man with dreadlocks (later identified as Mr. Sanders) standing on the sidewalk on the night of the Christmas party. See Trial Transcript (Ex. BBB at 239-40). Ms. Cruz was trying to find parking and when she drove past Mr. Sanders again he was inside of a car. Id. at 241. Ms. Cruz testified that she provided law enforcement officers with a description of Mr. Sanders on the night of the party. Id. A few days later, law enforcement officers presented Ms. Cruz with a photo lineup and she identified Mr. Sanders as the individual she saw on the night of the party. Id. at 242-43. On cross-examination, Ms. Cruz testified that she did not see anyone else with Mr. Sanders inside the car. Id. at 244.

Next, the State called Officer Kenyan Lee Watkins, a crime scene investigator. See Trial Transcript (Ex. BBB at 252). Officer Watkins testified that he arrived at the scene of the robbery at approximately 1:20 a.m. Id. at 252-53. He photographed the area and attempted to "lift" latent prints from two vehicles. Id. at 253. Officer Watkins was unable to find any prints on either vehicle. Id. at 254.

Finally, the State called Detective Lopez as a witness. Detective Lopez testified

as follows:

> Q. Okay. After speaking with Mr. Lam[y] and recovering the cell phone
> from Mr. Lam[y] where did your investigation lead you next?
>
> A . That led me to a pawnshop on 27th Avenue and approximately
> Northwest 84th Street.
>
> **Q. And based upon your investigation at the pawnshop what did you
> do?**
>
> **A. The investigation at the pawnshop led to two individuals that
> became suspects in the case**.
>
> [Counsel for the Petitioner]: Your Honor, I am going to object. Hearsay
> and <u>Crawford</u>.
>
> THE COURT: Sustained. Let me see you side bar real quick, please.

<u>See</u> Trial Transcript (Ex. BBB at 263) (emphasis added).

At sidebar, the petitioner's counsel moved for a mistrial and the following

discussion took place:

> THE COURT: Yes, sir, counselor.
>
> [COUNSEL FOR THE PETITIONER]: Yes, Your Honor. **I move for a
> mistrial at this time. This is in violation of the Court's ruling.** This
> individual talked about the compensation [sic] that he was given. The
> inference now is that he got information from people at the pawnshop.
> This is the proffer, this is the Crawford issue that I brought to the Court's
> attention.
>
> THE COURT: It wasn't <u>Crawford</u> when he gave him the cell phone.
>
> [COUNSEL FOR THE PETITIONER]: Not now.
>
> THE COURT: We will deal with the allegations at this point that you are
> raising, but the previous one I think that the testimony was I met with
> Sammy [Lamy] and I got a cell phone.

[COUNSEL FOR THE PETITIONER]: Right. But this is not the detective. The detective said that that led him to individuals and that he went over there. George Garcia has not testified. And Sammy Lam[y] has not identified Joshua Broughton, okay. And that was the ruling that he was not to get anywhere near that and they have crossed the line at this point.

THE COURT: State.

[PROSECUTOR]: Judge, it's the [S]tate's position that he has not crossed the line, what he said is that he was linked to two individuals and that he put those individuals into a lineup which is exactly what I proffered to the Court that I was going to do in regard to getting over that issue of no identification with Sammy Lam[y] and the ID.

THE COURT: I thought the issue was based on your investigation procedures what did you do, okay, and I put together a six pack.

[PROSECUTOR]: That is what I asked.

[COUNSEL FOR THE PETITIONER]: No, that is not what she asked.

THE COURT: I think that his response was based on -- what did he say? Based on the investigation. Read it back.

(Thereupon, the previous question and answer was read back.)

[COUNSEL FOR THE PETITIONER]: Judge, the investigation at the pawnshop is irrelevant and he knew Sammy Lam[y] because Mr. Lam[y] never talked to my client.

THE COURT: Now, help me out. Where does he get the pictures from?

[PROSECUTOR]: Judge, Mr. Broughton (sic) in his deposition he took back his identification.

THE COURT: I remember this issue in the <u>Arthur</u> Hearing.

[Prosecutor]: So based upon the investigation he put them into a lineup.

THE COURT: I understand that.

[COUNSEL FOR THE PETITIONER]: George Garcia has never identified Joshua Broughton. That is with regard to the pawnshop items.

THE COURT: So it was [co-defendant] Sanders by himself.

24

[COUNSEL FOR THE PETITIONER]: Yes, sir.

THE COURT: But the point is --

[PROSECUTOR]: During the Arthur Hearing they had a motion to suppress, there was the issue discussed about Twin, about how he knew that it was --

THE COURT: They were twins and brothers.

[Prosecutor]: That they were not really twins and they were brothers and that he was putting him in the lineup, but I am not going to go into those details, I am going to go straight to the lineup.

THE COURT: Right.

[COUNSEL FOR THE PETITIONER]: **Judge, I move for a mistrial. I think that this is very prejudicial to my client. It is certainly in violation of the previous Court's ruling. It is a violation of the Crawford case. I cannot cross examine any witness as to the issue. Not only that I think that it borders on misconduct, but there is no evidence, I mean that Joshua Broughton was identified by anybody at the pawnshop**.

THE COURT: **There is nothing because we are not going to get into the issues themselves. We are talking about stuff that is history as to where they are at. But he went and got some information and he put together a six pack, which is what we talked about earlier. And as far as I can see that is where we left it.** She hadn't gone into anything else.

[COUNSEL FOR THE PETITIONER]: Well, Judge, **the inference is that he went there and he put together a six pack. That is the information that came from the apartment and that information is false**.

THE COURT: I don't know if it is false or true.

[COUNSEL FOR THE PETITIONER]: Well, it is false. Nobody ever gets into that.

THE COURT: It led him to these two pictures is the bottom line.

[COUNSEL FOR THE PETITIONER]: Well, the question for the jury, maybe, you know, this guy is a psychic.

THE COURT: Don't talk about that. You don't know how close to home that is. We had a psychic in our last trial. Please, leave that alone. In any event, given the thrust of the conversation, while it may border on the [P]ostel[l] issue[12] that you are trying to raise, **I think that the substance of it was that he went and put together a six pack and showed it to the witnesses. Therefore, I will deny your motion for mistrial at this point, okay.** Move on, [S]tate.

Id. at 263-267 (emphasis and footnote added). After the trial court denied the ore tenus

motion for a mistrial, the State asked Detective Lopez the following:

BY [PROSECUTOR]:

Q. Okay. What was the next step in your investigation after the pawnshop?

A. Um, **to create some lineups with information that I obtained**.

Id. at 267 (emphasis added).

Detective Lopez also testified that he interviewed the petitioner and the petitioner

told him that he had met with Mr. Sanders at a gas station "on the evening of the

incident." See Trial Transcript (Ex. BBB at 284).[13] "[The petitioner] stated that he

purchased a silver colored wedding band for his father and he noticed that Mr. Sanders

had a watch that he was not used to seeing him wear along with a couple of other rings

that he was trying to sell . . . ." Id. Detective Lopez further asserted that "[the petitioner]

stated that he had given [the wedding band] to his father and sold it for approximately

$40 to him and he was able to take [police] to his father in order to recover that ring." Id.

_____

[12] The trial court appears to be referring to Postell v. State, 398 So.2d 851 (Fla. 3d DCA 1981).

[13] Detective Lopez later clarified that this meeting took place around midnight. See Trial Transcript (Ex. BBB at 285).

at 285.

After the State rested its case, the petitioner's counsel presented the testimony of the petitioner's girlfriend, Tommeisha Irby. See Trial Transcript (Ex. BBB). Ms. Irby testified that the petitioner was with her on the day of the robbery from approximately noon until approximately 10:42 p.m. that night. Id. at 321. Ms. Irby stated that she had sex with the petitioner that night and that approximately a month or two later she learned she was pregnant. Id. at 322. Ms. Irby asserted that the petitioner was 5 feet and three inches tall, weighed 130 pounds and had gold teeth. Id. at 323, 325.

On cross-examination, Ms. Irby testified that she was living at her uncle's house and that she could not remember the address. See Trial Transcript (Ex. BBB at 326-27). She also admitted that she had sex with the petitioner on prior occasions. Id. at 329. The prosecutor was able to impeach Ms. Irby with her deposition testimony wherein she testified that she believed she was already pregnant on the date of the robbery. Id. at 330. Ms. Irby also acknowledged that she did not recall the time when she did several things that day including waking up, going to her job to pick up a paycheck, going to a check cashing store, picking up food and returning to her uncle's house. Id. at 331. On redirect, Ms. Irby testified that had she conceived on December 14, 2007, she would have been pregnant that day. Id. at 332. The petitioner did not present any other witnesses.

The jury returned a verdict on May 13, 2009. See Jury Verdict (Ex. HHH).  The jury found the petitioner guilty of robbery with a firearm as to victim Steve Marin (Count

1) and dealing in stolen property (Count 5).[14] Id. The jury acquitted the petitioner of robbery with a firearm as to victim Maria Marin (Count 2) and kidnapping with a firearm (Counts 3 and 4). Id.

## C.    Post-Trial Motion to Dismiss and Sentencing Hearing

On May 20, 2009, the petitioner filed a motion to dismiss. See Motion to Dismiss Judgment and Conviction as to Count 1 of the Information or Other Relief (Ex. III). The motion was based on an allegedly inconsistent jury verdict because the jury had convicted the petitioner of robbery with a firearm as to Mr. Marin, but had acquitted him of the same offense with respect to Mrs. Marin. Additionally, the petitioner renewed his motion for a mistrial or a new trial based on certain comments made by the prosecutor during the trial. Id. at ¶5.

The sentencing hearing took place on July 31, 2009. See Sentencing Hearing Transcript (Ex. KKK). At the outset, the Court addressed the motion to dismiss and denied that motion. Id. at 9-10. The petitioner also addressed the Court and raised the issue of the 911 call following the robbery:

> THE DEFENDANT: That's hearsay, you know? Matter of fact, one last thing, I didn't testify which I wish to God that I would have. 'Cause when I was in the interview room Detective Lopez told me he just [sic] trying to put this case on anybody. **And he told me out [sic] his mouth, he said, "Man, I know you ain't rob them people because on the 911 call they indicate that the people had on masks and they didn't know how they looked." If you check back to the 911 call you will see I'm not lying**. And I am quite sure the State attorney already know [sic] that if they did a thorough investigation obviously that the case that the people had masks but they withheld information within the trial case. **That was done to the 911 call, but they didn't want to know that. The 911 call indicated they had masks 'cause the detective told me, Detective Lopez told**

---

[14] This was originally Count 7 of the Amended Information.

**me all this evidence that could have exonerated me was held back from trial. And I feel like the State held back this evidence.** I feel like they held back. They could look into this evidence and see that I am innocent.

***

[COUNSEL FOR THE PETITIONER]: Your Honor, with regards to any evidence that there could be regarding a 911 tape obviously, that would have been <u>Brady</u>. I am not aware of any, but if there is no evidence that indicates that I might need to file a motion for a new trial based on newly found evidence.

THE COURT: If there is such evidence look further.

[PROSECUTOR]: **I reviewed the discovery in this case**[ ]. I was not the initial attorney filing this case. I got it significantly after, and certainly after any 911 tapes would have been destroyed that hadn't previously been ordered. **And I don't recall having a 911 tape in this case.** It would have been reviewed in discovery.

[COUNSEL FOR THE PETITIONER]: I don't recall a 911, but I recall that the P.D. Office always states 911 tapes be saved. I can look into it if there was some grounds for a new trial, then I will file. Discovery evidence is always available within that. If there is such, then we will look at the appropriate time.

THE COURT: I can't just take his word. We need to move forward.

[COUNSEL FOR THE PETITIONER]: I understand, Judge.

THE COURT: If I am not mistaken, he was identified in a six pack by one of the victims. Mr. Marin[ ] testified, he said there is no mask. So if on the 911 tape is different than that, we will talk about it at that moment. Anything else, Mr. Broughton? He will look into that issue for you. **The first all of us are hearing about a 911 tape identifying a mask**. So he will look into it and see if there is anything forward to do. But we need to move. We will finish up today. If there is any evidence, we will address it at the appropriate time.

***

THE DEFENDANT: I feel like this, a thorough investigation should have

29

been [sic] before they even much took me to trial. **He should have done a thorough investigation and looked into the 911 tape and look into evidence that could exonerate [sic] before he just took the case**.

THE COURT: Identification sometimes is enough. **Unfortunately, the 911 tape is something that I am sure both parties will be looking into.**

[COUNSEL FOR THE PETITIONER]: Yes, definitely.

THE COURT: Both will be looking at the issue. Is there anything further you wish to say, sir?

THE DEFENDANT: That's it.

Sentencing Hearing Transcript (Ex. KKK at 15-18) (emphasis added).

The State argued that the petitioner qualified as a habitual violent felony offender based on his prior criminal record. See Sentencing Hearing Transcript (Ex. KKK at 19). The Court sentenced the petitioner as a habitual violent felony offender to a term of 30 years imprisonment as to Count 1 and a term of 30 years imprisonment as to Count 5 of the Amended Information, to run concurrently with each other. Id. at 24.

**D.    Direct Appeal**

The petitioner filed a notice of appeal on August 19, 2009. Ex. NNN. At the time the petitioner was represented by the Public Defenders Office. The petitioner raised one issue on appeal: whether the trial court erred in denying the defense's ore tenus motion for a mistrial following this question by the prosecutor:

Q. Now, let's go back to Mr. Broughton's statement and **we are speaking only about the robbery that occurred on December 14th of 2007?**

A. Okay.

Q. What did he tell you about that?

[COUNSEL FOR THE PETITIONER]: Your Honor, I am going to object

and reserve the right to make a motion at this time.

THE COURT: Let me see you side bar.

See Initial Brief of Appellant (Ex. PPP at 7); Trial Transcript (Ex. BBB at 277) (emphasis

added). The petitioner argued that the prosecutor's question could have easily been

construed by the jury as a reference to uncharged crimes. Id.

The Third District Court of Appeal held oral argument on June 29, 2011 and on

July 13, 2011 issued a per curiam affirmed decision without a written opinion. See Ex.

SSS; see also Broughton v. State, 64 So.3d 1275 (Fla. 3d DCA 2011) (Table).

**E.    The Petitioner's Attempts to Obtain the 911 Call and a Copy of Mr. Sanders'
        Recorded Statement**

Shortly after the petitioner's arrest, on December 20, 2007, the petitioner's

counsel filed a Motion to Preserve Electronic Recordings stating that the petitioner

believed "[t]hat telephone calls were made to '911' and said conversations were

electronically recorded." (Petitioner's Ex. M at 3). The motion was accompanied by a

Notice of Hearing setting the matter before the trial court for January 9, 2008. Id. at 2.

Neither party has filed any documents concerning the disposition of this motion by the

state trial court.

The petitioner sent an undated letter to his counsel indicating that between

December 19-21, 2007, the petitioner called his counsel and the following conversation

took place:

> When you picked up the phone I was very hysterical and I told you over
> the phone that I am being framed by a Detective. Also, **I told you that he
> told me that the victim got robbed by two strangers wearing a mask
> and that they cannot identify the people who robbed them. The
> Detective then told me that he is going to put this case on me**. . . .

31

> [Y]ou told me to calm down, that he cannot do that and you immediately put in a motion to preserve the electronic recordings in my case. I may need you to testify on my behalf to help me prove my innocence. Please listen to the call I made to refresh your mind.

(Petitioner's Ex. J) (emphasis added). The letter is undated and the record does not otherwise disclose when this letter was sent.

On December 26, 2007, the petitioner's counsel sent a memorandum to the Miami-Dade Police Department Communications Section ("MDPDCS") requesting copies of the BOLO and 911 calls for December 14, 2007. (Petitioner's Ex. L). Neither party has filed any documents concerning MDPDCS' response to this letter.

On January 13, 2012, approximately four years and one month after the December 14, 2007 robbery and approximately two years and eight months after the petitioner had been convicted of that robbery, the petitioner sent a letter to the State Attorney requesting "[a]ll 911 tapes that were made December 14, 2007" in the petitioner's case, any "record of Joshua Broughton in the interrogation room on December 17, 2007 or December 18 and December 19, 2007 and including phone calls" and "[t]he recording of co-defendant Anthony Sanders in the interrogation room on December 19, 2007."  (Petitioner's Ex. N).

On January 23, 2012, MDPDCS sent a letter to the petitioner indicating that it was "in receipt of [the petitioner's] public records request regarding 911 calls for December 7, 2007"[15] and that "[MDPDCS] retains audio recordings for a period of 60 days and computer printouts for a period of two years." (Petitioner's Ex. P). With respect to the petitioner's request for interrogation tapes, the letter advised that this

---

[15] The armed robbery took place on December 14, 2007.

request should be made "through the Police Legal Bureau" and that "[a] copy of [the petitioner's] request [would] be forwarded to the Bureau." Id.

On July 31, 2012, the petitioner received a letter from the Miami-Dade Police Department indicating that "a diligent search for all requested records held by the Miami-Dade Police Department, Robbery Bureau ha[d] been conducted." (Petitioner's Ex. O). The letter requested payment for one hour of research which yielded one photocopy. Id. There is no indication from the letter that either a 911 tape or an interrogation video was discovered during the search. Id.

The petitioner asserts that sometime after Mr. Sanders' March 10, 2009 guilty plea, the State produced photographs of Mr. Sanders in the interrogation room at police headquarters. (Petitioner's Ex. K). The State never produced a 911 call following the robbery or any recorded statements by Mr. Sanders during his interrogation.

**F.    State Post-Conviction Proceedings**[16]

**i.    First Motion for Post-Conviction Relief**

On March 29, 2012, the petitioner filed his first motion for post-conviction relief. See Motion for Post-Conviction Relief (Ex. ZZZ). The petitioner raised eight grounds in his motion:

1.    "Trial counsel rendered ineffective assistance for failure to move to exclude the defendant's alleged confession on grounds that the [S]tate failed to establish corpus delicti, in violation of the 6th and 14th amendment;"

2.    "Trial counsel rendered ineffective assistance for the failure to introduce portions of the alleged accomplice's interrogation, in violation of the 6th and 14th amendment;"

_____

[16] The petitioner was pro se in all state court post-conviction proceedings.

3.  "Trial counsel rendered ineffective assistance for failure to effectively cross-examine victim as to whether the assailants physically took the property, in violation of the 6th and 14th amendment;"

4.  "Trial counsel rendered ineffective assistance for failure to move for a judgement of acquittal on the ground that the [S]tate failed to submit evidence supporting the principal theory, in violation of the 6th and 14th amendment;"

5.  "Trial counsel rendered ineffective assistance for failure to object to the trial court giving instruction on principal, in violation of the 6th and 14th amendment;"

6.  "Trial counsel rendered ineffective assistance for failure to object to instruction on inference of knowledge, in violation of the 6th and 14th amendment;"

7.  "Trial counsel rendered ineffective assistance for failure to request a jury instruction on robbery by sudden snatching, in violation of the 6th and 14th amendment" and

8.  "Trial counsel rendered ineffective assistance for failure to object and move for a mistrial based on the prosecutorial misconduct on summation, in violation of the 6th and 14th amendment."

Id.

The state court denied the petitioner's motion on all grounds without an evidentiary hearing. See Order Denying Defendant's Pro Se Rule 3.850 Motion (Ex. CCCC). The undersigned will summarize the state post-conviction court's rulings only as to those grounds that are relevant to the instant federal habeas petition.

The state court denied ground 1 because the State had introduced through Mr. Marin's testimony "that a crime was committed and that the Defendant was identified as being the individual who committed it." Order Denying Motion for Post-Conviction Relief (Ex. CCCC at 1). The court noted that "[t]he Defendant's statement was only introduced after the State established that a crime had been committed" and that the petitioner's

34

counsel unsuccessfully moved to suppress that statement. For these reasons, the state

court determined that the petitioner had failed to establish ineffective assistance of

counsel as to the first ground in his motion.

The state court denied ground 2 as follows:

Defendant claims that his Motion for Post Conviction Relief should be granted as his counsel failed to introduce his co-defendant's statements at trial. The Defendant's claim is without merit. Co-defendants' post-Miranda statements to police implicating defendant were testimonial, and thus, inadmissible in violation of confrontation clause as statements were made in response to police interrogation, and they were not statements made in furtherance of conspiracy. Antunes-Salgado v. State, 987 So.2d 222, 226 (Fla. Dist. Ct. App. 2008). The co-defendants' statements were inadmissible under Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). Crawford prohibits the admission of "testimonial" hearsay because it violates the Confrontation Clause. Id. at 51[,] 124 S.Ct. 1354. Moreover, Crawford specifically holds that statements made during police interrogations are testimonial and therefore inadmissible. Id. at 53, 124 S.Ct. 1354. As such, the Defendant fails to show how his counsel was deficient in his performance for failing to introduce inadmissible hearsay. The Defendant's second claim in support of his motion is therefore denied.

Order Denying Motion for Post-Conviction Relief (Ex. CCCC at 1).

Ground 6 concerned a claim of ineffective assistance of counsel with respect to

the jury instruction on stolen property. The state court denied ground 6 for the following

reasons:

The Defendant in his sixth claim for Motion for Post Conviction [R]elief claims that his counsel was ineffective for failing to object to the jury instruction regarding inference of knowledge on the Dealing with Stolen Property count. The Defendant's claim is without merit. The theft instruction reads: "Proof of possession of recently stolen property, unless satisfactorily explained, gives rise to an inference that the person in possession of the property knew or should have known that the property had been stolen." Fla. Std. Jury Instr. (Crim.) 14.1 at 270. The theft instruction on **possession** of property recently stolen has been given in Florida since at least 1885. See Tilly v. State, 21 Fla. 242, 249 (1885)

(holding that the exclusive possession of the whole or some part of stolen property by the prisoner recently after the theft is sufficient, when standing alone, to cast upon him the burden of explaining how he came by it, or of giving some explanation, and if he fails to do so, to warrant the jury in convicting him of the larceny, burglary or robbery); accord Roberson v. State, 40 Fla. 509,24 So. 474, 479 (1898); Rimes v. State, 36 Fla. 90. 18 So. 114. 115 (1895); Leslie v. State, 35 Fla. 171, 17 So. 555, 557 (1895). As such, because the State made a prima facie case that the crime of dealing in stolen property was committed, the trial court was correct in giving the instruction and as such the Defendant fails to articulate how his counsel's performance was deficient. His sixth claim in support of his Motion for Post Conviction Relief is therefore denied.

Order Denying Motion for Post-Conviction Relief (Ex. CCCC at 2-3) (bold emphasis in original).

On January 17, 2013, the petitioner filed a notice of appeal from the state post-conviction court's denial of his Motion for Post-Conviction Relief. See Notice of Appeal (Ex. EEEE). On appeal, the petitioner raised the same eight issues raised in his Motion for Post-Conviction Relief. See Initial Brief of Appellant (Ex. HHHH). On August 7, 2013, the Third District Court of Appeal summarily affirmed the lower court's ruling in a per curiam decision without a written opinion. See Ex. OOOO; see also Broughton v. State, 121 So.3d 557 (Fla. 3d DCA 2013) (Table). On August 23, 2013, the petitioner filed a motion for rehearing. See Ex. QQQQ. That motion was summarily denied by the state appellate court on August 30, 2013. See Order Denying Motion for Rehearing (Ex. RRRR).

**ii.    Motion to Correct Sentence**

In the interim, on December 14, 2012, the petitioner filed a Motion to Correct Sentence on the ground that he was incorrectly sentenced as a habitual violent felony offender. See Ex. TTTT. The state court denied the petitioner's motion on December

36

27, 2012. See Ex. UUUU. The petitioner filed Defendant's Motion for Rehearing (Ex. VVVV) and a Motion to Hear and Rule (Ex. WWWW) which were both denied by the state court. See Order (Exs. XXXX and YYYY).

On May 14, 2013, the petitioner filed a notice of appeal from the trial court's orders denying his motion to correct sentence, motion for rehearing and motion to hear and rule. See Notice of Appeal (Ex. ZZZZ). In his initial brief, the petitioner raised the issue of whether the trial court erred in relying on a computer printout instead of on an oral pronouncement of the sentencing judgment for purposes of determining the habitual violent felony offender status. See Initial Brief of Appellant (Ex. BBBBB at 2). On July 31, 2013, the Third District Court of Appeal issued a per curiam affirmed decision without a written opinion. See Ex. CCCCC; see also Broughton v. State, 119 So.3d 451 (Fla. 3d DCA 2013) (Table).

### iii.    Second Motion for Post-Conviction Relief

On March 28, 2013, the petitioner filed a second motion for post-conviction relief. See Motion for Post-Conviction Relief (Ex. EEEEE). The petitioner raised the following eight grounds for relief:

1.    "Prosecutor withheld exculpatory evidence out of the discovery [sic] violating rule 3.220 and in violation of the 4th, 5th, 6th, and 14th amendments;"

2.    "Trial counsel rendered ineffective assistance for failure to present a motion for no probable cause at the Arthur hearing that was conducted on April 10, 2008, for placing the defendant in the six picture photo line up/and for failure to object to the falsified testimony that lead investigator Det. Lopez used at the hearing as probable cause to place to [sic] the defendant in the line up/counsel should have moved for a dismissal based on the government misconduct in violation of the 4th, 5th, 6th, and 14th

amendments;"

3.      "Trial counsel rendered ineffective assistance for [sic] failure to
        object and expose to the court at the hearing that was conducted
        on March 9,2009, that led Detective Lopez is [sic] changing the oral
        statement that he gave for the defendant at the Arthur hearing that
        was conducted on April 10, 2008, in violation of the 4th, 5th, 6th,
        and 14th amendments;"

4.      "Public defenders office rendered ineffective representation for [sic]
        failure to investigate exculpatory evidence and secure it in the time
        that would have exonerated the defendant before the [S]tate
        prosecuted him in violation of the 4th, 5th, 6th, and 14th
        amendments;"

5.      "Brady violation: prosecutors failure to furnish the defense the
        interrogation of the defendant by Sergeant Jorge Rodriguez I.D.
        #1810 and Detective Lopez in the interrogation room after counsel
        requested for it as Brady in violation of the 4th, 5th, 6th, and 14th
        amendments;"

6.      "Trial counsel rendered ineffective assistance by failing to call a credible
        witness in violation of the 6th and 14th amendment;"

7.      "Trial counsel rendered ineffectiveness in conceding the
        defendant's guilt in closing argument in violation of the 6th and 14th
        amendment" and

8.      "Trial counsel rendered ineffective assistance by failing to suppress
        the photo line up at the pre-trial hearing that was conducted on
        May 11, 2009, and move to dismiss this case in trial off [sic] of no
        in court identification in violation of the 5th, 6th, and 14th
        amendments."

Id.

        On May 14, 2013, the state post-conviction court denied the petitioner's second

motion for post-conviction relief in its entirety as follows: "The Defendant's motion is

successive. This Court previously denied the Defendant's motion on November 28,

2012. **The Defendant does not allege any new grounds in his instant motion.**

Further[,] the Third District has jurisdiction under DCA/# 3D 13-155." <u>See</u> Order

Denying Defendant's <u>Pro</u> <u>Se</u> Rule 3.850 Motion (Ex. GGGGG) (emphasis added). The

state post-conviction court's order is incorrect in its assessment that the petitioner did

not raise any new grounds. All eight grounds raised in the second motion for post-

conviction relief were new grounds. On May 24, 2013, the petitioner submitted a letter

to the judge seeking to be "discharged" because the evidence was "overwhelming" that

he did not commit the robbery. <u>See</u> Letter (Ex. JJJJJ). The Court denied the petitioner's

letter on July 10, 2013. <u>See</u> Order (Ex. KKKKK).

On June 14, 2013, the petitioner filed a notice of appeal. <u>See</u> Notice of Appeal

(Ex. LLLLL). The petitioner's initial brief raised the same eight issues on appeal. <u>See</u>

Initial Brief of Appellant (Ex. OOOOO).  On August 20, 2014, the Third District Court of

Appeal issued a <u>per</u> <u>curiam</u> affirmed decision without a written opinion. <u>See</u> Ex.

SSSSS; <u>see</u> <u>also</u> <u>Broughton v. State</u>, No. 3D13-1478, 2014 WL 4099701 (Fla. 3d DCA

Aug. 20, 2014) (Table).

### iv.    Petition for Writ of Habeas Corpus

In the interim and while the appeal from the order denying the second motion for

post-conviction relief was pending, the petitioner filed a petition for writ of habeas

corpus with the state appellate court on July 29, 2013. <u>See</u> Petition for Writ of Habeas

Corpus (Ex. EEEEEE). The petition raised the following two grounds for relief:

> 1. "Appellant [sic] counsel rendered ineffective assistance of counsel for
> failure [sic] to raise heresay [sic] and <u>Crawford</u> in violation of the 4th, 5th,
> 6th, and 14th Amendments" and

> 2. "Appellant's counsel was ineffective for failure [sic] to raise (the motion
> to dismiss judgment and conviction) in violation of the 6th and 14th

Amendments."

Id. at 7, 16. In the conclusion, the petitioner stated: "In ground one there is no way the

photo lineup can be introduced in the petitioner's case based on the fact that no one in

this case can collaberate [sic] how Det. Lopez received the information to link the

defendant and co-defendant together, but more importantly how he placed the

petitioner in the photo lineup." Id. at 17.

On August 21, 2013, the state appellate court issued an order denying the

petition. See Ex. HHHHHH. The one sentence order stated as follows: "Following

review of the petition for writ of habeas corpus, it is ordered that said petition is hereby

denied." Id.; see also Broughton v. State, 146 So.3d 39 (Fla. 3d DCA 2013) (Table).

**G.     The Instant Proceedings**

On August 4, 2015, the petitioner filed the instant petition. See Petition for Relief

from a Conviction or Sentence by a Person in State Custody (DE# 1, 8/4/15). The

respondent filed his response on September 18, 2015. See Response to Order to Show

Cause (DE# 14, 9/18/15). On October 12, 2015, the petitioner filed his reply. See

Petitioner's Reply to Response to Order to Show Cause (DE# 17, 10/12/15). This

matter is ripe for consideration.

<u>**STANDARD OF REVIEW**</u>

**A.     Exhaustion**

Before filing a section 2254 habeas petition in federal court, a petitioner must

exhaust all state court remedies that are available for challenging his state conviction.

See 28 U.S.C. § 2254(b), (c). "A critical prerequisite for any state petitioner seeking

40

federal habeas relief is the requirement that he first properly raise the federal constitutional claim in the state courts." Ward v. Hall, 592 F.3d 1144, 1156 (11th Cir. 2010) (citing 28 U.S.C. § 2254(b)). "To exhaust state remedies, the petitioner must 'fairly present[ ]' every issue raised in his federal petition to the state's highest court, either on direct appeal or on collateral review." Maples v. Allen, 586 F.3d 879, 886 (11th Cir. 2009) (quoting Castille v. Peoples, 489 U.S. 346, 351 (1989)). The petitioner "'must give the state court[ ] one full opportunity to resolve any constitutional issues by invoking one complete round of the [s]tate's established appellate review process.'" Id. (quoting O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999)). "The exhaustion requirement springs from principles of comity, which protect the state court's role in the enforcement of federal law and prevent disruption of state court proceedings." Ward, 592 F.3d at 1156 (citing Rose v. Lundy, 455 U.S. 509, 518 (1982)). In the instant case, the respondent disputes that the petitioner has exhausted all of the grounds raised in his petition. This issue will be addressed in the analysis portion of this Report and Recommendation.

**B.      Deference to the State Court's Factual Determinations under the AEDPA**

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L.No. 104-132, 110 Stat. 1214 (1996) provides that a prisoner in state custody may not be granted a writ of habeas corpus for any claim that was adjudicated on the merits in state court,[17] unless the decision of the state court was: (1) "contrary to, or involved an

---

[17] A state court's summary rejection of a claim, without discussion, qualifies as an adjudication on the merits under 2254(d) and warrants deference. See Wright v. Sec'y for Dep't of Corrs., 278 F.3d 1245, 1253-54 (11th Cir. 2002).

unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the [s]tate court proceeding." 28 U.S.C. §2254(d)(1)-(2).

"The 'contrary to' and 'unreasonable application' clauses of § 2254(d)(1) are separate bases for reviewing a state court's decisions." Putman v. Head, 268 F.3d 1223, 1241 (11th Cir. 2001) (citing Williams v. Taylor, 529 U.S. 362, 404-05 (2000)). Under section 2254(d)(1), "[a] state-court decision is contrary to . . . clearly established precedents if it applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or if it confronts a set of facts that is materially indistinguishable from a [Supreme Court] decision . . . but reaches a different result." Brown v. Payton, 544 U.S. 133, 141 (2005) (citing Williams, 529 U.S. at 405 and Early v. Packer, 537 U.S. 3, 8 (2002)). "A state court conducts an 'unreasonable application' of clearly established federal law [under section 2254] if it identifies the correct legal rule from Supreme Court case law but unreasonably applies that rule to the facts of the petitioner's case." Putman, 268 F.3d at 1241(citing Williams, 529 U.S. at 404-05). "It is not sufficient that the state court's application was incorrect; the misapplication must also be objectively unreasonable." Windom v. Sec'y, Dep't of Corrs., 578 F.3d 1227, 1248 (11th Cir. 2009).

Section 2254(d)(2) provides for federal habeas relief where the state court's adjudication of a claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. §2254(d)(2). When reviewing the petition, the Court must bear

in mind that any "determination of a factual issue made by a [s]tate court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); see also Crawford v. Head, 311 F.3d 1288, 1295 (11th Cir. 2002) (explaining that the AEDPA provides for a "highly deferential standard of review" for factual determinations made by a state court). "However, the statutory presumption of correctness applies only to findings of fact made by the state court, not to mixed determinations of law and fact." Parker v. Head, 244 F.3d 831, 836 (11th Cir. 2001) (citing McBride v. Sharp, 25 F.3d 962, 971 (11th Cir. 1994)).

The Eleventh Circuit has stated that the AEDPA "places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court." Crawford, 311 F.3d at 1295-96. Specifically, the AEDPA "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal 'retrials' and to ensure that state-court convictions are given effect to the extent possible under the law." Id. (quoting Bell v. Cone, 535 U.S. 685 (2002)); see also Newland v. Hall, 527 F.3d 1162, 1183 (11th Cir. 2008) (stating that "[s]ection 2254 was amended by the [AEDPA] to ensure 'greater federal court deference to state court decisions and to promote more federal-state judicial comity.'") (quoting Wright v. Sec'y for the Dep't of Corr., 278 F.3d 1245, 1255 (11th Cir. 2002)). "Federal courts may not grant relief on the basis of any [federal claims that have been adjudicated on the merits in state court proceedings] unless the state court's decision was 'contrary to, or involved an

unreasonable application of, clearly established Federal law' or was 'based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.'" Williams v. Alabama, 791 F.3d 1267, 1272 (11th Cir. 2015) (quoting 28 U.S.C. § 2254(d))

In his filings, the petitioner argues that this Court should review some or all of his claims de novo and should accord the state court's rulings no deference.[18] In page 24 of his memorandum of law, for instance, the petitioner argues that no state court adjudication on the merits occurred here because the state post-conviction court issued its rulings without an evidentiary hearing and the state appellate court issued a per curiam affirmance of those rulings without a written decision. The petitioner states:

> Applied to the case at bar, these principles indicate no "adjudication on the merits" ever occurred. The post[-]conviction court's summary denial without evidentiary hearing or meaningful written order, and the appellate court's per curiam affirmation of the decision was "materially incomplete" and did not involve a complete and fully-formed record. Thus, this court is not bound by those decisions in determining whether or not an evidentiary hearing is warranted.

Id. The petitioner raises a similar argument in his reply brief. See, Petitioner's Reply to Response to Order to Show Cause (DE# 17 at 22, 10/12/15) (arguing that "[t]he State post-conviction court summarily denied relief without evidentiary hearing. It did not address [Mr.] Broughton's claim that counsel was ineffective for failing to challenge the inference stemming from a below market value purchase of property. The Third District Court of Appeal of Florida affirmed without comment. As with subsection "a" of this

---

[18] Some of the grounds raised in the instant petition were not raised before the state court and thus, there is no state court ruling for this Court to review. As to those claims, the undersigned will address the issue of procedural default in the analysis portion of this Report and Recommendation.

filing, this Court is not bound by state court post-conviction determinations that did not involve a complete adjudication on the merits. De novo review of the claims included in this subsection is appropriate.").

The undersigned will address what deference, if any, is due to the state post-conviction court's rulings when addressing the different grounds raised by the petitioner in the analysis portion of this Report and Recommendation.

**C.     The Petitioner's Request for an Evidentiary Hearing**

The petitioner requests that the Court hold an evidentiary hearing. "Petitioner Joshua Broughton asserts [that] he has established an entirely sound factual and legal basis for an evidentiary hearing, if not outright relief." Memorandum in Support of Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 (DE# 1-1 at 35, 8/4/15). To be entitled to an evidentiary hearing on a section 2254 habeas claim, the petitioner must allege facts that, if proved at the hearing, would entitle him to relief. See Schriro v. Landrigan, 550 U.S. 465, 474-75 (2007) (holding that if the record refutes the factual allegations in the petition or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing). Subsection 2254(e)(2)(B) provides that:

> [i]f the applicant has failed to develop the factual basis of a claim in [s]tate court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that . . . the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for the constitutional error no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2)(B).

The "decision to grant an evidentiary hearing [is] generally left to the sound

discretion of [the] district courts." Schriro, 550 U.S. at 473. "[A] federal court must

consider whether such a hearing could enable an applicant to prove the petition's

factual allegations, which, if true, would entitle the applicant to federal habeas relief."

Williams v. Alabama, 791 F.3d 1267, 1277 (11th Cir. 2015) (quoting Schriro, 550 U.S.

at 474)). Here, the petitioner has failed to demonstrate the existence of any factual

allegations which, if true, would entitle the petitioner to habeas corpus relief as to any of

the grounds raised in his petition. For this reason, the undersigned concludes that the

petitioner's request for an evidentiary hearing should be **DENIED**.

## ANALYSIS[19]

The petitioner raises the following five grounds in the instant petition:

a.      The State Trial Court's Failure to Grant a Mistrial Following
Detective Lopez's Reference (Erroneously) to Out of Court Identifications
of Broughton by Non-Testifying Witnesses Violated Clearly Established
State and Federal Law and Constitutes a Violation of Crawford and the
Fourteenth Amendment; Counsel Provided Ineffective Assistance of
Counsel in Failing to Call [Mr.] Garcia and [Mr.] Lamy as Rebuttal
Witnesses[;]

b.      Trial Counsel's Failure to Seek Admission of Broughton's
Co-Defendant's Exculpatory Confession Constitutes Ineffective
Assistance of Counsel in Violation of the Sixth and Fourteenth
Amendments, and the State Post[-]Conviction Court's Refusal to Hold an
Evidentiary Hearing on the Issue was Contrary to Clearly Established
Federal Law and an Unreasonable Determination in Light of the Evidence
Presented[;]

c.      Trial Counsel's Failure to Object to the 'Possession of Property
Recently Stolen' Jury Instruction Constitutes Ineffective Assistance of
Counsel in Violation of the Sixth and Fourteenth Amendments and the
State Post[-]Conviction Court's Refusal to Hold an Evidentiary Hearing on

---

[19] The undersigned notes that the respondent does not dispute that the instant
petition was timely filed. See Response to Order to Show Cause (DE# 14 at 28,
9/18/15). As such, the undersigned will not review the timeliness of the instant petition.

the Issue was Contrary to Clearly Established Federal Law and an Unreasonable Determination in Light of the Evidence Presented[;]

d.    The State's Failure to Produce the Videotaped Confession of Co-Defendant Anthony Sanders and to Preserve the '911 Call' Placed Following the Incident Constitutes a Violation of Brady and Trombetta and Deprived Broughton of Directly Exculpatory Evidence[;]

e.    Trial Counsel's Failure to Call a Material, Exculpatory, and Available Alibi Witness Constituted Ineffective Assistance of Counsel in Violation of the Sixth and Fourteenth Amendments and the State Post[-]Conviction Court's Refusal to Hold an Evidentiary Hearing on the Issue was Contrary to Clearly Established Federal Law and an Unreasonable Determination in Light of the Evidence Presented[.]

Memorandum in Support of Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 (DE# 1-1 at 1-2, 8/4/15). The respondent maintains that the petitioner is not entitled to habeas corpus relief on any of these grounds. See Response to Order to Show Cause (DE# 14 at 1, 9/18/15). The undersigned will address each of these grounds below.

**A.    Ground One: The State Trial Court's Failure to Grant a Mistrial Following Detective Lopez' Reference (Erroneously) to Out of Court Identifications of the Petitioner by Non-Testifying Witnesses Violated Clearly Established State and Federal Law and Constitutes a Violation of Crawford and the Fourteenth Amendment; Counsel Provided Ineffective Assistance in Failing to Call Mr. Garcia and Mr. Lamy as Rebuttal Witnesses**

In Ground One, the petitioner raises the following claims: (1) error by the state trial court in failing to grant the ore tenus motion for mistrial following Detective Lopez' testimony and (2) ineffective assistance of trial counsel in failing to call Mr. Garcia and Mr. Lamy as rebuttal witnesses. See Petition for Relief from a Conviction or Sentence by a Person in State Custody (DE# 1 at 6, 8/4/15). In the memorandum of law attached to his petition, the petitioner raised an additional one-sentence claim: "appellate counsel was ineffective for failing to" raise the trial court's denial of the ore tenus motion for

47

mistrial on appeal. <u>See</u> Memorandum in Support of Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 (DE# 1-1 at 17, 8/4/15).

As an initial matter, the respondent argues that the petitioner has failed to exhaust his state court remedies. <u>See</u> Response to Order to Show Cause (DE# 14 at 35-36, 49,  9/18/15). The respondent notes that the first two arguments asserted in Ground One were not raised in any of the petitioner's post-trial motions filed in state court. <u>Id.</u> The respondent does not substantively address the claim of ineffective assistance of <u>appellate</u> counsel. In addition, the respondent argues that the claim of error by the state court and the claim of ineffective assistance of <u>trial</u> counsel both lack merit.

With respect to the claim of ineffective assistance by <u>appellate</u> counsel, the position taken by the petitioner in his petition is inconsistent with the position he takes in his memorandum of law and in his reply.  In his petition, the petitioner acknowledged that the claims raised in Ground One (the trial court's error in not granting a mistrial and counsel's failure to call Mr. Lamy and Mr. Garcia as rebuttal witnesses) were not previously raised on direct appeal or in a post-conviction motion or petition for habeas corpus in state court. <u>See</u> Petition for Relief from a Conviction or Sentence by a Person in State Custody (DE# 1 at 7, 8/4/15). In response to the questions "If you appealed from the judgment of conviction, did you raise this issue?" and "Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?," the petitioner checked the box for "No" as to each question. <u>Id.</u> Additionally, the petitioner asserted that he could not have raised these two claims on direct appeal

because they were not congnizable:

> (2) If you did not raise this issue in your direct appeal, explain why:

> **These claims were not cognizable on direct Appeal[.]**

Id. (emphasis added). While that may have been true of the claim of ineffective assistance, the trial court's alleged error could have been raised on direct appeal. In any event, the representation in the petition that the trial court's error in denying the mistrial "[was] not cognizable on direct [a]ppeal" is incongruous with the petitioner's later assertion in his memorandum that appellate counsel rendered ineffective assistance on direct appeal when he failed to raise the state court's error in denying the ore tenus motion for a mistrial.

The undersigned will address the exhaustion argument below.

### i.    Failure to Exhaust State Court Remedies

"A federal court may not grant a writ of habeas corpus on a claim unless the petitioner has exhausted all available state court remedies regarding that claim." Gore v. Crews, 720 F.3d 811, 815 (11th Cir. 2013) (citing 28 U.S.C. § 2254(b)). The Eleventh Circuit has stated that: "[i]t is by now axiomatic that, before seeking habeas relief under § 2254, a petitioner 'must exhaust all state court remedies available for challenging his conviction.'" Preston v. Sec'y, Florida Dep't of Corr., 785 F.3d 449, 457 (11th Cir. 2015) (quoting Lucas v. Sec'y, Dep't of Corr., 682 F.3d 1342, 1351 (11th Cir. 2012)). "In order to establish proper exhaustion of state court remedies, a petitioner must have 'fairly presented' the substance of his federal claims to the state courts by raising both the factual and legal premises of the claims for relief that are now being asserted in the

federal habeas proceeding." <u>Henderson v. Campbell</u>, 353 F.3d 880, 898 (11th Cir. 2003). "In order to determine whether a claim has been exhausted, [the Court must] look to the entire state court record and not just the state court's order, which may be silent as to a specific allegation of ineffective assistance of counsel." <u>Roberts v. Comm'r, Alabama Dep't of Corr.</u>, 677 F.3d 1086, 1090 (11th Cir. 2012).

The petitioner raises several arguments in support of his position that Ground One is not procedurally defaulted: (a) "Petitioner Broughton satisfied the state pleading requirements by sufficiently presenting this claim in state court proceedings;" (b) Respondent concedes the <u>Crawford</u> issue is properly before this Court; (c) the Supreme Court's decisions in <u>Martinez</u> and <u>Trevino</u> allow this Court to review the claims asserted in Ground One and (d) the Court may review unexhausted claims when those claims were not fully and fairly presented, or fully adjudicated on the merits by the state post-conviction court. <u>See</u> Petitioner's Reply to Response to Order to Show Cause (DE# 17 at 2-10, 10/12/15). The undersigned will address these arguments below.

**(a)      The Claims Asserted in Ground One Were Not Properly Presented to the State Post-Conviction Court**

In his reply, the petitioner maintains that he "satisfied the state pleading requirements by sufficiently presenting this claim in state court proceedings." Petitioner's Reply to Response to Order to Show Cause (DE# 17 at 2, 10/12/15). The record does not support this assertion.[20]

---

[20] As noted above, in the petition, the petitioner acknowledged that the first two claims in Ground One (trial court error in failing to grant a mistrial and ineffective assistance of trial counsel in failing to call Mr. Lamy and Mr. Garcia) were not raised in either direction appeal or in state collateral proceedings. <u>See</u> Petition for Relief from a

In his <u>first</u> motion for post-conviction relief (Ex. ZZZ), the petitioner raised eight claims. Those claims did not include trial court error in failing to grant a mistrial following Detective Lopez' testimony concerning the investigation that led him to compile the photo lineups or ineffective assistance of counsel based on the failure to call Mr. Lamy and Mr. Garcia as witnesses.

The petitioner then filed a <u>second</u> motion for post-conviction relief (Ex. EEEEE) also asserting eight claims. The claims asserted in the petitioner's second motion for post-conviction relief did not include claims that the state court erred in failing to grant a mistrial or that trial counsel rendered ineffective assistance of counsel in failing to call Mr. Lamy or Mr. Garcia as witnesses.

The petitioner also filed a petition for writ of habeas corpus (Ex. EEEEEE). in the Third District Court of Appeal asserting two claims of ineffective assistance of <u>appellate</u> counsel. In the first claim, the petitioner asserted that <u>appellate</u> counsel rendered ineffective assistance in failing to raise on direct appeal the hearsay and <u>Crawford</u> violations stemming from the trial court's denial of the <u>ore tenus</u> motion for a mistrial following Detective Lopez' testimony concerning his investigation. The Eleventh Circuit has stated that claims of ineffective assistance of counsel are separate from substantive claims of error. In <u>Taylor v. Sec'y, Dep't of Corr.</u>, 507 F. App'x 887, 891 (11th Cir. 2013), the petitioner argued that his "claims were not procedurally defaulted because, in his state habeas petition, he argued that his counsel had been ineffective

---

Conviction or Sentence by a Person in State Custody (DE# 1 at 7, 8/4/15). The petitioner could not have "sufficiently" presented these claims when he acknowledges that he did not raise them in the state court proceedings at all.

for failing to include these claims in [the petitioner]'s brief on direct appeal." The Eleventh Circuit concluded that "this argument [wa]s without merit because, for purposes of exhaustion of state remedies, **a substantive claim is 'separate and distinct' from an ineffective assistance of counsel claim based on the substantive claim**." Id. at 891-92 (emphasis added).

Assuming, without deciding, that the petitioner's claim of ineffective assistance of appellate counsel based on appellate counsel's failure to raise the trial court error concerning the mistrial on direct appeal also included a substantive claim of trial court error, the petitioner still fails to show that a substantive claim of trial court error was properly presented in the state post-conviction proceedings. "Florida law procedurally bars new claims . . . when 'the circumstances upon which they are based were known or should have been known at the time the prior petition was filed.'" Johnson v. Singletary, 647 So.2d 106, 109 (Fla. 1994). Here, the circumstances supporting the petitioner's claim of trial court error in failing to grant a mistrial were known to the petitioner at the time of trial. He did not raise a claim of trial court error in denying the mistrial on direct appeal or in his first or second motions for post-conviction relief. It was only in a third filing, his state petition for writ of habeas corpus, that he raised the trial court's error and even then it was asserted as a claim of ineffective assistance of appellate counsel.

Thus, the only claim previously presented by the petitioner to the state court was a claim of ineffective assistance of appellate counsel on direct appeal in failing to raise the trial court's error in denying a mistrial. The undersigned will address this argument

52

separately.

> **(b)     The Petitioner's Claim of Concession of the Mistrial Issue by the Respondent Is Too Broad**

The petitioner also argues that "Respondent concedes the <u>Crawford</u> issue [wa]s properly before this Court . . . ." Petitioner's Reply to Response to Order to Show Cause (DE# 17 at 2, 10/12/15); <u>id.</u> at 9 (stating "Respondent concedes [Mr.] Broughton's mistrial issue has been exhausted"). The petitioner's statement concerning the respondent's "concession" is too broad. What the respondent stated in his response brief was that:

> Petitioner's July 29, 2013, petition for writ of habeas corpus raised two grounds of ineffective assistance of appellate counsel. <u>See</u> Ex. EEEEEE. While count one of that habeas petition did raise the hearsay and <u>Crawford</u> issue at issue in the state petition, the State petition raised it as ineffective assistance of appellate counsel, not, as here error in the [s]tate court failing to grant a mistrial on that basis. **While similar, they raise distinctly different issues; <u>i.e.,</u> ineffective assistance of appellate counsel versus trial court error, and thus this issue has not properly been exhausted.** Nonetheless, Petitioner is not entitled to relief on this claim.

Response to Order to Show Cause (DE# 14 at 35-36, 9/18/15) (emphasis added).

Thus, the respondent did not concede that the <u>Crawford</u> (mistrial) issue has been exhausted.

The undersigned agrees with the respondent that a claim of ineffective assistance of appellate counsel in failing to raise the issue on appeal is different from a substantive claim that the trial court erred in denying the <u>ore tenus</u> motion for mistrial. <u>See</u> <u>Taylor v. Sec'y, Dep't of Corr.</u>, 507 F. App'x 887, 891-92 (11th Cir. 2013) (stating that "for purposes of exhaustion of state remedies, a substantive claim is 'separate and

distinct' from an ineffective assistance of counsel claim based on the substantive claim."). Here, the petitioner never raised in the state court collateral proceedings a claim that the trial court erred in denying the ore tenus motion for mistrial (apart from his claim of ineffective assistance of appellate counsel) or a claim of ineffective assistance of trial counsel in failing to call Mr. Garcia and Mr. Lamy as rebuttal witnesses. Those two claims have not been exhausted. As noted above, the undersigned will address the argument that appellate counsel was ineffective below.

### (c)    Martinez and Trevino Are Inapplicable to the Instant Case

Next, the petitioner argues that Supreme Court precedent limits the general rule that "a federal habeas corpus claim is 'procedurally defaulted if it has not been exhausted in state court and would now be barred under state procedural rules.'" Petitioner's Reply to Response to Order to Show Cause (DE# 17 at 3, 10/12/15) (quoting Mize v. Hall, 532 F.3d 1184, 1190 (11th Cir. 2008)). The petitioner cites to Martinez v. Ryan, 132 S.Ct. 1309 (2012) and Trevino v. Thaler, 133 S.Ct. 1911 (2013). Id. However and as discussed below, neither case excuses the petitioner's failure to exhaust state court remedies as to the first claim (trial court error in failing to grant a mistrial) and second claim (ineffective assistance in failing to call Mr. Lamy and Mr. Garcia as rebuttal witnesses) of Ground One.

"A federal court may consider the merits of a procedurally defaulted claim only if the petitioner can show **both 'cause' for the default and 'prejudice'** from a violation of his constitutional right." Hittson v. GDCP Warden, 759 F.3d 1210, 1260 (11th Cir. 2014) (quoting Wainwright v. Sykes, 433 U.S. 72, 84-85 (1977) (emphasis added)). Prior to

Martinez, the Supreme Court had decided Coleman v. Thompson, 501 U.S. 722 (1991). In Coleman, the Supreme Court stated that "[b]ecause [the petitioner] had no right to counsel to pursue his appeal in state habeas, **any attorney error that led to the default of [the petitioner]'s claims in state court [could not] constitute cause** to excuse the default in federal habeas." 501 U.S. at 757 (emphasis added). In Martinez, the Supreme Court "modifie[d]" its ruling in Coleman and stated: "This opinion qualifies Coleman by recognizing a **narrow exception**: **Inadequate assistance of counsel at initial-review collateral proceedings may establish cause** for a prisoner's procedural default of a claim of ineffective assistance at trial." Martinez, 132 S.Ct. at 1315 (emphasis added). In other words, "a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective." Id. at 1320.

Following the Martinez decision, the Supreme Court decided Trevino. In Trevino, the Supreme Court extended the holding of Martinez to cases "where . . . **state procedural framework, by reason of its design and operation**, makes it highly unlikely in a typical case that a defendant will have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal . . . ." Id. at 1921 (emphasis added).

Importantly, the Eleventh Circuit has reiterated that Martinez should be read narrowly: "By its own emphatic terms, the Supreme Court's decision in **Martinez is limited to claims of ineffective assistance of trial counsel that are otherwise**

**procedurally barred <u>due to</u> the ineffective assistance of post-conviction counsel**."
<u>Gore v. Crews</u>, 720 F.3d 811, 816 (11th Cir. 2013) (emphasis added). Thus, <u>Martinez</u> is inapplicable to the first claim in Ground One – the state court's failure to grant a mistrial following Detective Lopez' testimony concerning his investigation and compilation of the photo lineup – because it does not concern a claim of ineffective assistance of counsel. Rather the issue the petitioner seeks federal habeas court review is the state court's error. <u>See</u>, <u>e.g.</u>, <u>Hamm v. Comm'r, Alabama Dep't of Corr.</u>, 620 F. App'x 752, 777 (11th Cir. 2015) (stating "this Court has emphasized that <u>Martinez</u> does not extend beyond claims of ineffective assistance of trial counsel" and "[n]o authority suggests that <u>Martinez</u> has created a broad equitable exception that would apply to [petitioner]'s defaulted substantive claim about his Tennessee convictions.").

The ruling announced in <u>Martinez</u> is also inapplicable to the petitioner's claim that trial counsel was ineffective in failing to call Mr. Garcia and Mr. Lamy as rebuttal witnesses for the same reasons stated in <u>Gore</u>, <u>supra</u>. As the petitioner notes in his petition, he was <u>pro</u> <u>se</u> during the state court post-conviction collateral proceedings. Thus, the petitioner's failure to raise, at the state post-conviction court level, the issue of trial counsel's ineffective assistance in failing to call Mr. Garcia and Mr. Lamy as rebuttal witnesses was <u>not</u> due to any performance errors by post-conviction counsel because there was no post-conviction counsel. The narrow exception announced in <u>Martinez</u> is inapplicable to the petitioner's claim of ineffective assistance of trial counsel in failing to call Mr. Garcia and Mr. Lamy as rebuttal witnesses.

Moreover, <u>Martinez</u> and <u>Trevino</u> do not support an expansive reading of their

56

holdings. In fact, the Eleventh Circuit has consistently maintained that <u>Martinez</u> and <u>Trevino</u> are to be interpreted narrowly. <u>See</u>, <u>e.g.</u>, <u>Arthur v. Thomas</u>, 739 F.3d 611, 631 (11th Cir. 2014) (rejecting argument that the Eleventh Circuit "should broaden the equitable reasoning behind the <u>Martinez</u> rule" because "any such broadening would ignore the Supreme Court's emphatic statements that the <u>Martinez</u> rule creates only a narrow exception to <u>Coleman's</u> general rule").

As the Eleventh Circuit has noted, "[i]n <u>Martinez</u> and <u>Trevino</u>, it was how the <u>state</u> rules operated – the rules precluded review of, or a meaningful opportunity to raise, ineffective-trial-counsel claims, triggering a state procedural bar-which created the cause to excuse the state bar." <u>Arthur</u>, 739 F.3d at 630 (emphasis in original). In other words, "[t]he equitable concern of <u>Martinez</u> and <u>Trevino</u> arose from the injustice posed when a claim that a state's rules forced, either legally or practically, to be raised in a first-level collateral attack was not raised because of **collateral counsel's deficiencies**. Accordingly, without an exception to the bar on raising **collateral-counsel's ineffectiveness**, no opportunity arose for a defendant to raise the substantive claim." <u>Hamm v. Comm'r, Alabama Dep't of Corr.</u>, 620 F. App'x 752, 777 (11th Cir. 2015) (emphasis added). Here, the petitioner's failures to exhaust state court remedies with respect to the claim that the trial court erred in failing to grant a mistrial and the claim that trial counsel was ineffective in failing to call Mr. Garcia and Mr. Lamy as rebuttal witnesses were not caused by the operation of Florida procedural rules. Rather, the petitioner could have raised the first claim on direct appeal and both claims before the state post-conviction court, but failed to do so. "The narrow exception in the

Martinez rule [wa]s designed to be hard to meet 'to ensure that state-court judgments are accorded the finality and respect necessary to preserve the integrity of legal proceedings within our system of federalism.'" Arthur, 739 F.3d at 631 (quoting Martinez, 132 S.Ct. at 1316). In sum, Martinez and Trevino do not provide grounds for excusing the petitioner's procedural default as to the first claim (state court's failure to grant a mistrial) and second claim (trial counsel's failure to call rebuttal witnesses) asserted in Ground One.

> **(d)     The Alleged Inadequacy of the State Court Record Is Not Grounds to Excuse the Petitioner's Procedural Default Nor Has the Petitioner Shown Cause and Prejudice or a Fundamental Miscarriage of Justice**

The petitioner further argues that "review over unexhausted state claims in federal habeas proceedings [may be permitted] when those claims were not fully and fairly presented, or '[fully] adjudicated on the merits'" during the state post-conviction proceedings. See Petitioner's Reply to Response to Order to Show Cause (DE# 17 at 4, 10/12/15) (citing Boyko v. Parke, 259 F.3d 781 (7th Cir. 2001); Winston v. Kelly ("Winston I"), 592 F.3d 535, 544 (4th Cir. 2010); Winston v. Pearson ("Winston II"), 683 F.3d 489, 499 (4th Cir. 2012)). The petitioner argues that his case required an evidentiary hearing at the state post-conviction court level to "collective[ly] evaluat[e] [] the evidence." Id. at 7 (quoting Michael Skipwith v. Walter McNeil, Case No.: 09-60361-Civ-Altonaga). The petitioner reasons that the state post-conviction court's failure to hold an evidentiary hearing and its summary denials of the petitioner's claims mean that no adjudication on the merits ever occurred. Id. at 9 (stating "[t]he record indicates that no 'adjudication on the merits' ever occurred; the post-conviction court's

58

summary denial without evidentiary hearing or meaningful written order; and the appellate court's per curiam affirmation of the decision was 'materially incomplete' and did not involve a complete and fully-formed record.").

The problem with the petitioner's argument is that it is undermined by Supreme Court precedent. Under Harrington v. Richter, 131 S.Ct. 770, 785 (2011), a state post-conviction is not required to provide a statement of reasons to support its denial of a petitioner's claim. A state post-conviction court's summary adjudication of a petitioner's claim is an adjudication on the merits and is entitled to deference under the AEDPA. Additionally, the petitioner has presented no binding precedent requiring a state court evidentiary hearing before the state post-conviction court's decision may be deemed an adjudication on the merits. The petitioner's assertion that "section 2254 grants a federal habeas court the power to hear the claim and hold an evidentiary hearing when a state post-conviction court's denial was unreasonable under the circumstances under clearly established **state law**,"[21] is simply wrong because a federal habeas court does not review state law claims. See Callahan v. Campbell, 427 F.3d 897, 932 (11th Cir. 2005) ("It is a fundamental principle that state courts are the final arbiters of state law, and federal habeas courts should not second-guess them on such matters.") (quoting Herring v. Sec'y, Dep't of Corr., 397 F.3d 1338, 1355 (11th Cir. 2005)).

Additionally, as a practical matter, the petitioner's argument concerning the state post-conviction court's failure to provide him with an opportunity to fully and fairly

---

[21] See Petitioner's Reply to Response to Order to Show Cause (DE# 17 at 6, 10/12/15) (emphasis added).

present his claims through an evidentiary hearing makes little sense when applied to claim one (the state court's failure to grant a mistrial) and claim two (ineffective assistance of trial counsel in failing to call Mr. Lamy and Mr. Garcia as rebuttal witnesses) of Ground One. The petitioner never asserted either claim on direct appeal, in his first motion for post-conviction relief or in his second motion for post-conviction relief. Thus, the state court could not have unreasonably denied the petitioner an evidentiary hearing on claims that he never raised in the first place.

The petitioner also notes that he "has no experience with the legal system and self-representation, and was not equipped to raise and argue the subtleties of the mistrial claim." Petitioner's Reply to Response to Order to Show Cause (DE# 17 at 8, 10/12/15). The fact that the petitioner was pro se during the state post-conviction court proceedings should not excuse the petitioner from meeting the exhaustion requirement.[22] See, e.g., Harmon v. Barton, 894 F.2d 1268, 1275 (11th Cir. 1990) (finding claim procedurally defaulted and noting that "[w]here a pro se petitioner is able to raise an issue, it would be inequitable to give him a 'second bite at the apple' when he initially defaults the issue while we deny a second chance to the petitioner whose counsel fails to raise the issue.") (citation and internal quotation marks omitted).

In sum, none of the arguments raised by the petitioner excuse the petitioner's failure to raise claim one (the state court's failure to grant a mistrial) and claim two (ineffective assistance of trial counsel in failing to call Mr. Lamy and Mr. Garcia as

---

[22] The petitioner incorrectly states that he "was pro se the entire history of proceedings after trial." Petitioner's Reply to Response to Order to Show Cause (DE# 17 at 7, 10/12/15). The petitioner was represented by counsel on direct appeal.

rebuttal witnesses) as asserted in Ground Two. Thus, these two claims are procedurally defaulted.

"Procedural default may be overcome . . . by a showing of (1) cause and prejudice; or (2) a fundamental miscarriage of justice." Bishop v. Warden, GDCP, 726 F.3d 1243, 1258 (11th Cir. 2013). The petitioner has not established cause and prejudice to excuse his procedural default, nor has he established a fundamental miscarriage of justice if his claim is not heard.[23] The petitioner argues that he "was pro se the entire history of proceedings after trial, and was prejudiced by the state court's unfounded denial of an evidentiary hearing." Petitioner's Reply to Response to Order to Show Cause (DE# 17 at 7, 10/12/15). The petitioner's pro se status is insufficient to excuse a procedural default. See Jenkins v. Bullard, 210 F. App'x 895, 901 (11th Cir. 2006) (stating "[t]he fact that [the petitioner] is proceeding pro se with his § 2254 petition is insufficient to establish cause."); McCoy v. Newsome, 953 F.2d 1252, 1259 (11th Cir. 1992) (stating that "status as a pro se petitioner, standing alone, cannot be considered when determining whether he has shown cause for the default.").

Additionally, the petitioner has not shown prejudice. The state post-conviction court's denial of an evidentiary hearing on claims the petitioner actually asserted in his first and second motions for post-conviction relief could not have prejudiced the petitioner with respect to claims he never asserted in either motion. Nor has the petitioner met the  "extraordinary" circumstances of the "fundamental miscarriage of

---

[23] "A 'fundamental miscarriage of justice' occurs in an extraordinary case, where a constitutional violation has resulted in the conviction of someone who is actually innocent." Henderson v. Campbell, 353 F.3d 880, 892 (11th Cir. 2003).

justice" exception to the procedural default rule. <u>Henderson</u>, 353 F.3d 880, 892 (11th Cir. 2003).

For the reasons stated above, the Court should DENY Ground One as procedurally DEFAULTED to the extent the petitioner seeks federal habeas court review of the claim of trial court error in failing to grant a mistrial and trial counsel's ineffective assistance in failing to call Mr. Garcia and Mr. Lamy as rebuttal witnesses.

### ii.    The Merits of Petitioner's Claims

Even if the Court were to excuse the petitioner's procedural default, Ground One should still be denied. As noted above, in Ground One of his petition, the petitioner raises two claims: (1) the trial court's failure to grant a mistrial and (2) counsel's ineffective assistance in failing to call Mr. Garcia and Mr. Lamy as rebuttal witnesses. The petitioner also includes a two-sentence argument that his <u>appellate</u> counsel was ineffective in failing to raise the state court's failure to grant a mistrial on appeal. <u>See</u> Memorandum in Support of Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 (DE# 1-1 at 17, 8/4/15). The undersigned will address these claims below.

### (a)    The State Trial Court's Failure to Grant a Mistrial

The petitioner argues that the trial court erred in denying his counsel's <u>ore tenus</u> motion for a mistrial because "the State elicited prejudicial statements from Detective Lopez indicating third parties provided statements at a pawnshop identifying [Mr.] Broughton and [Mr.] Sanders as the perpetrators of the robbery and possessors of stolen property." Memorandum in Support of Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 (DE# 1-1 at 13, 8/4/15). The petitioner refers to the

following testimony at trial:

> Prosecutor: Okay. After speaking with Mr. Lamy and recovering the cell phone from Mr. Lamy where did your investigation lead you next?
>
> Detective Lopez: That led me to a pawnshop on 27th Avenue and approximately Northwest 84th Street.
>
> Prosecutor: **And based upon your investigation at the pawnshop what did you do?**
>
> Detective Lopez: **The investigation at the pawnshop led to two individuals at that [sic] became suspects in this case.**
>
>                           \*\*\*
>
> Prosecutor: Okay. **What was the next step in your investigation after the pawnshop?**
>
> Detective Lopez: **Um, to create some lineups with information that I obtained.**

Id. at 13-14 (quoting Trial Transcript, Ex. BBB at 262-63) (emphasis added). The

petitioner's counsel moved for a mistrial and the trial court denied the ore tenus motion.

Id.

> The petitioner argues that:
>
> The State used the above testimony of Detective Lopez to skirt a crucial issue in the case: sworn statements provided by [Mr.] Lamy and [Mr.] Garcia indicating only one individual, "Dread," was in the pawnshop at the time the transaction unfolded. [Mr.] Garcia's deposition testimony confirms this statement and indicates he **does not know [Mr.] Broughton and did not identify him to [Detective] Lopez or [Detective] Holmes** via photograph. If [Mr.] Broughton is not with "Dread" at the time of the sale of the cellular phone, [Detective] Lopez has no way to connect him with the crime. By permitting [Detective] Lopez to indicate someone at the pawnshop named [Mr.] Broughton as a suspect, the court deprived [Mr.] Broughton of his rights under Crawford and the Confrontation Clause and allowed to State to quickly address (something it wanted desperately to do) a missing element in the case. Any rational human being would understand from [Detective] Lopez's statement that a third party identified

[Mr.] Broughton as involved in the crime.

Memorandum in Support of Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 (DE# 1-1 at 15, 8/4/15) (emphasis in motion).

The parties agree that the Supreme Court has not decided a case with facts identical to the instant case, but dispute whether the trial court's ruling violated Crawford and the Confrontation Clause in failing to grant a mistrial following Detective Lopez' testimony. See Response to Order to Show Cause (DE# 14 at 35, 9/18/15) (noting that "the United States Supreme Court has never explicitly held that a reference to nonspecified information being provided to the police and being used to explain the course of the investigation is a) either for the truth of the matter, or b) a violation of the Confrontation Clause."); Petitioner's Reply to Response to Order to Show Cause (DE# 17 at 16, 10/12/15) (stating that Respondent correctly notes the U.S. Supreme Court has not decided a confrontation clause case under these precise facts. Nevertheless, Detective Lopez's testimony falls under the body of clearly established federal law, which applies to prohibit [Mr.] Lamy and [Mr.] Garcia's statements admitted within Detective Lopez's testimony.").

On a section 2254 petition, the federal habeas court's "inquiry is limited to whether the state court unreasonably applied a holding of the Supreme Court." Reese v. Sec'y, Florida Dep't of Corr., 675 F.3d 1277, 1287 (11th Cir. 2012). The Supreme Court has never held that an officer's testimony concerning his investigation violates the Confrontation Clause, although there are other courts that have held that it does. As the Eleventh Circuit has noted, "[t]he Supreme Court has reiterated, time and again, that, in

the absence of a clear answer – that is, a holding by the Supreme Court – about an issue of federal law, we cannot say that a decision of a state court about that unsettled issue was an unreasonable application of clearly established federal law." Id. at 1288 (citing Wright v. Van Patten, 552 U.S. 120, 126 (2008)). The Court does not need to resolve the issue of whether the trial court unreasonably applied clearly established federal law when it denied the mistrial because even assuming, without deciding, that the petitioner has shown a Crawford violation, the Court should still deny this claim because any trial court error was harmless error for the reasons discussed below.

The petitioner argues that the instant case is analogous to Harris v. Wainright, 760 F.2d 1148 (11th Cir. 1985). In Harris, a suspect demanded money from two victims at gunpoint and when one of the victims refused, he shot that victim. Id. at 1149. The suspect then fled in a yellow Cadillac. Id. The defendant was charged with the crime and a jury convicted him of attempted first degree murder, aggravated assault and attempted robbery. Id. at 1151. At trial, the prosecution elicited the following testimony from Officer Jaeger, a police officer, who had investigated the shooting:

> Q. Did you receive any information concerning the ownership of a Cadillac?
>
> An objection was made based upon hearsay, and a side bar conference ensued. Defense counsel insisted that the question inferred that petitioner owned the car. The prosecution responded:
>
>> It's not hearsay. We are not asking where he got it from or who he got it from. It is did he receive the information.
>
> The defense resumed its objection, noting that the prosecution was attempting to get in evidence about the testimony of someone not present. The court overruled the objection.

65

In the presence of the jury the prosecution restated the question, eliminating reference to ownership but adding reference to the Cadillac's being involved in the robbery:

> **Q. Did you receive information about a yellow Cadillac involved in an armed robbery in Miami, Dade County, Florida?**
>
> **A. Yes, sir, I did.**
>
> Q. Based on that, what did you do?
>
> A side bar followed at which the defense renewed its objection that the questioning raised an inference that petitioner was identified by someone else, or the car was identified by some other person or through some other source. The defense's motion for a mistrial was overruled. The defense asked for a ruling on the follow-up question: "Based on that, what did you do?" The prosecution stated that it would rephrase the question, but the trial court cautioned the prosecution to proceed carefully and specifically noted: "Let me tell you. I don't want [Officer Jaeger] to testify that he had a picture of the Defendant." One of the prosecutors responded: We'll not go that far."
>
> Proceedings before the jury resumed as follows:
>
> **Q. The next question is, what did you do then?**
>
> **A. Compiled a photographic line-up** . . . .

Id. at 1150 (emphasis added).

"The district court granted habeas corpus relief to the petitioner because at petitioner's trial the court admitted hearsay testimony into evidence, over proper objection, which violated petitioner's constitutional right to confront the witnesses against him under the Sixth Amendment as made applicable to the states through the Fourteenth Amendment." Harris, 760 F.2d at 1149. The Eleventh Circuit affirmed the

district court. In doing so, it noted that:

> The hearsay testimony in question had a double impact. It bolstered uncorroborated identification testimony given by the [victims] and, independently of the identification testimony, tended to connect petitioner with the crime through his connection with the yellow Cadillac. The testimony was brought in as an explanation of why an investigating officer prepared a photographic lineup that included petitioner's picture, a purpose for which the testimony was not even necessary.

Id.

In addressing Harris, the respondent notes that it predates the AEDPA and Crawford. See Response to Order to Show Cause (DE# 14 at 45 n. 27, 9/18/15). The respondent distinguishes Harris on the ground that one of the victims in Harris identified someone other than the defendant whereas here, Mr. Marin identified the petitioner. Id. at 48-49. The respondent further states that "there was no corroborating evidence besides the tainted statement regarding how the officer came to create the line-up." Response to Order to Show Cause (DE# 14 at 49, 9/18/15). The respondent notes that in the instant case:

> there w[ere] also additional facts such as Petitioner's statement to the police that while he wasn't involved in the actual robbery, he was aware of the situation as he claimed to have purchased some of the items from Mr. Sanders; that he had sold what would turn out to be Mr. Marin's wedding band to his father; that that wedding band was found at Petitioner's father's house; and that when the ring was handed back to Detective Lopez, it was being "polished". While admittedly these additional facts did not provide absolute proof of Petitioner's participation in the robbery itself, they do provide additional evidence not present in Harris such that the error in allowing the detective to testify that additional investigation at the pawn shop preceded the lineup was harmless under the circumstances of this case.

Id.

In his reply, the petitioner argues that "[t]he state court's denial of [Mr.]

Broughton's motion for a mistrial violated <u>Crawford</u> and flew in the face of clearly

established federal law" and notes that "the State and lead Detective Lopez maintained

a false position that the Defendant Joshua Broughton, was identified at the pawnshop

by George Garcia." Petitioner's Reply to Response to Order to Show Cause (DE# 17 at

10, 10/12/15). According to the petitioner, Detective Lopez' "testimony allowed

Respondent to skirt [Mr.] Broughton's confrontation clause protections, striking a critical

blow to the reliability of [Mr.] Broughton's trial. For example, [Mr.] Garcia's deposition

testimony indicated he d[id] not know [Mr.] Broughton and never identified him to

Detective Lopez, despite [Detective] Lopez's testimony to the contrary." <u>Id.</u> The

petitioner argues that he "was prejudiced when he could not test the reliability of [Mr.

Garcia and Mr. Lamy's] conflicting statements and subsequent identifications 'in the

crucible of cross-examination.'" <u>Id.</u> (quoting <u>Crawford</u>, 541 U.S. at 61). The petitioner

acknowledges that:

> **One application of <u>Crawford</u> yet unheard by the U.S. Supreme Court is officer testimony referencing their investigation, or witness statements provided during their investigation  -- in order to aid the jury's understanding of the investigation's purpose or the circumstances under which the officer acted.** Although, some federal courts have approved the practice, these courts limit the officer's testimony to the extent necessary to aid the jury's understanding, rather than as substantive evidence toward guilt and the truth of the matter asserted. However, this is a high-wire balancing act, and many courts are skeptical of this sort of evidence. <u>See</u> <u>United States v. Silva</u>, 380 F.3d 1018, 1020 (7th Cir. 2004) ("Allowing agents to narrate the course of their investigations, and thus spread before juries damning information that is not subject to cross-examination, would go far toward abrogating the defendant's rights under the sixth amendment and the hearsay rule.). Ultimately, no matter the factual circumstances, <u>Crawford</u> controls the confrontation clause issue.

<u>Id.</u> at 11-12.

The petitioner maintains that the trial court's ruling violated the Confrontation Clause and that the trial court's error was not harmless in the instant case because: (1) "[t]he state trial court violated clearly established law when. . . it admitted officer testimony that ran afoul of <u>Crawford</u> because [Detective Lopez] referenced statements, including names of suspects, details of conversations, and observations, of which he had no firsthand knowledge, yet the declarants did not testify;" (2) the court admitted the testimony at trial over objections after previously suppressing it <u>in limine</u>, and failed to cure improper closing remarks referencing that testimony over objections. <u>See</u> Trial Tr., Closing Arguments, May 13, 2009, at pp. 359-61;" (3) "there was no proper purpose for this testimony: the only purpose was to circumvent the confrontation clause and admit hearsay testimonial evidence at trial" and "this error was not harmless because a reasonable jury would be unable to differentiate Detective Lopez's firsthand testimony from the hearsay statements he used during his investigation" and the court cannot hold the error harmless when "[f]ar too much was made of hearsay in this trial." Petitioner's Reply to Response to Order to Show Cause (DE# 17 at 14, 10/12/15) (citing <u>United States v. Silva</u>, 380 F.3d 1018, 1020 (7th Cir. 2004)).

Even if there is a Confrontation Clause violation, the petitioner would need to show that the error was not harmless. <u>See</u>  <u>Mason v. Allen</u>, 605 F.3d 1114, 1123 (11th Cir. 2010) (stating "notwithstanding the Confrontation Clause violation, we cannot reverse a conviction or order a new sentencing hearing if the error is harmless"). The Eleventh Circuit has stated that "[i]n habeas proceedings, [the Court] review[s] whether a constitutional violation is harmless by determining 'whether the error had substantial

and injurious effect or influence in determining the jury's verdict.'" Id. (citing Brecht v.
Abrahamson, 507 U.S. 619, 623 (1993)). Courts "analyze the effect of the
Confrontation Clause violation by looking at several factors, including 'the importance of
the witness' testimony in the prosecution's case, whether the testimony was cumulative,
the presence or absence of evidence corroborating or contradicting the testimony of the
witness on material points, . . . and, of course, the overall strength of the prosecution's
case.'" Id. at 1123-24 (quoting Delaware v. Van Arsdall, 475 U.S. 673, 684 (1986)).

It is beyond dispute that Detective Lopez' testimony was important to the
prosecution. Nonetheless, the jury heard other evidence of the petitioner's guilt. The
jury heard testimony from Mr. Marin (one of the victims) that a few days after the
December 14, 2007 robbery he identified in a photo lineup the gunman who had robbed
him. See Trial Transcript (Ex. BBB at 215-16, 219-20, 222). Mr. Marin testified that he
was "certain" of his photo lineup identification. Id. at 219-20. The jury heard testimony
that the petitioner met with Mr. Sanders on the night of the robbery at a gas station and
purchased a silver ring which he then sold to his father for approximately $40. Id. at
285. The jury also heard testimony from Detective Lopez that the petitioner led
Detective Lopez to his father's house where a wedding ring was recovered. Id. at 285.
Mr. Marin testified that the wedding ring returned to him by police was the wedding ring
that was taken from him during the robbery. Id. at 213-215. Thus here, there was other
evidence presented at trial which could support the jury's guilty verdict on both the
robbery with a firearm count and the dealing in stolen property count. Having reviewed
the trial transcript, the undersigned concludes that even assuming trial court error, that

error was harmless. See, e.g, United States v. Dupree, 240 F. App'x 382, 386, 390 (11th Cir. 2007) (concluding that the admission of evidence was harmless beyond a reasonable doubt because "the statement was merely cumulative of the government's overwhelming proof that [the defendant] was the May 1996 robber, and the statement was mentioned only once throughout the trial."). In light of the other evidence of the petitioner's guilt presented at trial, the petitioner has not shown that any trial court error concerning the objected to portions of Detective Lopez' testimony had a "substantial and injurious effect or influence in determining the jury's verdict." Mason, 605 F.3d at 1123.

    For these reasons, the Court should deny this portion of Ground One should it decide to overlook the petitioner's procedural default and consider the merits.

### (b)    The Petitioner's Claim of Ineffective Assistance of Counsel for Failure to Call Mr. Garcia and Mr. Lamy as Rebuttal Witnesses

    The petitioner also asserts a claim of ineffective assistance of trial counsel in failing to call Mr. Garcia and Mr. Lamy as rebuttal witnesses. The petitioner notes that Mr. Garcia provided a sworn statement wherein he stated that "Dread" came into the pawnshop seeking to sell a watch and a cell phone. Memorandum in Support of Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 (DE# 1-1 at 17, 8/4/15). Mr. Garcia never identified the petitioner as "Dread."[24] The petitioner further notes that during Mr. Garcia's deposition, Mr. Garcia stated that "Dread" came alone into the store

---

[24] It is apparent from other parts of the record that co-defendant Sanders was known by the nickname "Dread." See, e.g., Arthur Hearing Transcript (Ex. N at 12) (testimony from Detective Lopez that "'Dread' . . . later became known as Mr. Sanders . . . .").

and that he did not know an individual named Joshua Broughton. Id. The petitioner also notes that in his sworn statement, Mr. Lamy stated that he dealt only with Mr. Garcia when he purchased the cell phone and did not mention anyone else at the pawnshop. Id. at 17-18. According to the petitioner, these statements by Mr. Garcia and Mr. Lamy would have "call[ed] into question [Detective] Lopez's account of what transpired and support[ed Mr.] Broughton's" theory that Detective Lopez was trying to "pin cases" to Mr. Broughton and Mr. Broughton's brother. Id. at 18.

The petitioner further argues that "[Messrs.] Lamy and Garcia, two uninterested witnesses, had the capability to provide powerful rebuttal testimony that would have caused the jury to question [Detective] Lopez's entire testimony." Memorandum in Support of Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 (DE# 1-1 at 18, 8/4/15). According to the petitioner:

> Counsel's failure to call [Mr.] Garcia and [Mr.] Lamy to the stand after [Detective] Lopez had testified deprived [the petitioner] of the presentation of a complete defense. [The petitioner]'s defense at trial centered on [Detective] Lopez's credibility (lack thereof) and reckless attempts to obtain a conviction in this matter. Failing to call these witnesses in support of that defense cannot be considered strategic and constitutes ineffective assistance of counsel in violation of the Sixth Amendment and Strickland.

Id.

In addressing the merits of this claim, the respondent argues that this claim should be denied because Florida law requires that the petitioner: "(1) identify the prospective witness, (2) describe the substance of the witness testimony, (3) state that the witness was available to testify, and (4) describe the prejudice resulting from omitting the witness testimony." Response to Order to Show Cause (DE# 14 at 50,

9/18/15). The respondent notes that the petitioner has not met these requirements. The respondent further argues that:

> [s]ince Petitioner did not raise this portion of this claim in the [s]tate court, he did not, and does not here, demonstrate how, even assuming the witnesses testified consistently with their previous statements and/or affidavits, how those stor[i]es, inconsistent as they may have been, would have denied Petitioner a complete defense.

Id. The respondent further posits that trial counsel's decision not to call Mr. Garcia and Mr. Lamy may have been strategic "to keep any further identification and association with Mr. Sanders to a minimum." Id.[25]

In his reply, the petitioner asserts that he "was never afforded the opportunity to develop these claims and facts in state court." Petitioner's Reply to Response to Order to Show Cause (DE# 17 at 17, 10/12/15). The undersigned has already noted that the petitioner never raised the claim of ineffective assistance stemming from counsel's failure to call Mr. Lamy and Mr. Garcia as witnesses at trial in any of his post-conviction motions. See discussion supra. The state court could not have denied the petitioner the opportunity to develop the record on a claim he never raised. As noted earlier, trial counsel's failure to call these two witnesses would have been known to the petitioner at

---

[25] It is unclear how Mr. Lamy could have provided any testimony that would have linked the petitioner to Mr. Sanders. Mr. Lamy did not know the petitioner or Mr. Sanders. He came into the pawnshop and purchased a cell phone from "a seller by the name of George." See Statement of Sammy Lamy (Ex. EEEEE at F). Additionally, and although Detective Lopez testified at the Arthur Hearing that Mr. Garcia told him that two men came into the pawnshop and that later these men were identified by the nicknames "Twin" and "Dread," see Arthur Hearing Transcript (Ex. N at 11-12), Mr. Garcia testified during his deposition that only one man came into the pawnshop trying to sell the cell phone and that man was "Dread" (Anthony Sanders). See Deposition of George Garcia (Ex. PP at 7, 9-10).

the time he filed his first motion for post-conviction relief.

The petitioner further asserts that counsel's failure to call these witnesses could not have been deemed strategic or tactical because "clearly established state and federal law grants petitioners an evidentiary hearing for ineffective assistance [of] counsel claims alleging defective strategy." Petitioner's Reply to Response to Order to Show Cause (DE# 17 at 17, 10/12/15). However, [t]he test is whether counsels' representation fell below an objective standard of reasonableness, not whether counsel could provide some explanation for their actions. . . . [Where] the record establishes that counsels' decision . . . was objectively reasonable, an evidentiary hearing [i]s unnecessary." Thomas v. United States, 596 F. App'x 808, 810 (11th Cir. 2015).

"[C]omplaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified are largely speculative." Buckelew v. United States, 575 F.2d 515, 521 (5th Cir.1978).[26] The petitioner has not submitted an affidavit from the uncalled witnesses stating that they would have been available to testify at trial and that they would have provided favorable testimony for the petitioner consistent with their prior statements. The petitioner's argument that the state court denied him the opportunity to develop those facts is rejected above. The petitioner never raised this claim of ineffective assistance in state post-conviction proceedings and he could have obtained an affidavit from these witnesses independent of any evidentiary hearing.

---

[26] The Eleventh Circuit in Bonner v. City of Prichard, 661 F. 2d 1206, 1207 (11th Cir. 1981) (en banc), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

Even assuming that these witnesses were available to testify at trial and that they would have testified in the manner asserted by the petitioner, the petitioner has failed to show his counsel performed in a constitutionally deficient manner when he failed to call these witnesses. "The inquiry into whether a lawyer has provided effective assistance is an objective one: a petitioner must establish that no objectively competent lawyer would have taken the action that his lawyer did take." Van Poyck v. Fla. Dep't of Corr., 290 F.3d 1318, 1322 (11th Cir. 2002).

In the instant case, counsel could have strategically decided not to divert the jury's attention to Detective Lopez' investigation in favor of focusing on the discrepancies between Mr. Marin's description of the gunman and the petitioner's physical attributes which he did at trial. See Trial Transcript (Ex. CCC at 362-63) (in closing arguments petitioner's counsel argued: "Let's focus on the facts. Mr. Marin, on the night in question, gave a description of the individual that robbed him. In that description is 5'9 inches tall. Now, the evidence presented here submitted by the government is that Joshua Broughton is 5'3 inches tall. . . . This is [a] photo of him and his girlfriend standing side by side. She told you she's 5'3 inches tall . That's his height. That is a half a foot difference in the description. He also testified that the individual that robbed him was approximately 160 pounds. You also heard the undisputed testimony that Mr. Broughton was 130 pounds. . . . The testimony of the description given by Mr. Marin on the night in question was that the individual was a medium to dark complexion. If you look at Joshua Broughton, he has a rather light complexion" and "[n]ow Mr. Marin's testimony that the person might be his own height, 5'11[.] Mr. Marin

did not say this individual had gold teeth. Mr. Marin didn't say whether he talked or I could see his gold teeth when he talked. That's an important feature that he did not mention about the robbery; that's a reasonable doubt."). Although argument of counsel is not evidence at trial, counsel's closing arguments reveal his defense strategy which was to create doubt concerning Mr. Marin's identification of the gunman. Moreover, had the petitioner's counsel called these two witnesses on rebuttal it may have opened the door to additional testimony concerning Detective Lopez' investigation and why he included the petitioner in the photo lineup shown to Mr. Marin. Although not discussed at trial, at the <u>Arthur</u> hearing, Detective Lopez testified that Mr. Garcia had identified an individual nicknamed "Twin" being present at the pawnshop. <u>See</u> Transcript, Ex. N at 11-13.

The Eleventh Circuit has stated that "[e]ven if counsel's decision appears to have been unwise in retrospect, the decision will be held to have been ineffective assistance only if it was 'so patently unreasonable that no competent attorney would have chosen it.'" <u>Dingle v. Sec'y for Dep't of Corr.</u>, 480 F.3d 1092, 1099 (11th Cir. 2007) (quoting <u>Adams v. Wainwright</u>, 709 F.2d 1443, 1445 (11th Cir.1983)). The petitioner has failed to show that "no competent attorney" would have failed to call Mr. Lamy and Mr. Garcia as rebuttal witnesses at trial. The petitioner has not met the performance prong of <u>Strickland</u>.

Additionally, the petitioner has failed to show prejudice. To meet the prejudice prong, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been

different.'" Zeigler v. Crosby, 345 F.3d 1300, 1308-09 (11th Cir. 2003). The Eleventh

Circuit has stated that "[w]here a claim of ineffective assistance is based on counsel's

failure to call a witness, the burden to show prejudice is heavy because 'often

allegations of what a witness would have testified to are largely speculative.'" Kurtz v.

Warden, Calhoun State Prison, 541 F. App'x 927, 930 (11th Cir. 2013) (quoting Sullivan

v. DeLoach, 459 F.3d 1097, 1109 (11th Cir. 2006)).

Here, the petitioner was convicted of robbery with a firearm as to Mr. Marin and

dealing in stolen property. Thus, even if the petitioner's counsel had called Mr. Lamy

and Mr. Garcia to establish that the petitioner was not at the pawnshop and that the

petitioner did not sell Mr. Lamy the cell phone, this evidence would not have negated

Mr. Marin's testimony that he identified the gunman from a photo lineup, that he was

certain of his identification and that Mr. Marin's ring was recovered from the petitioner's

father. The jury also heard testimony from Detective Lopez that the petitioner told him

that he had sold a "**silver colored wedding band for his father**" for approximately

$40. See Trial Transcript (Ex. BBB at 284-85). The petitioner has not made a showing

of prejudice resulting from trial counsel's failure to call Mr. Lamy and Mr. Garcia as

rebuttal witnesses.

The petitioner has failed to meet both the performance and the prejudice prongs

of Strickland with respect to trial counsel's failure to call Mr. Lamy and Mr. Garcia at

trial. The Court should deny this claim of ineffective assistance of counsel.

### (c)    Ineffective Assistance of Appellate Counsel

As noted above, in the memorandum of law attached to the petition (but not in

the petition itself), the petitioner includes a two-sentence argument that appellate counsel was ineffective in failing to raise on direct appeal the trial court's error in denying the <u>ore tenus</u> motion for a mistrial. <u>See</u> Memorandum in Support of Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 (DE# 1-1 at 17, 8/4/15) (stating that "[w]hile this issue was preserved by trial counsel, it was not brought to the attention of the Third District Court of Appeal by [Mr.] Broughton's appellate counsel. [Mr.] Broughton's appellate counsel was ineffective for failing to identify this point of error on appeal."). The respondent does not address this argument. Nonetheless to the extent the petitioner seeks habeas corpus relief on this ground, the petition should be DENIED.

The petitioner's argument is conclusory and provides the Court with no analysis of his claim of ineffective assistance of appellate counsel. "It is not the job of the court to search through the record and make arguments for the parties. <u>Robinson v. RockTenn CP, LLC</u>, 986 F. Supp. 2d 1287, 1301 (N.D. Ala. 2013). The petitioner is represented by counsel in these proceedings and it is not the role of the Court to find support for the petitioner's claim of ineffective assistance of appellate counsel in failing to raise  on direct appeal the state court's denial of the <u>ore tenus</u> motion for mistrial. To the extent the petitioner seeks federal habeas corpus relief based on an error by appellate counsel, that argument should be DENIED as abandoned.

In sum, Ground One should be **DENIED** in its entirety. The petitioner has procedurally defaulted on his claim of trial court error in failing to grant a mistrial and on his claim that trial counsel rendered ineffective assistance when he failed to call Mr.

Lamy and Mr. Garcia as rebuttal witnesses. Even if the Court were to overlook this procedural default, Ground One should still be **DENIED**. The petitioner has not overcome harmless error as to the mistrial issue and has failed to show ineffective assistance of counsel in failing to call rebuttal witnesses. To the extent the petitioner also seeks habeas corpus relief based on appellate counsel error, the petitioner has not provided the Court with any analysis to support this argument.

**B.     Ground Two: Trial Counsel's Failure to Seek Admission of Co-Defendant's Exculpatory Confession Constitutes Ineffective Assistance of Counsel in Violation of the Sixth and Fourteenth Amendments, and the State Post-Conviction Court's Refusal to Hold an Evidentiary Hearing on the Issue was Contrary to Clearly Established Federal Law and an Unreasonable Determination in Light of the Evidence Presented**

In Ground Two, the petitioner argues that his counsel rendered ineffective assistance when he failed to introduce at trial portions of co-defendant Sanders' statement to Detective Lopez. See Memorandum in Support of Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 (DE# 1-1 at 18-25, 8/4/15). At trial, the State indicated that it did not intend to call co-defendant Sanders as a witness and as such, it would not be seeking to introduce the statement Mr. Sanders gave to Detective Lopez during an interview. See Ex. BBB at 182. The petitioner's counsel agreed that Mr. Sanders' statement should not be admitted into evidence. Id.

The petitioner further asserts that the state court's failure to hold an evidentiary hearing on this claim was contrary to Federal law and violated the petitioner's due process rights. See Petition for Relief from a Conviction or Sentence by a Person in State Custody (DE# 1 at 8, 8/4/15) (stating "[t]he state court summarily denied relief on this claim without the benefit of a hearing . . . . [t]his violated the defendant['s] rights to

79

due process under the 5th, 6th and 14th [A]mendment."); Memorandum in Support of Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 (DE# 1-1 at 24, 8/4/15). The undersigned will address the state post-conviction court's failure to hold an evidentiary hearing first.

### i.     The State Court's Failure to Grant an Evidentiary Hearing

The petitioner's arguments regarding the state post-conviction court's failure to hold an evidentiary hearing are twofold: (1) the state court's failure to hold an evidentiary hearing violated the petitioner's rights to due process and (2) the state court's failure to hold an evidentiary hearing and its "summary denial" of the petitioner's claim entitles the petitioner to de novo review (as opposed to AEDPA deference) of the ineffective assistance of counsel claim asserted in Ground Two. See Petition for Relief from a Conviction or Sentence by a Person in State Custody (DE# 1 at 8, 8/4/15).

As to the second argument, the undersigned will review the petitioner's claim of ineffective assistance of counsel asserted in Ground Two de novo, but not for the reasons asserted by the petitioner. The Supreme Court has instructed that "Courts can . . . deny writs of habeas corpus under § 2254 by engaging in de novo review when it is unclear whether AEDPA deference applies because a habeas petitioner will not be entitled to a writ of habeas corpus if his or her claim is rejected on de novo review, see § 2254(a)." Berghuis v. Thompkins, 560 U.S. 370, 390 (2010). In response to Ground Two, the respondent does not attempt to support the state post-conviction court's denial of the petitioner's claim of ineffective assistance of counsel on the grounds asserted in the state court's opinion (Ex. CCCC). Instead, both parties apply a de novo standard of

review in addressing the merits of the petitioner's claim of ineffective assistance of counsel in Ground Two. The undersigned will assume, without deciding, that <u>de novo</u> review applies in discussing the merits of this claim below.

Nonetheless, because the petitioner continues to assert that the state post-conviction court's failure to hold an evidentiary hearing and its "summary" denials of his post-conviction claims entitle him to <u>de novo</u> review in Grounds III and IV, the undersigned will dispose of this argument here.

### (a)   Due Process Claim

To the extent the petitioner is asserting a federal due process claim based on the state post-conviction court's failure to hold an evidentiary hearing, that claim is not cognizable in federal court. In <u>Carroll v. Sec'y, DOC</u>, 574 F.3d 1354, 1365 (11th Cir. 2009), the Eleventh Circuit rejected a due process claim based on the state court's summary denial of a Rule 3.850 claim without holding an evidentiary hearing. The Eleventh Circuit "has repeatedly held defects in state collateral proceedings do not provide a basis for habeas relief." <u>Id.</u> (citing, <u>e.g.</u>, <u>Anderson v. Sec'y for Dep't of Corr.</u>, 462 F.3d 1319, 1330 (11th Cir. 2006) (<u>per curiam</u>); <u>Quince v. Crosby</u>, 360 F.3d 1259, 1262 (11th Cir. 2004); <u>Spradley v. Dugger</u>, 825 F.2d 1566, 1568 (11th Cir. 1987) (<u>per curiam</u>).

Moreover, the petitioner's claim also lacks merit to the extent it is based on the state post-collateral court's alleged failure to follow **state law** in denying the petitioner's request for an evidentiary hearing because that claim is not reviewable by a federal habeas court. In Ground One, for instance, the petitioner argues that state law entitled

81

him to an evidentiary hearing. See, e.g., Petitioner's Reply to Response to Order to

Show Cause (DE# 17 at 7, 10/12/15) (stating that "[c]ritically, the state court

unreasonably denied the hearing when **well-established Florida law required such a**

**hearing** under the facts.") (emphasis added); id. at 8 (stating that "the nature of [Mr.]

Broughton's ineffective assistance claim entitled him to a state post-conviction

evidentiary hearing under **clearly established Florida law**, and the state court's denial

of that hearing triggers the exception to the exhaustion requirement.") (emphasis

added). The Eleventh Circuit has stated that "'[a] state's interpretation of its own laws or

rules provides no basis for federal habeas corpus relief, since no question of a

constitutional nature is involved.'" Carroll, 574 F.3d at 1365 (quoting McCullough v.

Singletary, 967 F.2d 530, 535 (11th Cir. 1992)).

### (b)    State Court's Failure to Hold an Evidentiary Hearing and 'Summary' Denials

Under the AEDPA, a prisoner in state custody may not be granted a writ of

habeas corpus for any claim that was **adjudicated on the merits** in state court, unless

the decision of the state court was: (1) "contrary to, or involved an unreasonable

application of, clearly established Federal law, as determined by the Supreme Court of

the United States," or (2) "based on an unreasonable determination of the facts in light

of the evidence presented in the [s]tate court proceeding." 28 U.S.C. § 2254(d)(1)-(2).

According to the petitioner, because the state post-conviction court did not hold an

evidentiary hearing and because it issued what the petitioner considers a "summary

denial," that it's decision (Ex. CCCC) was not an adjudication on the merits. See

Memorandum in Support of Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. §

2254 (DE# 1-1 at 24, 8/4/15) (stating that "[a] claim is not 'adjudicated on the merits'

when the state court makes its decision 'on a materially incomplete record.'") (quoting

Winston v. Kelly ("Winston I"), 592 F.3d 535, 544 (4th Cir. 2010)). In essence, the

petitioner argues that the state post-conviction court's failure to hold an evidentiary

hearing and its issuance of a "summary" denial stripped its decision of AEDPA

deference. The petitioner's arguments lack merit.

In Harrington v. Richter, 131 S.Ct. 770, 785 (2011), the Supreme Court stated:

"[t]his Court now holds and reconfirms that § 2254(d) does not require a state court to

give reasons before its decision can be deemed to have been 'adjudicated on the

merits.'" The Court also stated that "[w]hen a federal claim has been presented to a

state court and the state court has denied relief, **it may be presumed that the state**

**court adjudicated the claim on the merits** in the absence of any indication or state-

law procedural principles to the contrary." Harrington, 131 S.Ct. at 784-85. The

Supreme Court further stated that "[t]he presumption may be overcome when there is

reason to think some other explanation for the state court's decision is more likely." In

Harrington, the Supreme Court placed the burden on the petitioner. Id. at 785 (stating

that the petitioner "d[id] not make that showing"). In light of the Supreme Court's holding

in Harrington, there is no basis for the petitioner's argument that the state court's

"summary denial" of the petitioner's claims was not an adjudication on the merits. The

Eleventh Circuit has observed that "[u]nder Harrington's general rule . . . a state court's

simple one-word affirmance is presumed to be an adjudication on the merits of the

petitioner's claim." Shelton v. Sec'y, Dep't of Corr., 691 F.3d 1348, 1353 (11th Cir.

83

2012) (reversing district court's grant of habeas corpus relief for "failing to accord deference to the state court decision on the erroneous view that it was not an adjudication on the merits of [the petitioner]'s appeal."). Thus, to the extent the petitioner's argument is based on the brevity of the state court's written opinion or the appellate court's summary affirmance without a written opinion, Harrington puts the petitioner's argument to rest. See also Hittson v. GDCP Warden, 759 F.3d 1210, 1232 (11th Cir. 2014) (stating that "there is no AEDPA requirement that a state court explain its reasons for rejecting a claim").

Moreover, although the petitioner cites to a Fourth Circuit case, he has not pointed to any Supreme Court precedent to support his argument that the state post-conviction court's "decision was 'materially incomplete' and did not involve a complete and fully-formed record" because the state post-conviction court failed to hold an evidentiary hearing before denying the petitioner's claims. See Memorandum in Support of Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 (DE# 1-1 at 24, 8/4/15) (citing Winston I). In Carroll v. Sec'y, DOC, 574 F.3d 1354, 1366 (11th Cir. 2009), the Eleventh Circuit "conclude[d that a petitioner's] due process claim regarding the failure of the state court to conduct an evidentiary hearing d[id] not state a cognizable claim for habeas relief" where the petitioner was unable to point to "any . . . decision of the Supreme Court or [the Eleventh Circuit], to support his argument that **federal law** require[d] state courts to conduct evidentiary hearings" on his claim. In the instant case, the petitioner has not presented any Supreme Court case law to support his argument that the state court was required to hold an evidentiary hearing before

denying his state post-conviction claims.

In sum, the petitioner has not shown that the state post-conviction court's decision (Ex. CCCC) and the appellate court's per curiam affirmance (Ex. OOOO) were not adjudications on the merits under section 2254. The undersigned will now turn to the merits of Ground Two.

### ii.    Petitioner's Claims of Ineffective Assistance of Counsel for Failure to Introduce Exculpatory Portions of Mr. Sanders' Statement

In his first motion for post-conviction relief filed with the state court, the petitioner argued that his counsel rendered ineffective assistance when he failed to introduce portions of Mr. Sanders' statement to Detective Lopez. See Motion for Post-Conviction Relief (Ex. ZZZ at 15-29). In that motion, the petitioner argued that had the jury heard portions of Mr. Sanders' statement wherein he stated that a man named "Willie" had participated in the robbery with Mr. Sanders, the jury could not have found beyond a reasonable doubt that the petitioner was guilty of robbery with a firearm. Id. at 15-16.[27] The petitioner further argued that Mr. Sanders' statement was not hearsay because it would not have been offered for the truth of the matter asserted, but to show that Detective Lopez had knowledge that the petitioner was not the individual who committed the robbery on December 14, 2007. Id. at 17. Alternatively, the petitioner argued that if the statement were hearsay, it would have still been admissible as a statement against interest under Florida law. Id. at 16.

---

[27] In other parts of the record, the petitioner refers to this person as "Willie Davis." See e.g., Memorandum in Support of Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 (DE# 1-1 at 21, 8/4/15).

The state post-conviction court denied the petitioner's claim without an evidentiary hearing. See Order Denying Defendant's Pro Se Rule 3.850 Motion (Ex. CCCC). The state post-conviction court found that the petitioner's ineffective assistance of counsel claim was "without merit" because Mr. Sanders' statement to Detective Lopez was testimonial and would have been inadmissible under Crawford, 541 U.S. at 54, which prohibits the admission of testimonial hearsay under the Confrontation Clause. Id. at 1. As such, the state post-conviction court determined that the petitioner's counsel could not have rendered deficient performance in failing to introduce inadmissible hearsay. The state appellate court issued a per curiam affirmance of this ruling without an opinion. See Ex. OOOO; see also Broughton v. State, 121 So.3d 557 (Fla. 3d DCA 2013) (Table).

The parties dispute whether Mr. Sanders' statement[28] would have been admissible at trial. In the instant motion, the petitioner maintains that the relevant portions of co-defendant Sanders' statement would have been admissible under Fla. Stat § 90.804(2)(c) and that trial counsel's failure to introduce portions of this statement "deprived him of a crucial piece of evidence that would have changed the outcome at

---

[28] There is also the question of whether a written or recorded memorialization of the exculpatory portions of Mr. Sanders' statement even exists. The record does not reveal that Mr. Sanders' statement was memorialized. Notably, Detective Lopez testified that his interview with Mr. Sanders was not recorded. See Suppression Hearing Transcript (Ex. QQ at 97-98). Mr. Sanders also testified that he refused Detective Lopez' request that he provide a taped confession: "He asked me to give a tape confession. I asked him if they [sic] crazy." Id. at 134. The existence of co-defendant's videotaped confession is the subject of Ground Four of the instant petition and will be discussed in addressing Ground Four.

trial." Memorandum in Support of Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 (DE# 1-1 at 18-19, 8/4/15). The petitioner maintains that the state post-conviction court's ruling based on Crawford and the Confrontation Clause was "nonsensical, contrary to established legal principles and factually flawed." Id. at 19. The petitioner notes that "[t]he trial court apparently premised its holding on the [incorrect] assumption [that] the statement provided by [Mr.] Sanders **implicated** Broughton," when in fact the statements "were exculpatory in nature." Id. (emphasis in original). The petitioner further states that "[c]ontrary to the state post[-]conviction court's holding, the Confrontation Clause plays no role in the admission **of exculpatory statements by an accused**." Id. at 20 (emphasis in original). The petitioner relies on Lilly v. Virginia, 527 U.S. 116, 139-40 (1999) wherein the Supreme Court held that a defendants' rights under the Confrontation Clause had been violated when the trial court admitted the hearsay statements of a non-testifying witness which were against the non-testifying witness' penal interest and also inculpated the defendant. The petitioner argues that because Mr. Sanders had already pled guilty at the time of the petitioner's trial, Mr. Sanders was practically a disinterested third-party. Id. at 19.

The petitioner further argues that the state post-conviction court should have analyzed his ineffective assistance of counsel claim "through the prism of Section 90.804[(2)](c)" which governs statements against interest. See Memorandum in Support of Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 (DE# 1-1 at 20, 8/4/15). The test for determining whether statements against interest are admissible under section 90.804(2)(c) is: "(1) whether the declarant is unavailable, and if so (2)

whether the statements are relevant, (3) whether the statements tend to inculpate the declarant and exculpate the defendant, and (4) whether the statements are corroborated." Id. (citing Voorhees v. State, 699 So.2d 602, 613 (Fla. 1997). The petitioner argues that all four prongs are met here. See Memorandum in Support of Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 (DE# 1-1 at 20-23, 8/4/15). The petitioner further argues that the exclusion of this evidence was not harmless error "[g]iven the wildly inaccurate descriptions of the perpetrators provided by the Marins[ ] and the complete lack of other evidence tending to indicate [Mr.] Broughton's guilt." Id. at 23.

The respondent maintains that the petitioner has failed to show that trial counsel rendered ineffective assistance under either the performance prong or the prejudice prong of Strickland because Mr. Sanders' statement would have been inadmissible at trial. See Response to Order to Show Cause (DE# 14 at 53-54, 9/18/15). The respondent notes that at the time of trial, Mr. Sanders had already pled guilty, therefore he wouldn't have been able to invoke the Fifth Amendment and as such would not have been "unavailable" at trial. Id. The respondent further notes that "the [statement against interest] exception to the hearsay rule applies only to the extent that the statement 'sensibly and fairly can be redacted to include only those statements which are solely self-inculpatory." Id. at 54 (quoting Brooks v. State, 787 So.2d 765, 775 (Fla. 2001) (quoting Franqui v. State, 699 So.2d 1332, 1339 (Fla. 1997)). Thus, the respondent concludes that Mr. Sanders' "recorded statement, even if it existed, would not have been admissible under" § 90.804(2)(c). Id. at 54.

The respondent further argues that the petitioner's counsel was not ineffective in failing to introduce Mr. Sanders' statement because at the March 9, 2009 evidentiary hearing on Mr. Sanders' probation violation and on both defendants' motions to suppress (Ex. QQ), Mr. Sanders testified that he purchased the hair clippers and the watch (both items were recovered from Mr. Sanders' house and Mr. Marin identified the watch as his watch) from the petitioner. See Response to Order to Show Cause (DE# 14 at 57, 9/18/15) (quoting Ex. QQ at 138-39). In light of this testimony from Mr. Sanders, the respondent states:

> It is thus clear on the record that Mr. Sanders' original statement to the police, as described by [Detective Lopez], arguably took responsibility for the crime but refused to name his confederate in the crime. In subsequent testimony, Mr. Sanders denied any personal responsibility for the crime and sought to place blame on Petitioner. Assuming, for the purposes of argument only, that a statement in which Mr. Sanders took personal responsibility for the crime and also named someone other than Petitioner as his confederate actually existed, something that is not apparent from the record and is merely an unsupported and undocumented implication, counsel would have been foolish to attempt to introduce it at trial when it could be impeached by the prior testimony of Mr. Sanders directly implicating Petitioner.

Id. at 57-58. The respondent further notes that Mr. Sanders testified at his deposition that the petitioner was the other man who participated in the robbery of Mr. and Mrs. Marin at gunpoint on December 14, 2007 and that the petitioner was the one who tried to sell Mr. Marin's watch to George Garcia at the pawnshop. Id. at 58-60 (citing Ex. XX at 8, 11-12, 21, 27-28, 30). In light of Mr. Sanders' unfavorable testimony at the March 9, 2009 hearing and during his deposition, the respondent argues that the petitioner's "counsel would have had ample strategic reason to avoid any risk that Mr. Sanders would testify at trial." Id. at 61. In sum, the respondent argues that "there could be no

89

constitutionally deficient performance, as required by Strickland, even if an admissible recorded statement existed and counsel knew or reasonably should have known about its existence. Indeed, it would have been deficient performance to open the door to otherwise inadmissible impeachment evidence suggesting Petitioner's guilt." Id.

In his reply, the petitioner maintains that trial counsel rendered ineffective assistance, the relevant portions of Mr. Sanders' statement would've been admissible under section 90.804(2)(c) and the petitioner "was entitled to an evidentiary hearing under clearly established state and federal law in order to conclude his attorney's decision during the trial was 'strategic' or 'tactical' in nature." Petitioner's Reply to Response to Order to Show Cause (DE# 17 at 17, 10/12/15). Specifically, the petitioner argues that Mr. Sanders' statement would have been admissible under section 90.804(2)(c) in lieu of live testimony because Mr. Sanders would have still been able to assert his Fifth Amendment. Id. at 18 (noting that the Fifth Amendment privilege extends to pending appeals and post-conviction motions). Moreover, the trial court would have needed to hold an evidentiary hearing to determine whether Mr. Sanders was available to testify. Id. at 19. The petitioner maintains that "to the extent [Mr.] Sanders was, or could have been available to the defense as a witness, defense counsel was ineffective for failing to call him as a witness and to be cross-examined as to his exculpatory confession." Id.

Even assuming, arguendo, that Ground Two is subject to de novo review,[29] see

_____

[29] See Berghuis v. Thompkins, 560 U.S. 370, 390 (2010) (stating that where the standard of review is unclear, the district court may apply de novo review in denying a petition for habeas corpus relief).

discussion supra, the petitioner has failed to meet his burden of showing ineffective assistance of counsel. "A person challenging a conviction based on ineffectiveness of counsel must show both that his counsel provided deficient assistance and that prejudice resulted." Barwick v. Sec'y, Florida Dep't of Corr., 794 F.3d 1239, 1243-44 (11th Cir. 2015) (citing Strickland, 466 U.S. at 687). To meet the performance prong of Strickland, the petitioner must show that "counsel's representation fell below an objective standard of reasonableness." Strickland, 466 U.S. at 689. Under the prejudice prong, the petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. Because a petitioner must meet both prongs in order to establish a claim of ineffective assistance, "[a] court deciding an ineffectiveness claim need not 'address both components of the inquiry if the defendant makes an insufficient showing on one.'" Conner v. GDCP Warden, 784 F.3d 752, 766 (11th Cir. 2015) (quoting Strickland, 466 U.S. at 697).

The petitioner has not shown that counsel rendered deficient performance in failing to introduce Mr. Sanders' exculpatory statement at trial (or calling Mr. Sanders as a live witness). See, e.g., Johnson v. State, 921 So.2d 490, 501 (Fla. 2005) (stating that "[c]ounsel cannot be deemed ineffective for failing to present evidence that would open the door to damaging cross-examination and rebuttal evidence that would counter any value that might be gained from the evidence."). At the time of trial, the petitioner's counsel was aware of the unfavorable testimony Mr. Sanders had provided during the

evidentiary hearing on the motions to suppress wherein he testified that the hair

clippers and wristwatch (later identified by Mr. Marin as the watch that was stolen from

him during the robbery) found at Mr. Sanders' house had come from the petitioner.

Moreover, Mr. Sanders' deposition was taken a few days before the start of trial.

Thus, counsel was also aware that Mr. Sanders had testified that the petitioner had

participated in the December 14, 2007 robbery of the Marins and had attempted to sell

some of the stolen items to the pawnshop. See Deposition of Anthony T. Sanders (Ex.

XX at 11, 27-31). In light of this damaging testimony that the State could have used to

impeach Mr. Sanders' exculpatory statement that Willie Davis (and not the petitioner)

had robbed Mr. and Mrs. Marin, counsel's decision not to introduce Mr. Sanders'

exculpatory statement "[fell] within the wide range of reasonable professional

assistance." Strickland, 466 U.S. at 689. Under Strickland, "[j]udicial scrutiny of

counsel's performance must be highly deferential," and the petitioner has failed to show

that counsel's failure to introduce Mr. Sanders' exculpatory statement at trial was not

the result of reasonable professional judgment.

The petitioner argues that he "was entitled to an evidentiary hearing under

clearly established state and federal law in order to conclude his attorney's decision

during the trial was 'strategic' or 'tactical' in nature." Petitioner's Reply to Response to

Order to Show Cause (DE# 17 at 17, 10/12/15). However, the Eleventh Circuit has

rejected this argument:

> As for [the petitioner]'s claim that we must conclude that trial counsels'
> reason for failing to object was not reasonable or strategic, since the
> district court did not hold an evidentiary hearing, we disagree. The test is
> whether counsels' representation fell below an objective standard of

> reasonableness, not whether counsel could provide some explanation for
> their actions. Cf. Strickland, 466 U.S. at 687-88, 104 S.Ct. 2052;
> Chandler, 218 F.3d at 1315. Because the record establishes that
> counsels' decision not to object was objectively reasonable, an evidentiary
> hearing was unnecessary. Winthrop-Redin, 767 F.3d at 1216.

Thomas v. United States, 596 F. App'x 808, 810 (11th Cir. 2015) (on a § 2255 claim).

Similarly here, counsel's failure to introduce Mr. Sanders' exculpatory statement at trial

was objectively reasonable because it would have opened the door for the State to

impeach the exculpatory statement by introducing other damaging statements by Mr.

Sanders.

The petitioner has also failed to show prejudice under Strickland. Even if Mr.

Sanders' exculpatory statement would have been admissible under Fla. Stat. §

90.804(2)(c) as a statement against interest, the petitioner has failed to show that he

was prejudiced by counsel's allegedly deficient performance. As noted above, had Mr.

Sanders' exculpatory statement been introduced at trial, it would have opened the door

for the State to impeach Mr. Sanders with his prior sworn testimony at his deposition

and at the evidentiary hearing on the motions to suppress that the petitioner was the

man who participated in the December 14, 2007 robbery with Mr. Sanders and that the

petitioner was the one who sold Mr. Sanders the hair clippers and the wristwatch (which

was later identified by Mr. Marin as the wristwatch that was stolen from him during the

robbery). The deposition and hearing testimony which could have been used to

impeach Mr. Sanders' exculpatory statement would have been highly unfavorable to the

petitioner and could have undermined the petitioner's misidentification and alibi

defenses. See, e.g., Darden v. Wainwright, 477 U.S. 168, 186 (1986) (observing that

"[a]ny attempt to portray petitioner as a nonviolent man would have opened the door for the State to rebut with evidence of petitioner's prior convictions . . . . Similarly, if defense counsel had attempted to put on evidence that petitioner was a family man, they would have been faced with his admission at trial that, although still married, he was spending the weekend furlough with a girlfriend"); DeYoung v. Schofield, 609 F.3d 1260, 1291 (11th Cir. 2010) (noting that the introduction of certain "mental health evidence would have opened the door to harmful testimony which may well have eliminated any mitigating weight in the overall equation."); Easter v. Estelle, 609 F.2d 756, 759 (5th Cir. 1980) (noting that "[w]hile counsel failed to interview and subpoena certain witnesses, this constituted trial strategy since to do so would have opened the door to introduction of [the petitioner]'s prior conviction"). In light of the harmful testimony Mr. Sanders provided during his deposition and during the evidentiary hearing on the motions to suppress, the petitioner has failed to show that counsel's failure to introduce Mr. Sanders' exculpatory statement at trial prejudiced the defense.

In sum, even under a de novo review, which is more favorable to the petitioner than the AEDPA standard of review, the petitioner has failed to show ineffective assistance of counsel.

Lastly, the petitioner argues that "[a]t very least, [Mr.] Broughton is entitled to a hearing on the issue of counsel's failure to seek to introduce portions of [Mr.] Sanders's statement under Section 90.804[(2)](c) of the Florida Statutes." Memorandum in Support of Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 (DE# 1-1 at 24, 8/4/15). However, the Supreme Court has stated that "if the record refutes the

94

applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." Schriro v. Landrigan, 550 U.S. 465, 474 (2007) (district court did not abuse discretion in denying request for evidentiary hearing where even assuming the truth of the facts the petitioner sought to prove at the evidentiary hearing, the petitioner was still not entitled to habeas corpus relief). In the instant case, even if the exculpatory portions of Mr. Sanders' statement were admissible at trial, the petitioner has failed to meet the performance and prejudice prongs of Strickland. Accordingly, the petitioner has not shown entitlement to habeas corpus relief and an evidentiary hearing on Ground Two is not warranted.

### iii. Petitioner's Claim of State Court Error in Allowing Evidence of Mr. Marin and Ms. Cruz' Identification of Mr. Sanders in Photo Lineups and Ms. Cruz' Testimony That She Observed Mr. Sanders on the Night of the Robbery

The petitioner also argues that the trial court erred when it allowed evidence of Mr. Marin and Ms. Cruz' identification of Mr. Sanders in a lineup and Ms. Cruz' testimony that she observed Mr. Sanders on the day of the robbery. See Memorandum in Support of Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 (DE# 1-1 at 25, 8/4/15). The petitioner states that:

> This evidence was completely irrelevant to [Mr.] Broughton's proceedings and essentially requested the jury find to him guilty by association. The error was compounded by the fact [Mr.] Broughton could not cross-examine [Mr.] Sanders to extract himself from the evidentiary picture painted by the State. The trial court allowed the State to introduce prejudicial information relating to [Mr.] Sanders while simultaneously preventing the defense from exploiting its primary weakness: [Mr.] Garcia and [Mr.] Lamy's exculpatory statements. This constitutes clear error and deprived [Mr.] Broughton of due process under the Fifth, Sixth and Fourteenth Amendments.

Id.

This additional ground of trial court error – the introduction of evidence of Mr. Marin and Ms. Cruz' identification of Mr. Sanders  –  is not properly before the District Court. The petitioner did not previously raise this argument on direct appeal or in his state post-conviction proceedings. Because the petitioner has failed to exhaust this claim of error in state court and because "Florida law procedurally bars new claims . . . when 'the circumstances upon which they are based were known or should have been known at the time the prior petition was filed,'" Jimenez v. Florida Dep't of Corr., 481 F.3d 1337, 1342 (11th Cir. 2007) (quoting Johnson v. Singletary, 647 So.2d 106, 109 (Fla. 1994)), this Court should DENY the claim that the trial court erred when it allowed evidence to be introduced at trial of Mr. Marin and Ms. Cruz' identification of Mr. Sanders. See Jimenez, 481 F.3d at 1342 (stating that "if unexhausted claims would be procedurally barred in state court under the state's law of procedural default, the federal court may consider the barred claims as having no basis for federal habeas relief.").[30]

For the reasons stated above, the petitioner has not shown entitlement to relief or to an evidentiary hearing on Ground Two.

---

[30] As noted earlier, the petitioner bears the burden of overcoming a procedural default. See Coleman, 501 U.S. at 750 (stating that a petitioner must "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice."). The petitioner has not addressed any of the grounds for overcoming a procedural default as to the claim of state court error based on the introduction of Mr. Marin and Ms. Cruz' identification of Mr. Sanders at trial.

C.   **Ground Three: Trial Counsel's Failure to Object to the 'Possession of Property Recently Stolen' Jury Instruction Constitutes Ineffective Assistance of Counsel in Violation of the Sixth and Fourteenth Amendments and the State Post-Conviction Court's Refusal to Hold an Evidentiary Hearing on the Issue was Contrary to Clearly Established Federal Law and an Unreasonable Determination in Light of the Evidence Presented**

In Ground Three, the petitioner argues that counsel was ineffective when he failed to object to the "possession of property recently stolen" jury instruction. See Memorandum in Support of Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 (DE# 1-1 at 25-29, 8/4/15). As with Ground One and Ground Two, the petitioner also argues that the state post-conviction court's failure to hold an evidentiary hearing was both contrary to clearly established Federal law and an unreasonable determination in light of the evidence. Id. For the reasons stated in Ground Two, the petitioner is not entitled to relief based on the state post-conviction court's failure to hold an evidentiary hearing.

Florida law permits the following inference: "proof of possession of property recently stolen, unless satisfactorily explained, gives rise to an inference that the person in possession of the property knew or should have known that the property had been stolen." Fla. Stat. § 812.022(2). Additionally, "[p]roof of the purchase or sale of stolen property at a price substantially below the fair market value, unless satisfactorily explained, gives rise to an inference that the person buying or selling the property knew or should have known that the property had been stolen." Id. at § 812.022(3).

At trial, the state court read the following instruction to the jury:

If you find the defendant guilty of theft, you must also determine if the State has proved beyond a reasonable doubt whether:

97

A[.] The property taken had a value of $300 or more but less than $20,000.

B[.] The property taken had a value of less than $300.

**Proof of possession of recently stolen property, unless satisfactorily explained, gives rise to an inference that the person in possession of the property knew or should have known that the property had been stolen.**

**Proof of the purchase or sale of stolen property at a price substantially below the fair market value, unless satisfactorily explained, gives rise to an inference that the person buying or selling the property knew or should have known that the property had been stolen.**

Trial Transcript (Ex. CCC at 387-88) (emphasis added).

The petitioner maintains that his trial counsel should have objected to both inferences asserted in this jury instruction. The petitioner notes that Detective Lopez gave inconsistent testimony during the <u>Arthur</u> Hearing and the evidentiary hearing on the motions to suppress/probation violation:

During his April 10, 2008, <u>Arthur</u> Hearing sworn testimony, Detective Lopez stated the following with regard to [Mr.] Broughton's alleged confession:

"[S]pecifically, [Mr. Broughton] said that he had knowledge of the crime based on the fact [that] he met with Mr. Sanders at a gas station later on the evening of the incident [after the incident] had occurred, that Mr. Sanders had told him he had been involved in a robbery. . . . **Mr. Broughton's father was interested [in] a wedding band and was able to purchase that wedding band from Mr. Sanders, I believe it was for approximately $40 and he was cooperative in so far as having nothing to do with the incident**."

Exhibit "A" at pp. 20. On March 9, 2009, Detective Lopez's testimony change[d] in a material aspect . . . ., rather than merely referring [Mr.]

> Sanders to his father, [Mr.] Broughton **"purchased the silver ring"** from [Mr.] Sanders and later sold it to his father for $40. Exhibit "B" at pp. 75. This activity would obviously qualify as dealing in stolen property.

Memorandum in Support of Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 (DE# 1-1 at 26-27, 8/4/15) (emphasis in Memorandum). The petitioner further notes that: "the State amended the [I]nformation the same day of the Arthur Hearing to charge [Mr.] Broughton with dealing in stolen 'jewelry.' This change constitute[d] perjury at worst, or an unintentional modification due to a failure to properly document [Mr.] Broughton's 'confession' at best. Either way, such fluctuating and uncorroborated testimony [by Detective Lopez] does not support a prima facie case or the burden shifting inference for possession of recently stolen property" as permitted under Fla. Stat. § 812.022. Id. at 27.

According to the petitioner "[a] plethora of Florida appellate court decisions have found indirect or unexclusive possession woefully insufficient to support inclusion of the instruction, no matter how suspicious the circumstances." Memorandum in Support of Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 (DE# 1-1 at 27, 8/4/15) (citing Garcia v. State, 899 So.2d 447 (Fla. 4th DCA 2005), Walton v. State, 404 So.2d 776 (Fla. 1st DCA 1981); Chamberland v. State, 429 So.2d 842 (Fla. 4th DCA 1983)). Thus, the petitioner argues, his counsel's failure to object to the jury instruction "constitutes obvious ineffective assistance of counsel in violation of the Sixth Amendment and Strickland. . . ." Id. The petitioner further argues that counsel's deficient performance resulted in prejudice: "In a case where the evidence in the State's possession was relatively precarious, admission of the improper instruction enabled a

guilty finding upon insufficient evidence and was highly prejudicial." Id.

The petitioner further faults his counsel for failing to file a motion for bill of particulars and for failing to object to the jury instruction's use of the term "jewelry," instead of "the specific items alleged to have been possessed or otherwise 'trafficked' by [Mr.] Broughton" because that erroneous instruction "invited the jury to find [the petitioner] guilty even if he was indirectly involved in [Mr.] Sanders's sale of the wedding ring to [the petitioner's] father." Memorandum in Support of Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 (DE# 1-1 at 28, 8/4/15).

Lastly, the petitioner argues that his counsel was ineffective in "fail[ing] to object to a second inference requested by the State, that the person buying the property knew or should have known the property had been stolen if it was purchased substantially below market value" because "[t]here was no evidence introduced at trial indicating the market value of the silver ring taken from Steve[n] Marin." Memorandum in Support of Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 (DE# 1-1 at 28, 8/4/15).

The respondent argues that trial counsel did not render ineffective assistance in failing to object to the jury instruction on possession of stolen property. As to the first inference – that "proof of possession of recently stolen property, unless satisfactorily explained, gives rise to an inference that the person in possession of the property knew or should have known that the property had been stolen – the respondent notes that "[t]his instruction has been given in Florida since at least 1885" and that "the United States Supreme Court [in Barnes v. United States, 412 U.S. 837 (1973)] approved the

use of jury instructions on possession of recently stolen property in appropriate cases."

Response to Order to Show Cause (DE# 14 at 62-63, 9/18/15). The respondent argues

that the evidence adduced at trial supports the use of the possession of recently stolen

property inference in the petitioner's trial:

> the jury was presented with facts which supported the giving of such an instruction. For instance, Mr. Marin explained that one of the men pointed a gun at his head and demanded his watch, ring and car keys. (Ex. BBB, pp. 203, 208). [Mr. Marin] removed the jewelry off and handed it to the gunman (Id. at 203, 208). Mr. Marin would later identify Petitioner in a photo array. Petitioner also gave a statement to the police in which he said that, while he did not take part in the robbery, he had seen [Mr.] Sanders that night at a gas station. At that meeting, [Mr.] Sanders offered to sell him jewelry, and Petitioner bought a silver colored wedding band which he sold to his father. (Id. at 284). Detective Lopez . . . also testif[ied] that he went to Petitioner's father's apartment and recovered the ring – which was later identified by Mr. Marin. (Id. at 285, 304-05). As such, because the State made a prima facie case that the crime of dealing in stolen property was committed, the trial court was correct in giving the instruction. . . . [T]he state presented enough evidence to the jury which, if believed, would allow the jury to make the inference permitted by the instruction. Indeed, the ring was found at Petitioner's father's house and Petitioner's own statement suggested that he had at least some involvement with the ring having allegedly met with Mr. Sanders in the gas station parking lot after the incident.

Id. at 64-65. The respondent does not address any other claims raised in the

petitioner's memorandum of law on Ground Three.

In his reply, the petitioner maintains that there was a lack of evidentiary support

for the issuance of this jury instruction:

> the state's failure to prove – let alone allege – the value of the items is constitutional error because it allowed the state to charge [Mr.] Broughton with a higher crime – second degree felony – without proving the material element of the items' value. Counsel failed to object to the inference requested by the State that the person buying the property knew or should have known the property had been stolen if it was purchased substantially below market value. There was no evidence introduced at trial indicating

the market value of the silver ring taken from Steve Marin. Trial
Transcripts at pp. 235-236. The State attempted to suggest the market
value was significantly more than $40 by informing the jury of the price of
Marin's watch. However, Florida case law requires competent testimony
on the issue of value prior to use of an inference instruction.

Petitioner's Reply to Response to Order to Show Cause (DE# 17 at 20, 10/12/15). The

petitioner further argues:

> [s]econd and in the same vein, the state's use of the term 'jewelry' rather
> than the specific items alleged to have been possessed or otherwise
> 'trafficked' by [Mr.] Broughton invited the jury to find him guilty even if he
> was indirectly involved in [Mr.] Sanders's sale of the wedding ring to his
> father. [Mr.] Broughton was not charged under a principal theory in the
> dealing in stolen property count. Trial counsel was ineffective for failing to
> file a motion for a bill of particulars and to object to the vague jury
> instruction submitted at trial. . . . Counsel was ineffective for not at least
> raising the argument, when Florida law so clearly allows this inference.

Id. at 21. As such, the petitioner insists that "the instruction was impermissible,

the inferences were impermissible, and the evidence against [Mr.] Broughton was

insufficient, to convict on those charges." Id.

### i.      AEDPA Deference

The petitioner argues that Ground Three must be reviewed de novo because:

> [Mr.] Broughton raised his counsel's failure to object to both the improper
> inferences included in the jury instructions on dealing in stolen property.
> The State post[-]conviction court summarily denied relief without
> evidentiary hearing. It did not address [Mr.] Broughton's claim that counsel
> was ineffective for failing to challenge the inference stemming from a
> below market value purchase of property. The Third District Court of
> Appeal of Florida affirmed without comment. As with [Ground One] of this
> filing, this Court is not bound by [s]tate court post[-]conviction
> determinations that did not involve a complete adjudication on the merits.

Memorandum in Support of Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. §

2254 (DE# 1-1 at 28-29, 8/4/15). The undersigned has already disposed of this

argument in Ground Two. The state post-conviction court's decision was an

adjudication on the merits under the AEDPA for the reasons stated in Ground Two. <u>See</u>

Section (B)(i)(b) of the Analysis portion of this Report and Recommendation.

### ii.    The Merits of the Petitioner's Claim of Ineffective Assistance of Counsel

In his first motion for post-conviction relief, the petitioner argued that the State

had not presented sufficient evidence to support the inference concerning the

possession of recently stolen property and that trial counsel was ineffective in failing to

object to that jury instruction. <u>See</u> Motion for Post-Conviction Relief (Ex. ZZZ at 49-57).

In denying the petitioner's claim, the state post-conviction court stated the following:

> The Defendant in his sixth claim for Motion for Post Conviction [R]elief
> claims that his counsel was ineffective for failing to object to the jury
> instruction regarding inference of knowledge on the Dealing with Stolen
> Property count. The Defendant's claim is without merit. The theft
> instruction reads: "Proof of possession of recently stolen property, unless
> satisfactorily explained, gives rise to an inference that the person in
> possession of the property knew or should have known that the property
> had been stolen." Fla. Std. Jury Instr. (Crim.) 14.1 at 270. The theft
> instruction on **possession** of property recently stolen has been given in
> Florida since at least 1885. <u>See</u> <u>Tilly v. State</u>, 21 Fla. 242, 249 (1885)
> (holding that the exclusive possession of the whole or some part of stolen
> property by the prisoner recently after the theft is sufficient, when standing
> alone, to cast upon him the burden of explaining how he came by it, or of
> giving some explanation, and if he fails to do so, to warrant the jury in
> convicting him of the larceny, burglary or robbery); <u>accord</u> <u>Roberson v.</u>
> <u>State</u>, 40 Fla. 509,24 So. 474, 479 (1898); <u>Rimes v. State</u>, 36 Fla. 90. 18
> So. 114. 115 (1895); <u>Leslie v. State</u>, 35 Fla. 171, 17 So. 555, 557 (1895).
> As such, because the State made a <u>prima</u> <u>facie</u> case that the crime of
> dealing in stolen property was committed, the trial court was correct in
> giving the instruction and as such the Defendant fails to articulate how his
> counsel's performance was deficient. His sixth claim in support of his
> Motion for Post Conviction Relief is therefore denied.

Order Denying Defendant's Pro Se Rule 3.80 Motion (Ex. CCCC at 2-3) (emphasis in

original). The state appellate court affirmed in a per curiam decision without a written

opinion.

The petitioner makes much of the fact that he raised a claim of "ineffective

[assistance of counsel] for failing to challenge the inference stemming from a below

market value purchase of property" which the state post-conviction court did not

address in its written decision. See Petitioner's Reply to Response to Order to Show

Cause (DE# 17 at 22, 10/12/15).[31] As the Eleventh Circuit has noted, "the Supreme

Court squarely held in Harrington v. Richter that a state court decision need not address

every argument, nor even explain its reasoning, to be entitled to AEDPA deference as

to its ruling on a federal constitutional claim." Lee v. Comm'r, Alabama Dep't of Corr.,

726 F.3d 1172, 1211 (11th Cir. 2013). In light of Supreme Court precedent on this

issue, the state post-conviction court's failure to address one of the arguments raised

by the petitioner in its written decision, does not advance the petitioner's claim of error.

Because the state post-conviction court's decision (Exhibit CCCC) is entitled to

AEDPA deference, the petitioner must show that the state post-conviction court's ruling

was: (1) "contrary to, or involved an unreasonable application of, clearly established

Federal law, as determined by the Supreme Court of the United States," or (2) "based

on an unreasonable determination of the facts in light of the evidence presented in the

---

[31] Specifically, the petitioner argues that he "raised his counsel's failure to object to both the improper inferences included in the jury instructions on dealing in stolen property. The State post-conviction court summarily denied relief without evidentiary hearing. **It did not address [his] claim that counsel was ineffective for failing to challenge the inference stemming from a below market value purchase of property.**" Petitioner's Reply to Response to Order to Show Cause (DE# 17 at 22, 10/12/15) (emphasis added).

[s]tate court proceeding." 28 U.S.C. §2254(d)(1)-(2). The petitioner has not met his

burden here. The petitioner has not shown that the state post-conviction court's

decision was contrary to clearly established Federal law under Strickland or that the

decision was "an unreasonable determination of the facts in light of the evidence

presented in the [s]tate court proceeding." 28 U.S.C. §2254(d)(1)-(2); Robinson v.

Moore, 300 F.3d 1320, 1343 (11th Cir. 2002) (stating that "[i]t is well established that

the Supreme Court's decision in Strickland is the controlling legal authority to be applied

to ineffective assistance of counsel claims") (quotation omitted).

      The state post-conviction court denied the petitioner's ineffective assistance of

counsel claim based on the performance prong: "the Defendant fails to articulate how

his counsel's performance was deficient. The Eleventh Circuit has explained that:

> **Where the performance prong of Strickland is concerned, habeas review is indeed doubly deferential.** See, e.g., Yarborough v. Gentry, 540 U.S. 1, 6, 124 S.Ct. 1, 157 L.Ed.2d 1 (2003) ("Judicial review of a defense attorney's summation is . . . highly deferential-and doubly deferential when it is conducted through the lens of federal habeas."). This is because, as the Supreme Court told us in Strickland, counsel's performance is itself due a base level of deference: "Judicial scrutiny of counsel's performance must be highly deferential." 466 U.S. at 689, 104 S.Ct. 2052. When we layer the "deferential lens of § 2254(d)" atop that first level of deference, the end result is "doubly deferential" review of counsel's performance. See Knowles v. Mirzayance, 556 U.S. 111, 121 n. 2, 123, 129 S.Ct. 1411, 173 L.Ed.2d 251 (2009).

Evans v. Sec'y, Dep't of Corr., 703 F.3d 1316, 1333 (11th Cir. 2013) (emphasis added).

Under Florida law, the possession of recently stolen property gives rise to an inference

that the individual knew or should have known that the property had been stolen. See

Fla. Stat. § 812.022(2). As discussed in more detail below, the jury heard evidence at

trial – through the testimony of Mr. Marin and Detective Lopez – from which it could

have reasonably concluded that the petitioner knew that Mr. Marin's ring was stolen. Mr. Marin identified the petitioner in a photo lineup as one of the two robbers who stole his wedding ring and Detective Lopez testified that that although the petitioner denied involvement in the robbery he told Detective Lopez that he had sold a wedding ring to his father for approximately $40 (Mr. Marin testified that the ring returned to him by a police officer was his wedding ring). See discussion of testimony infra. To rebut the strong presumption that counsel's performance was reasonable, the petitioner "must establish that no competent counsel would have taken the action that his counsel did take." Id. (internal quotation marks omitted). In light of the evidence presented at trial, the petitioner has failed to show that no reasonable counsel would have failed to object to this jury instruction. See Ward v. Hall, 592 F.3d 1144, 1164 (11th Cir. 2010) (stating that "[i]n order to establish that counsel's conduct was unreasonable . . . the petitioner must prove 'that no competent counsel would have taken the action that his counsel did take.'") (quoting Chandler v. United States, 218 F.3d 1305, 1315 (11th Cir. 2000) (en banc)).

In sum, the state post-conviction court's determination that the petitioner's counsel did not render deficient performance when he failed to object to this jury instruction (Ex. CCCC at 1-2) was not an unreasonable application of Strickland in light of the facts presented at trial. Under AEDPA, the issue is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher threshold. See Williams v. Taylor, 529 U.S. 362, 410 (2000). Here, the state post-conviction court's denial of the petitioner's claim

of ineffective assistance of counsel for failing to object to this jury instruction was not an unreasonable application of controlling Supreme Court precedent or an unreasonable determination of the facts. Accordingly, the petitioner has not shown entitlement to habeas corpus relief.

Moreover, even assuming without deciding, that the petitioner's counsel was deficient in failing to object to the jury instruction on the possession of recently stolen property, the petitioner has failed to show prejudice. The petitioner has not shown that there was a reasonable probability that the result of the proceeding would have been different because the jury heard sufficient evidence to find the petitioner guilty of dealing in stolen property.

At trial, the jury heard testimony from Mr. Marin that he was presented with a photo lineup, that he identified the person who had held the gun during the robbery from this photo lineup and that he was "certain" of his identification of this person. See Trial Transcript (Ex. BBB at 220-21). The person identified in the photo lineup which was published to the jury, id., was the petitioner. The jury also heard testimony from Mr. Marin that his wedding ring was taken from him during the robbery. Id. at 207, 214. He further testified that the ring was returned to him after the robbery by a police officer. Id. at 215. Mr. Marin testified that he recognized his wedding ring because he wore it everyday. Id. at 214. The jury also heard testimony from Detective Lopez concerning his interview with the petitioner. Detective Lopez relayed that:

> [the petitioner] indicated to [him] that he had had an opportunity to meet with Mr. Sanders on the evening of the incident at a gas station located off of 2nd Avenue and Northwest 54th Street and in making contact with [Mr. Sanders] he noticed that Mr. Sanders had some jewelry to sell. **He stated**

**that he purchased a silver colored wedding band for his father** and he noticed that Mr. Sanders had a watch that he was not used to seeing him wear along with a couple of other rings that he was trying to sell, and he also noticed some credit cards.

*** 

Q. And did [the petitioner] direct you to where the ring could be found, what did he do with the ring?

A. Yes. **[The petitioner] stated that he had given it to his father and sold it for approximately $40 to him** and he was able to take us to his father in order to recover that ring.

Id. at 284-85 (emphasis added). In light of Mr. Marin's testimony that he identified the man who held the gun during the robbery in a photo lineup and Detective Lopez' testimony that the petitioner told him that he had sold a wedding ring to his father, there was sufficient evidence presented at trial for the jury to conclude that the petitioner knew the wedding ring was stolen because he had participated in the robbery of Mr. Marin. Additionally, there was sufficient evidence from which the jury could conclude that the petitioner, knowing the ring was stolen, sold that ring to his father based on Detective Lopez' testimony at trial concerning the petitioner's statements. The jury could have also reasonably concluded that the ring the petitioner sold to his father was Mr. Marin's ring given Mr. Marin's testimony that he recognized the wedding ring the police officer returned to him as his wedding ring. In sum, there was sufficient evidence presented at trial for a reasonable jury to have convicted the petitioner of dealing in stolen property and the petitioner cannot show prejudice based on counsel's failure to object to this jury instruction. The petitioner cannot show a reasonable probability that, but for counsel's error in failing to object to this jury instruction, the result would have

been different. See Strickland, 466 U.S. at 694.

The petitioner's claim of ineffective assistance of counsel asserted in Ground Three should be **DENIED** on the merits. The petitioner has failed to show that the state post-conviction court misapplied the performance prong of Strickland in denying the petitioner's claim of ineffective assistance of counsel based on the failure to object to the dealing in stolen property jury instruction. Moreover, the petitioner has failed to show prejudice because there was sufficient evidence presented at trial which would have supported the petitioner's conviction for dealing in stolen property even without the inferences contained in the contested jury instruction.

**D.   Ground Four: The State's Failure to Produce the Videotaped Confession of Co-Defendant Anthony Sanders and to Preserve the '911 Call' Placed Following the Incident Constitutes a Violation of Brady and Trombetta and Deprived [Mr.] Broughton of Exculpatory Evidence**

In Ground Four, the petitioner argues that the State violated his due process rights when it destroyed or failed to preserve exculpatory evidence: the videotaped confession of co-defendant Sanders and the tape of the 911 call following the robbery. Memorandum in Support of Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 (DE# 1-1 at 29-32, 8/4/15).[32]

---

[32] The undersigned has doubts as to whether Ground Four is reviewable by this Court. Although the petitioner raised a claim of ineffective assistance of counsel based on trial counsel's failure to introduce portions of Mr. Sanders' statement in his first motion for post-conviction relief (Ex. ZZZ at 15-29), he did not raise a Brady violation claim as to this same evidence. Moreover, he did not assert any claims, Brady or otherwise, as to the 911 call in the first Motion for Post-conviction Relief (Ex. ZZZ). Although, the petitioner raised both the 911 call and a Brady violation based on the State's failure to turn over an interrogation tape (albeit of the petitioner and not Mr. Sanders) in the second Motion for Post-Conviction Relief (Ex. EEEEE), the state post-conviction court denied the petitioner's second motion for post-conviction relief based

The Supreme Court has recognized three components of a <u>Brady</u> violation: "[1]The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued." <u>Strickler v. Greene</u>, 527 U.S. 263, 281-82 (1999). The petitioner asserts that all three components are met as to Mr. Sanders' videotaped confession and the 911 call.

The petitioner maintains the evidence was exculpatory because Mr. Sanders' videotaped confession "undercuts [Mr.] Broughton's dealing in stolen property charge because [Mr.] Sanders admits he was in possession of Steve Marin's silver wedding band" and also "included mention of Willie Sanders,[33] the actual perpetrator of the offense and an individual who, unlike [Mr.] Broughton, matched almost perfectly with the descriptions provided by Steve and Maria Marin." Memorandum in Support of Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 (DE# 1-1 at 29, 8/4/15) (footnote added); <u>see</u> <u>also</u> Ground Two discussion, <u>supra</u>. The undersigned notes that the petitioner has not provided any record citation for the proposition that

_____

on state procedural grounds. <u>See</u> Order Denying Defendant's <u>Pro Se</u> Rule 3.850 Motion (Ex. GGGGG). For the reasons discussed in Ground Five, a state post-conviction court's order denying a claim on state procedural grounds is not reviewable by a federal habeas court. <u>See</u> Ground Five discussion, <u>infra</u>. Nonetheless, because the respondent did not raise any of these arguments as to Ground Four, the undersigned will address the merits of Ground Four without regard to the procedural concerns identified here.

[33] The reference to "Willie Sanders" appears to be a typographical error. In Ground Two, the petitioner asserts that "[Mr.] Sanders . . . named the perpetrator, a man named Willie Davis." Memorandum in Support of Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 (DE# 1-1 at 29, 8/4/15).

Willie Davis "matched almost perfectly with the descriptions provided by Steve and Maria Marin." Nonetheless, the undersigned will assume the petitioner's assertion is correct in considering Ground Four.

The petitioner further argues that the 911 call was exculpatory because "it contained indications that the perpetrators of the robbery were wearing masks." Memorandum in Support of Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 (DE# 1-1 at 29, 8/4/15). The petitioner cites to correspondence he wrote to the Assistant Public Defender "indicating [Detective] Lopez told [Mr.] Broughton 'that the victim got robbed by two strangers wearing a mask and that they cannot identify the people who robbed them.'" Id. at 30 (quoting Petitioner's Ex. J).

The petitioner further argues that this evidence was suppressed by the State in bad faith. See Memorandum in Support of Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 (DE# 1-1 at 30-31, 8/4/15). Specifically, the petitioner cites to Detective Lopez' testimony at the evidentiary hearing on the motions to suppress wherein he testified that Mr. Sanders' "interview was not recorded because [Mr.] Sanders did not want to provide a recorded statement and Detective Lopez 'didn't want to memorialize it.'" Id. at 30 (quoting Transcript of Motion to Suppress Hearing, Ex. QQ at 98). The petitioner maintains that "[Detective] Lopez then contradicted himself by stating, 'We always like to get a taped statement.'" Id. The petitioner notes that sometime after Mr. Sanders' March 10, 2009 guilty plea, "the State produced previously undisclosed photographs of [Mr.] Sanders in the interrogation room at police headquarters. Id. (citing Petitioner's Ex. K). The petitioner argues that these

111

photographs prove co-defendant Sanders' interview was videotaped:

> The photographs are very obviously screen shots of video recordings.
> They show [Mr.] Sanders eating while in the interrogation room and being
> allowed to use his cell phone. Crucially, the photographs of the monitor
> show a notation at the bottom of the screen admonishing officers to
> "Please turn off when not in use." This demonstrates the Sanders
> confession was recorded, [Detective] Lopez knew it was recorded, and
> knew how to operate the equipment at headquarters.

Id. The petitioner further argues that "[t]o the extent trial counsel did not determine this

information by way of deposition or subpoena, he was clearly ineffective." Id.

As to the 911 recording, the petitioner states:

> the 911 recording placed on the evening of the incident. [Mr.] Broughton
> informed both his public defender and trial counsel that a 911 recording
> existed indicating the two perpetrators of the crime were wearing masks.
> This call was subsequently destroyed by the Miami-Dade Police
> Department despite a preservation letter sent by the Miami-Dade Public
> Defender's Office, and the filing of a Motion to Preserve Electronic
> Records. See December 26, 2007, Preservation Letter, attached hereto
> as Exhibit "L", and December 21, 2007, Motion to Preserve Electronic
> Recordings, attached hereto as Exhibit "M". The State was very much
> aware of the existence of the 911 call and the defense's attempts to
> preserve it.

Memorandum in Support of Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. §

2254 (DE# 1-1 at 31, 8/4/15).

Generally, "[d]estruction of potentially exculpatory evidence violates Brady if law

enforcement acted in bad faith." Memorandum in Support of Petition for Writ of Habeas

Corpus Pursuant to 28 U.S.C. § 2254 (DE# 1-1 at 31, 8/4/15) (citing Arizona v.

Youngblood, 488 U.S. 51, 58, (1988)). The petitioner notes however, no bad faith is

required if the evidence "both possess an exculpatory value that was apparent before

the evidence was destroyed, and [was] of such a nature that the defendant would be

112

unable to obtain comparable evidence by other reasonably available means." Id.

(quoting California v .Trombetta, 467 U.S. 479, 489 (1984)). The petitioner argues that

in the instant case, he can show both bad faith and the factors required by Trombetta:

> the exculpatory confession of [Mr.] Sanders must have been immediately
> apparent to [Detective] Lopez given the information it contained. [Mr.]
> Broughton need not demonstrate bad faith as a result. Regardless, bad
> faith is present from the record due to [Detective] Lopez's contradictory
> and misleading testimony, and the "miraculous" production of the
> interrogation photographs discussed above.

Id.

The petitioner also argues that he was prejudiced by the State's failure to

produce this evidence. See Memorandum in Support of Petition for Writ of Habeas

Corpus Pursuant to 28 U.S.C. § 2254 (DE# 1-1 at 31-32, 8/4/15). The petitioner notes

that under Brady or Giglio v. United States, 405 U.S. at 150, 154 (1972),[34] all he would

need to show to establish prejudice is "a reasonable probability of a different result as

to either guilt or penalty." Id. at 31 (citation and internal quotation marks omitted;

footnote added). The petitioner argues that he has met this burden because:

> The Sanders confession likely would have resulted, at minimum, in a not
> guilty verdict on the dealing in stolen property count and would have
> bolstered [Mr.] Broughton's claim that Willie Davis was the actual
> perpetrator. It also would have provided strong impeachment evidence to
> contradict [Detective] Lopez's several varying accounts of what [Mr.]

---

[34] To support a Giglio claim, "a petitioner 'must establish that (1) the prosecutor
knowingly used perjured testimony or failed to correct what he subsequently learned
was false testimony; and (2) such use was material – i.e., that there is a reasonable
likelihood that the false testimony could have affected the judgment.'" Ferguson v.
Sec'y, Dep't of Corr., 580 F.3d 1183, 1208 (11th Cir. 2009) (quoting Davis v. Terry, 465
F.3d 1249, 1253 (11th Cir. 2006)). The petitioner does not explain how Giglio applies to
Ground Four and makes no allegation that the State used or failed to correct perjured
testimony. In any event, he fails to establish any Giglio violation.

Sanders actually said. The suppression or destruction of the videotape of the Sanders confession thus qualifies as prejudicial for purposes of <u>Brady</u> and <u>Giglio</u>. Similarly, the 911 recording would have completely undercut [Mr.] Marin's alleged identification of [Mr.] Broughton and [Mr.] Sanders and destroyed the only real piece of evidence the State possessed. It[s] suppression and destruction too, violated <u>Brady</u> and <u>Giglio</u>.

<u>Id.</u> at 32.

The respondent argues that the State's failure to produce Mr. Sanders' videotaped confession or to preserve the 911 call did not violate <u>Brady</u> or <u>Trombetta</u>. <u>See</u> Response to Order to Show Cause (DE# 14 at 64-78, 9/18/15). As to the photographs of Mr. Sanders in a police interview room, the respondent:

> acknowledges that Petitioner attached as an appendix to his post-conviction motion a copy of two pictures allegedly showing Mr. Sanders on his cell phone in an interrogation room. Petitioner also asserts that the State disclosed these pictures to Petitioner sometime after Mr. Sander's deposition. <u>See</u> Petition, p. 30.[35] It is unclear when the pictures were disclosed and even exactly what they demonstrate – i.e, they could indeed be proof that Mr. Sanders' interview was videotaped, however, they could also simply be proof that Mr. Sanders was filmed at some point looking at his cell phone. Indeed, it is possible, although Respondent does not know, that these were the pictures to which the prosecutor was referring as far back as the March 9, 2009 hearing, discussed above. <u>See</u> Ex. QQ, p. 147. Notwithstanding, the [existence] of the pictures themselves, however, does not afford Petitioner the relief he seeks.

<u>Id.</u> at 70-71 (footnote added). The respondent notes that "it appears Petitioner is not claiming that he was unaware of them at the time of trial. Accordingly, even if those pictures were disclosed at a late date, they were apparently nonetheless disclosed at

---

[35] What the petitioner asserts is that these photographs of Mr. Sanders were disclosed at some point after Mr. Sanders' guilty plea. <u>See</u> Memorandum in Support of Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 (DE# 1-1 at 30, 8/4/15) (stating "[a]t some point following Sanders's March 10, 2009, plea of guilty, the State produced previously undisclosed photographs of Sanders in the interrogation room at police headquarters.").

some point, and it cannot be said that the State suppressed that evidence." Id. at 72. However, it is not the photographs themselves that the petitioner asserts the State failed to produce, it is the videotaped interview of Mr. Sanders. The respondent is not asserting that the state produced the videotape of Mr. Sanders, to the contrary, the respondent spends several pages of his response brief citing testimony suggesting that Mr. Sanders' interview was never taped. See Response to Order to Show Cause (DE# 14 at 65-70, 9/18/15).

The respondent further argues that the petitioner's counsel was not ineffective in failing to pursue the missing videotape. See Response to Order to Show Cause (DE# 14 at 72-77, 9/18/15).The respondent notes that Mr. Sanders provided unfavorable testimony concerning the petitioner's participation in the robbery of Mr. and Mrs. Marin during his deposition testimony and provided unfavorable testimony at the evidentiary hearing on the motions to suppress when he identified the petitioner as the person he purchased certain items from. Id. at 72. The respondent argues that:

> even if the pictures showed that Det. Lopez was mistaken about the interviewing being videotaped, or even so far as to show he was being dishonest, the state having had Det. Lopez impeached in such a way would likely have been inclined to call Mr. Sanders to the stand to explain his version of events which would have been detrimental to Petitioner.

Id. at 72-73.

As to the 911 tape, the respondent notes, "there does not appear to be record evidence of a 911 tape actually existing other than Petitioner's assertion that one did."

Response to Order to Show Cause (DE# 14 at 73, 9/18/15).[36] The respondent notes that: "while true that Petitioner sought to preserve any electronic evidence, which would include a 911 tape, when the 911 tape was specifically requested, the response given was that a search indicated there had not been a 911 tape." Id. (citing January 11, 2012 Letter from State Attorney (Ex. YYY)).[37] The respondent also notes that the petitioner raised the existence of the 911 call at his sentencing hearing wherein the petitioner stated that Detective Lopez had told him that the 911 call "indicate[d] that the [robbers] had on masks and they didn't know how they looked." Sentencing Hearing Transcript (KKK at 15). The petitioner's counsel stated that he did not recall a 911 call in the case, but if there was evidence of a 911 tape he may need to file a motion for new trial. Id. at 16. The prosecutor also indicated that she was not aware of a 911 tape in the case. Id.

The respondent further argues that even if the 911 tape existed, "not withstanding the record evidence to the contrary" that:

> it is unclear how such a tape would have served to have helped Petitioner such that he should be afforded federal habeas corpus relief. Indeed, presumably that tape would have been a call from one of the victims. As Mr. Marin identified Petitioner in a photo array and later testified at the trial

---

[36] The undersigned notes that at trial, Mr. Marin testified that he called police following the robbery. See Trial Transcript (Ex. BBB at 212). Additionally, the petitioner filed correspondence stating that "[MDPDCS] retains audio recordings for a period of 60 days . . . ." (Petitioner's Ex. P). Thus, there is evidence suggesting that the 911 tape actually existed, at least for a period of 60 days.

[37] This was not the only request for the tape of the 911 call. The petitioner has filed a letter dated December 26, 2007 sent by the petitioner's counsel to the MDPDCS requesting copies of the BOLO and 911 calls for December 14, 2007. (Petitioner's Ex. L). Neither party has filed any documents concerning MDPDCS' response to this letter.

> to the detriment of Petitioner, the 911 tape stating that the assailants wore masks would admittedly provide some marginal assistance to Petitioner, however, it would still not serve to explain how Mr. Marin made his positive photo array identification nor explain how his ring was found in Petitioner's father's house. As the 911 tape, presumably describing the events which had transpired would have possibly inculpated Petitioner as much as exculpated him, even if the 911 tape had existed at some point, Respondent submits that any claim of bad faith destruction of that 911 tape would be tenuous at best, and when evidence has been destroyed, absent bad faith on the part of the government, there is no due process claim.

Id. at 75-76. Lastly, the respondent notes that Detective Lopez testified that Mr. Sanders' interview was not recorded and that Sergeant Rodriguez was present when Mr. Sanders told Detective Lopez that he did not want his statement memorialized on tape. Id. at 77-78 (there appears to be an obvious typographical error on page 77 of the response wherein the respondent states "there was testimony not only from Detective Lopez that a tape existed;" the response cites to pages 97-99 of the evidentiary hearing transcript on the motions to suppress wherein Detective Lopez testified that Mr. Sanders' interview was not recorded and that Sergeant Rodriguez was present to witness Mr. Sanders declining to have his interview taped); see Suppression Hearing Transcript (Ex. QQ at 97-99).

In his reply, the petitioner maintains that the State did have possession and knowledge of the Brady evidence. See Petitioner's Reply to Response to Order to Show Cause (DE# 17 at 22, 10/12/15). As to the videotaped recording of Mr. Sanders, the petitioner states:

> at some point following [Mr.] Sanders's March 10, 2009, plea of guilty, the State produced previously undisclosed photographs of [Mr.] Sanders in the interrogation room at police headquarters. The photographs are very obviously screen shots of video recordings. They show [Mr.] Sanders

eating while in the interrogation room and being allowed to use his cell phone. Crucially, the photographs of the monitor show a notation at the bottom of the screen admonishing officers to "Please turn off when not in use." This demonstrates the Sanders confession was recorded, [Detective] Lopez knew it was recorded, and knew how to operate the equipment at headquarters. It is not apparent from the record where the photos came from or why they were turned over only after [Mr.] Sanders's confession. To the extent trial counsel did not determine this information by way of deposition or subpoena, counsel was clearly ineffective. Detective Orlando Lopez had a history with the Broughton family, including Joshua's brother, Jermell. [Detective] Lopez was present when Joshua Broughton was arrested due to a bench warrant on an unrelated West Palm Beach criminal case and believed [Mr.] Broughton [was] involved. The investigation of the case played out with [Mr.] Broughton the target regardless of what evidence the investigation uncovered.

Id. at 23-24.

As to the 911 call, the petitioner asserts that he:

informed both his public defender and trial counsel that a 911 recording existed indicating the two perpetrators of the crime were wearing masks. In addition, the Miami-Dade Public Defender's Office sent a preservation letter and filed a Motion to Preserve Electronic Records. See Exhibit "L", and Exhibit "M", initial brief. However, the 911 call was subsequently destroyed by the Miami-Dade Police Department. The State was very much aware of the existence of the 911 call and the defense's attempts to preserve it.

Petitioner's Reply to Response to Order to Show Cause (DE# 17 at 24, 10/12/15).

The petitioner has failed to show a Brady violation stemming from the State's failure to produce Mr. Sanders' videotaped statement (assuming that the statement was actually recorded) because the petitioner cannot show prejudice. As noted above, one of the requirements for a Brady violation is that "prejudice must have ensued." Strickler, 527 U.S. 263, 281-82 (1999). The Eleventh Circuit has observed that the test for prejudice under Brady is the same as that for claims alleging ineffective assistance of counsel under Strickland. See Tanzi v. Sec'y, Florida Dep't of Corr., 772 F.3d 644, 662

(11th Cir. 2014). In addressing Ground Two, the undersigned already determined that the petitioner cannot show prejudice stemming from the failure to introduce Mr. Sanders' exculpatory statement at trial. The undersigned's analysis applies equally to the petitioner's <u>Brady</u> claim. <u>See</u> Ground Two, <u>supra</u>. In short, had Mr. Sanders' exculpatory statement been introduced at trial, it would have opened the door for the State to present Mr. Sanders' sworn deposition testimony wherein he testified that he and the petitioner committed the December 14, 2007 robbery and that the petitioner was the one who attempted to sell certain items obtained from the robbery (the cell phone and the wristwatch) to George Garcia. <u>See</u> Deposition of Anthony T. Sanders (Ex. XX at 8, 11-12, 21, 27-28, 30). Additionally, the introduction of Mr. Sanders' exculpatory statement would have allowed the State to introduce Mr. Sanders' testimony from the evidentiary hearing on the motions to suppress wherein he testified that the items found at his house (the hair clippers and Mr. Marin's wristwatch) had been obtained from the petitioner. <u>See</u> Transcript of Evidentiary Hearing on Motions to Suppress (Ex. QQ at 138-39). In light of the damaging evidence that the State would have been allowed to introduce to impeach Mr. Sanders' exculpatory statement, the undersigned cannot conclude that the State's failure to produce a recording  of Mr. Sanders' exculpatory statement prejudiced the defense. Accordingly, the petitioner has failed to show a <u>Brady</u> violation.

As to the tape of the 911 call, the petitioner has shown that his counsel made a timely request for the 911 tape recording and that no 911 tape was ever produced. However, there is nothing in this record establishing bad faith on the part of the

prosecutor or the police in failing to preserve the 911 tape. See, e.g., Illinois v. Fisher, 540 U.S. 544, 548 (2004) (stating that "[the Supreme Court] ha[s] never held or suggested that the existence of a pending discovery request eliminates the necessity of showing bad faith on the part of police."). There is no evidence that the prosecutor ever obtained a copy of the 911 call. See Sentencing Hearing Transcript (Ex. KKK at 15-18) (wherein prosecutor states that she did not recall "having" a 911 tape in this case). As to the police, there is no evidence that law enforcement destroyed the 911 call in bad faith. In fact, the petitioner supplies an argument for the bad faith destruction of Mr. Sanders' statement, but does not provide an argument to support the bad faith destruction of the 911 tape. See Memorandum in Support of Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 (DE# 1-1 at 31, 8/4/15) (stating that "bad faith is present from the record due to Lopez's contradictory and misleading testimony, and the 'miraculous' production of the interrogation photographs [of Mr. Sanders] discussed above."); Petitioner's Reply to Response to Order to Show Cause (DE# 17 at 25, 10/12/15) (same).

The petitioner argues that in any event he does not need to show bad faith under California v. Trombetta, 467 U.S. 479, 488 (1984) where "no bad faith is required if the evidence 'both possess[es] an exculpatory value that was apparent before the evidence was destroyed, and [was] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.'" Memorandum in Support of Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 (DE# 1-1 at 31, 8/4/15) (quoting Trombetta, 467 U.S. at 489). The petitioner argues that the exculpatory

120

value of the 911 call was readily apparent because "it contained indications that the perpetrators of the robbery were wearing masks." Petitioner's Reply to Response to Order to Show Cause (DE# 17 at 24, 10/12/15).

In California v. Trombetta, 467 U.S. 479, 482 (1984), the defendants were charged with driving while intoxicated. "The arresting officers . . . failed to preserve samples of respondents' breath" used to provide an estimate of the amount of alcohol on their breath. Id. The respondents both claimed that had their breath samples been preserved, they would have been able to impeach the incriminating test results. Id. In rejecting the respondents' due process claims, the Supreme Court observed that the police officers "were acting in good faith and in accord with their normal practice" in disposing the breath samples. Id. at 488 (citing Killian v. United States, 368 U.S. 231, 242 (1961)). And "more importantly," the missing evidence did not "meet [the] standard of constitutional materiality." Id. at 488-89. To meet the materiality standard, the "evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." Id. In determining that the respondents could not meet these requirements, the Court noted that "the chances [were] extremely low that preserved samples would have been exculpatory" and the respondents had "alternative means of demonstrating their innocence" through inspecting the calibration of the machine used to estimate blood alcohol content or cross-examining the officer who administered the test. Id. at 490.

In Arizona v. Youngblood, 488 U.S. 51, 58 (1988), the police failed to preserve

blood and semen samples taken from a rape victim. The Supreme Court acknowledged that "the likelihood that the preserved materials would have enabled the defendant to exonerate himself appears to be greater than it was in <u>Trombetta</u>, but here, unlike in <u>Trombetta</u>, the State did not attempt to make any use of the materials in its own case in chief." <u>Id.</u> at 56. Notwithstanding the potential evidentiary value of this evidence, the Supreme Court still required the defendant to make a showing of bad faith on the part of law enforcement which he could not do. <u>Id.</u> at 58 (stating "[t]he Arizona Court of Appeals noted in its opinion – and we agree – that there was no suggestion of bad faith on the part of the police. It follows, therefore, from what we have said, that there was no violation of the Due Process Clause.").

Here, the 911 call from one or both of the victims stating that the robbers were wearing masks would have had even less evidentiary value than the evidence that was not preserved in <u>Trombetta</u> and <u>Youngblood</u>. It would have provided the petitioner with impeachment material with which to attack Mr. Marin's photo lineup identification of the petitioner as one of the robbers. However, at trial the jury still heard testimony concerning discrepancies between the description of the robber provided by Mr. Marin and the petitioner's actual physical attributes. <u>See</u> Trial Transcript (Ex. BBB at 261) (Detective Lopez summarizing Mr. Marin's description of "the one that had the gun as a black male, medium to dark complexion, 20 to 30 years old. Approximately 5'9" in height, approximately 160 pounds, un-shaven . . . ."); <u>Id.</u> at 323 (Ms. Irby describing the petitioner as five feet three inches tall and weighing 130 pounds). The petitioner's counsel was also able to show that while the petitioner had gold teeth, Mr. Marin's

description of the gunman did not include the gold teeth. Id. at 230. Moreover, the jury could have still concluded that the petitioner committed the robbery based on the fact that the petitioner led law enforcement to Mr. Marin's wedding ring (stolen during the robbery) which was recovered from the petitioner's father. The 911 call was at best potentially useful evidence, but not the type of evidence that would have relieved the petitioner of the burden of establishing bad faith. See Youngblood, 488 U.S. at 58 (holding that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.").

Because the 911 call was only potentially useful evidence, under Supreme Court precedent the petitioner would still need to show bad faith. There is nothing in this record to support a finding of bad faith on the part of law enforcement in failing to preserve the 911 call. See Trombetta, 467 U.S. at 488 (finding no bad faith and noting that law enforcement in that case "did not destroy respondents' breath samples in a calculated effort to circumvent" Brady); United States v. Cruz, 508 F. App'x 890, 901 (11th Cir. 2013) (stating that "[t]o establish a due process violation based upon destruction of evidence, the defendant must also show bad faith on the part of the police. Bad faith is present if the officer destroyed the evidence 'in a calculated effort to circumvent the disclosure requirements established by Brady v. Maryland.'") (quoting Trombetta, 467 U.S. at 488).

Additionally, the petitioner has not shown a Brady violation because he cannot meet the suppression prong of Strickler, 527 U.S. at 281-82. It is evident from the

documents filed by the petitioner that he believed that a 911 tape existed well before the petitioner's case proceeded to trial. See Petitioner's Ex. J (undated letter from the petitioner indicating that between December 19-21, 2007, the petitioner spoke to his counsel and relayed to counsel that a Detective told the petitioner "that the victim got robbed by two strangers wearing a mask and that they cannot identify the people who robbed them."); Petitioner's Ex. M at 2 (Motion to Preserve Electronic Recordings including 911 tape); Petitioner's Ex. L (December 26, 2007 letter from petitioner's counsel to MDPDCS requesting a copy of BOLO and 911 calls). Thus, the petitioner and his counsel were aware of the possible existence of the 911 call well before the May 11-13, 2009 trial. It appears that the petitioner may have waited until his sentencing hearing to raise the issue of the tape of the 911 call. See Sentencing Transcript, Ex. KKK at 15-18 (trial judge indicating that this was "[t]he first all of us are hearing about a 911 tape identifying a mask."). In any event, the petitioner has not shown a Brady violation. See Occhicone v. State, 768 So.2d 1037, 1042 (Fla. 2000) (noting that "a Brady claim cannot stand if a defendant knew of the evidence allegedly withheld or had possession of it, simply because the evidence cannot then be found to have been withheld from the defendant.").

Although the State never produced a tape of the 911 call, the petitioner believed the 911 call existed well before the case proceeded to trial. Thus, this is not a situation where the petitioner learned of the existence of exculpatory evidence for the first time **after** his trial. See United States v. Cravero, 545 F.2d 406, 420 (5th Cir. 1976) (observing that "[t]he purpose of Brady is to assure that the accused will not be denied

access to exculpatory evidence **known to the government but unknown to him**) (emphasis added); United States v. Manthei, 979 F.2d 124, 127 (8th Cir. 1992) (Brady is only violated if evidence is discovered, after the trial, of information which had been known to the prosecution but unknown to the defense). The petitioner has not shown entitlement to a new trial under Brady.

At the time of trial, the petitioner believed the tape of a 911 call existed wherein one or both of the victims stated that the robbers were wearing masks. The petitioner proceeded to trial knowing he did not have this tape of the alleged 911 call and did not seek relief from the court based on the State's failure to produce the tape of the 911 call. Under these circumstances – where the petitioner knew of the existence of the exculpatory evidence – the petitioner has not shown a Brady violation because the petitioner cannot meet Brady's suppression requirement. Although the 911 tape was never produced, the substance of the 911 tape (that one or both of the victims could not identify the robbers because they were wearing masks)[38] was known to the petitioner at the time of trial. Based on these facts, the petitioner has not shown a Brady violation stemming from the State's failure to produce a tape of the 911 call.

Ground Four should be DENIED on the merits. The petitioner cannot show prejudice stemming from the State's failure to produce the video recording of Mr. Sanders' statement (if it existed). The petitioner has also failed to show a Brady

---

[38] The only evidence that robbers were wearing masks comes from the petitioner. Nonetheless and for purposes of resolving the instant motion, the undersigned will accept as true the substance of the 911 call as relayed by the petitioner in his filings.

violation stemming from the State and law enforcement's failure to produce the tape of

the 911 call because the petitioner cannot show bad faith and because the petitioner

cannot show that this evidence was suppressed by the State.

**E.     Ground Five: Trial Counsel's Failure to Call a Material, Exculpatory, and Available Alibi Witness Constituted Ineffective Assistance of Counsel in Violation of the Sixth and Fourteenth Amendments and the State Post-Conviction Court's Refusal to Hold an Evidentiary Hearing on the Issue was Contrary to Clearly Established Federal Law and an Unreasonable Determination in Light of the Evidence Presented**

In Ground Five, the petitioner argues that his counsel should have called his

girlfriend's grandmother, Cynthia Hill, at trial as an alibi witness. See Memorandum in

Support of Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 (DE# 1-1

at 32-35, 8/4/15).

At trial, the petitioner's counsel presented the testimony of the petitioner's

girlfriend, Tommeisha Irby. See Trial Transcript (Ex. BBB at 320-33). Ms. Irby testified

that on December 14, 2007 (the day of the robbery) she was with the petitioner from

approximately noon until approximately 10:42 p.m. Id. at 321. Ms. Irby testified that she

recalled this date because she had sex with the petitioner that night and that

approximately a month or two later she learned she was pregnant. Id. at 322. She also

testified that the petitioner was 5 feet and three inches tall, weighed 130 pounds and

had gold teeth. Id. at 323, 325.

On cross-examination, Ms. Irby testified that she could not remember the

address of her uncle's house, where she resided. See Trial Transcript (Ex. BBB at 326-

327). She also admitted that she had sex with the petitioner on prior occasions. Id. at

329. The prosecutor was able to impeach Ms. Irby with her deposition testimony

wherein she testified that she believed she was already pregnant on the date of the robbery. Id. at 330.[39] Ms. Irby also admitted that she did not recall the time when she did several things that day including waking up, going to her job to pick up a paycheck, going to a check cashing store, picking up food and returning to her uncle's house. Id. at 331.

According to the petitioner, Ms. Irby's grandmother, "Cynthia Hill was available at the time of trial and ready, able, and willing to testify as a defense witness on [Mr.] Broughton's behalf." Memorandum in Support of Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 (DE# 1-1 at 32, 8/4/15). The petitioner further asserts that Ms. Hill would have testified that the petitioner was at Ms. Hill's home[40] from approximately 7:00 p.m. "until after 10:00 [p.m.]." Id. The petitioner argues that he was prejudiced by his counsel's decision not to call Ms. Hill to the stand because: (1) Ms. Irby could not remember the address of the residence where she lived; (2) Ms. Irby was impeached concerning the time line of her pregnancy; (3) "Ms. Irby was a nervous teenager at the time of trial and likely did not appear calm, cool, and collected" and (4) Ms. Irby had a tattoo of the defendant on her arm which the prosecution used to discredit her testimony. Id. at 33. By contrast, the petitioner notes that Ms. Hill is a 54-year-old woman who did not have a personal relationship with the defendant, she would have testified to the address of the residence where she resided and the petitioner

---

[39] On redirect, Ms. Irby testified that had she conceived on December 14, 2007, she would have been pregnant that day. See Trial Transcript (Ex. BBB at 332).

[40] Ms. Irby's trial testimony was that she resided at her uncle's house. This appears to also be her grandmother's residence.

speculates that "she likely would not have appeared rattled as [Ms.] Irby [did] while subject to cross-examination." Id. In essence, the petitioner argues that Ms. Hill would have made a better witness than her granddaughter, Ms. Irby.

The petitioner argues that his counsel rendered ineffective assistance when he failed to call Ms. Hill as an alibi witness and that he is entitled to an evidentiary hearing on the issue. He further argues that Ms. Hill's testimony was not cumulative because she would had been an independent defense witness. See Memorandum in Support of Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 (DE# 1-1 at 33, 8/4/15) (citing Taylor v. State, 522 So.2d 418 (Fla. 5th DCA 1988); State v. Wells, 538 So.2d 1292 (Fla. 2d DCA 1989)). The petitioner notes that the state post-conviction court erroneously denied his second motion for post-conviction relief (Ex. EEEEE) wherein he raised his counsel's failure to call Ms. Hill as a witness. Id. The state court denied the petitioner's second motion for post-conviction relief as follows: "The Defendant's motion is successive. This Court previously denied the Defendant's motion on November 28, 2012. The Defendant does not allege any new grounds in his instant motion. Further[,] the Third District has jurisdiction under DCA/# 3D 13-155." Order Denying Defendant's Pro Se Rule 3.850 Motion (Ex. GGGGG). The petitioner notes his claim of ineffective assistance of counsel for failure to call Ms. Hill was unrelated to any claims he had previously raised. See Memorandum in Support of Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 (DE# 1-1 at 33, 8/4/15).

The petitioner further argues that this claim of ineffective assistance of counsel "cannot be rejected as a strategic decision or merely cumulative evidence without an

128

evidentiary hearing." Memorandum in Support of Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 (DE# 1-1 at 34, 8/4/15).[41] According to the petitioner, his "[c]ounsel's performance in failing to call [Ms.] Hill as a witness 'fell below an objective standard of reasonableness' and severely prejudice[d] his ability to proffer an effective theory of defense" and "[a]t very least, [he] deserved an evidentiary hearing at the state post[-]conviction level and now deserves one before this Court." Id. (quoting Strickland, 466 U.S. at 688).

The respondent does not dispute that the petitioner's second motion for post-conviction relief (Ex. EEEEE) raised claims that had not been raised in his first motion for post-conviction relief (Ex. ZZZ). See Response to Order to Show Cause (DE# 14 at 79 at n. 33, 9/18/15). Nonetheless, the respondent maintains that the petitioner is not entitled to relief on Ground Five. Id. The respondent argues that the petitioner's second motion for post-conviction relief (Ex. EEEEE) was still successive because the petitioner had previously filed a prior motion for post-conviction relief (Ex. ZZZ). Id. (stating that the petitioner's claim of ineffective assistance of counsel in Ground Five "could properly be deemed successive as the facts underlying this claim were known to Petitioner both at the time of his direct appeal and at the time of his first motion for post-conviction relief on March 28, 2013"). The respondent notes that because the facts underlying this claim of ineffective assistance of counsel – the failure to call Ms. Hill as

---

[41] The state post-conviction court's order denying the petitioner's second motion for post-conviction relief did not address the merits of any of the petitioner's claims and therefore did not reject the petitioner's claim of ineffective assistance of counsel on strategic or tactical grounds or as cumulative. See Order Denying Defendant's Pro Se Rule 3.850 Motion (Ex. GGGGG).

a defense witness at trial – were known to the petitioner at the time of trial, these facts

cannot constitute newly discovered evidence. Id. at 80-81. Thus, the respondent

reasons:

> while the trial court's order denying Petitioner's second motion for
> post-conviction relief did err in stating that the second petition raised the
> same grounds, the order was correct in that the second motion was
> successive as it raised additional allegations of ineffective assistance of
> counsel, including the one at issue in [Ground Five], and thus, was
> procedurally barred as successive.

Id. at 81.

As to the merits of the petitioner's claim, the respondent notes that "whether to

call a particular witness to testify at trial is ordinarily a strategic decision committed to

the professional judgment of trial counsel, assuming that counsel has conducted a

reasonable investigation before making such a decision. These strategic decisions are

generally not subject to post-conviction attack under Strickland." Response to Order to

Show Cause (DE# 14 at 81, 9/18/15).

The respondent further argues that Ms. Hill's testimony "would not have made a

difference in Petitioner's case." Response to Order to Show Cause (DE# 14 at 82,

9/18/15). The respondent notes that Mr. Marin testified at trial that the robbery took

place around 10:30 p.m. Id. at 83 (citing Trial Transcript, Ex. BBB at 226-27).[42]

---

[42] The undersigned disagrees with the respondent that this fact was established
at trial. With respect to the time of the robbery, Mr. Marin testified as follows:

Q . Okay. And this is around 10:30 at night?

**A. I guess.**

Q. You don't remember?

According to the petitioner, Ms. Hill would have testified that the petitioner left her house around 10:00 p.m. Thus, the respondent reasons that "[t]o the extent Petitioner was seeking to establish an alibi as to his location at or around the time of the actual offense, 10:30 p.m., Tommisha Irby testified that he was with her until a specific time, 10:42 p.m." Id. The respondent concludes that:

> As the jury heard Petitioner's alibi from Tommisha Irby that he was with her at the time of the incident and apparently discounted it, the fact that Ms. Hill would have stated that he was there until 10:00 would not have impacted the jury in a significant fashion. Since the jury was presented with evidence that they clearly did not accept when weighed against the evidence presented by the state, Petitioner cannot demonstrate the prejudice required under Strickland to be afforded relief on this claim.

Id. at 84.

In his reply, the petitioner notes that "Respondent . . . concede[d] that the lower court erred to hold [Mr.] Broughton's claims to be successive. . . . Yet Respondent also alleges [Mr.] Broughton's post[-]conviction motions were successive and therefore ineligible for relief before this Court." Petitioner's Reply to Response to Order to Show Cause (DE# 17 at 26, 10/12/15). What the respondent stated in his response brief was that "[w]hile, as acknowledged supra Petitioner's March 28, 2013 motion did raise different issues tha[n] his prior post-conviction motion, compare Ex. ZZZ with Ex.

―――――――――――――――――

    A. It was nighttime.

    Q. Okay.

    A. It was late.

Trial Transcript (Ex. BBB at 226-27) (emphasis added).

EEEEE, **this motion was nonetheless successive as Petitioner had filed a previous motion for post-conviction relief on March 29, 2012**." Response to Order to Show Cause (DE# 14 at 79, 9/18/15) (emphasis added). Thus, the respondent continues to maintain that Ground Five is successive even though the issues raised in the petitioner's first and second motions for post-conviction relief were different. This is because the petitioner could have raised the claim that counsel rendered ineffective assistance when he failed to call Ms. Hill in his first motion for post-conviction relief.

The petitioner maintains that "[Mr.] Broughton's claims are not successive because they are unrelated to any claim raised previously." Petitioner's Reply to Response to Order to Show Cause (DE# 17 at 26, 10/12/15). However, a post-conviction claim is successive when it raises a claim that could have been raised in a prior post-conviction motion. See Scrambling v. State, 919 So.2d 671, 672 (Fla. 5th DCA 2006) (concluding that a Rule 3.850 motion for post-conviction relief was procedurally barred as successive where the "defendant's current rule 3.850 motion [wa]s one that could have or should have been raised in his first rule 3.850 motion"). Here, the petitioner cannot argue that counsel's failure to call Ms. Hill is newly discovered evidence. The petitioner knew as early as August 4, 2008 when he sent a letter to trial counsel that Ms. Hill could potentially serve as an alibi witness for the defense. See Memorandum in Support of Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 (DE# 1-1 at 32, 8/4/15) (discussing the August 8, 2008 letter the petitioner sent to trial counsel regarding Ms. Irby and Ms. Hill). Moreover, the petitioner knew when the defense rested that Ms. Hill was not called as a witness at trial. The

petitioner did not raise a claim of ineffective assistance of counsel based on counsel's failure to call Ms. Hill in his first motion for post-conviction relief (Ex. ZZZ). Therefore, the evidence Ms. Hill could have provided at trial was not newly discovered evidence and the petitioner's second motion for post-conviction relief was successive as to the claim asserted in Ground Five, because he could have asserted it in his first motion for post-conviction relief and failed to do so.

The petitioner also argues that the Court should find that Ground Five is not procedurally barred under Trevino and Martinez for the reasons discussed in Ground One. See Petitioner's Reply to Response to Order to Show Cause (DE# 17 at 27, 10/12/15). The undersigned previously rejected the petitioner's Trevino/Martinez argument and for those same reasons the undersigned concludes that neither Trevino nor Martinez excuse the procedural bar to Ground Five.

The petitioner further maintains that "[t]rial counsel's decision not to call Ms. Hill cannot be immunized as a strategic decision or as merely cumulative evidence without an evidentiary hearing." Petitioner's Reply to Response to Order to Show Cause (DE# 17 at 27, 10/12/15). The petitioner also insists that counsel's failure to call Ms. Hill resulted in prejudice: Ms. Hill's "credible testimony calling into question the Marins' relatively weak identification of [Mr.] Broughton could have easily upset the prosecution's case." Id. He argues that "[a]t minimum, there was sufficient conflicting evidence remaining after trial to entitle [Mr.] Broughton to an evidentiary hearing at the state post-conviction level under clearly established law." Id.

### i.      Ground Five is Procedurally Barred

Although the state post-conviction court's denial of the petitioner's second motion for post-conviction relief (Ex. EEEEE) rested in part on an erroneous view that the petitioner did not allege any new grounds in his second motion for post-conviction relief, see Order Denying Defendant's Pro Se Rule 3.850 Motion (Ex. GGGGG), the state court's adjudication did not result in a decision that was contrary to, or an unreasonable application of, clearly established federal law because the state post-conviction court's ruling was based on state procedural law. In any event, the state post-conviction court did not err when it determined that the petitioner's second motion for post-conviction relief (Ex. EEEEE) was successive, albeit for the wrong reasons. The facts supporting all eight grounds asserted in the petitioner's second motion for post-conviction relief (Ex. EEEEE) were known to the petitioner at the time he filed his first motion for post-conviction relief (Ex. ZZZ). "Florida law procedurally bars new claims . . . when 'the circumstances upon which they are based were known or should have been known at the time the prior petition was filed.'" Johnson v. Singletary, 647 So.2d 106, 109 (Fla. 1994); Christopher v. State, 489 So.2d 22, 24 (Fla. 1986) (stating that "[t]he abuse of the procedure doctrine, as recently codified in rule 3.850, is now expanded to allow a court to summarily deny a successive motion for post-conviction relief **unless the movant alleges that the asserted grounds were not known and could not have been known to the movant at the time the initial motion was filed. Further, the movant must show justification for the failure to raise the asserted issues in the first motion**) (emphasis added).

In <u>Jimenez</u>, 481 F.3d at 1342, the Eleventh Circuit explained that "if unexhausted claims would be procedurally barred in state court under the state's law of procedural default, the federal court may consider the barred claims as having no basis for federal habeas relief." Ms. Hill and the substance of her expected testimony were known to the petitioner at the time of his first motion for post-conviction relief (Ex. ZZZ). Yet, the petitioner failed to include a claim of ineffective assistance of counsel for failure to call Ms. Hill as an alibi witness at trial in his first motion for post-conviction relief. That argument was raised in his second motion for post conviction relief (EEEEE) which the state post-conviction court denied on state procedural grounds. Accordingly, the petitioner's claim is procedurally barred from federal habeas review in this Court.

In sum, although the state post-conviction court incorrectly concluded that the claims raised in the petitioner's second motion for post-conviction relief (Ex. EEEEE) were not new claims, it correctly determined that the petitioner's claims (including the instant claim of ineffective assistance of counsel in failing to call Ms. Hill) were successive under Florida law. <u>See</u> <u>Scrambling v. State</u>, 919 So.2d 671, 672 (Fla. 5th DCA 2006) (concluding that a Rule 3.850 motion for post-conviction relief was procedurally barred as successive where the "defendant's current rule 3.850 motion [wa]s one that could have or should have been raised in his first rule 3.850 motion"). The Eleventh Circuit has instructed that "[w]hen a state court denies a claim as defaulted based on an adequate and independent state procedural rule, a petitioner may not bring the claim in federal habeas unless he can show cause for and actual prejudice from the default" or "avoid a fundamental miscarriage of justice." <u>Lucas v.</u>

Warden, Georgia Diagnostic & Classification Prison, 771 F.3d 785, 801 (11th Cir. 2014). The petitioner has not shown that any of these three exceptions apply to the claim asserted in Ground Five. Accordingly Ground Five is procedurally barred from federal habeas review.

**ii.    Ground Five Lacks Merit**

Even if the Court were to consider the merits of Ground Five, the petitioner has failed to show entitlement to habeas corpus relief. The petitioner has not included an affidavit or declaration from Ms. Hill attesting that she would have been available at trial and what testimony she would have provided if she had been called as a witness. Although the petitioner has requested an evidentiary hearing to develop the record on his claims of ineffective assistance of counsel, the petitioner fails to show why he could not have obtained an affidavit or declaration from Ms. Hill to support Ground Five. "In the case of an uncalled witness, at the very least, the petitioner must submit an affidavit from the uncalled witness stating the testimony he or she would have given had they been called to testify." Allison v. Sec'y, DOC, No. 2:13-CV-861-FTM-38, 2015 WL 4620558, at *9 (M.D. Fla. July 31, 2015).

The petitioner has also failed to show that counsel's failure to call Ms. Hill as an alibi witness at trial was both deficient performance and prejudicial to the defense under Strickland. It is well established that "[c]ounsel is not required to call additional witnesses to present redundant or cumulative evidence." Ford v. Hall, 546 F.3d 1326, 1338 (11th Cir. 2008). Through Ms. Irby, counsel presented evidence at trial that the petitioner was with Ms. Irby on the day of the robbery from approximately noon until

approximately 10:42 p.m. (Ex. BBB at 321). The petitioner now argues that counsel should have called Ms. Hill to the stand to testify that on the same night, the petitioner was with Ms. Irby at the home where Ms. Hill lived until approximately shortly after 10:00 p.m. See Memorandum in Support of Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 (DE# 1-1 at 32, 8/4/15). Thus, Ms. Hill's testimony would have been cumulative of Ms. Irby's testimony. If anything, Ms. Irby's testimony would have provided a later-in-time alibi for the petitioner. "The mere fact that other witnesses might have been available or that other testimony might have been elicited from those who testified is not a sufficient ground to prove ineffectiveness of counsel." Foster v. Dugger, 823 F.2d 402, 406 (11th Cir. 1987).

The petitioner insists that Ms. Hill's testimony would not have been cumulative. However, given that both Ms. Irby and Ms. Hill would have testified to the petitioner's whereabouts on the night of the robbery shows that their testimony was indeed cumulative. The petitioner relies on Taylor v. State, 522 So.2d 418 (Fla. 5th DCA 1988). Taylor is readily distinguishable from the instant case. Taylor did not involve a petition for post-conviction relief, thus the Taylor court did not consider a claim of ineffective assistance of counsel under Strickland. More importantly, Taylor was an appeal from an order denying a motion for new trial based on the state's failure to provide **newly discovered evidence**. Id. at 419 (stating that "[a]lthough [the new witness]'s name was known to the state prior to trial . . . **his name was not furnished in response to defense discovery** because the state did not know that [this witness] had any material knowledge of the incident.") (emphasis added). Here, the existence of Ms. Hill as a

137

rebuttal witness was not newly discovered evidence or evidence that the State failed to provide to the defense. The petitioner acknowledges he sent a letter to his counsel on August 4, 2008, well before the May 2009 trial, disclosing Ms. Hill and Ms. Irby as potential alibi witnesses. See Memorandum in Support of Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 (DE# 1-1 at 32, 8/4/15). Thus, the instant case is materially distinguishable from Taylor.

The Eleventh Circuit has stated that "'[w]hich witnesses, if any, to call, and when to call them, is the epitome of a strategic decision, and it is one that [the Court] will seldom, if ever, second guess.'" Evans v. Sec'y, Florida Dep't of Corr., 699 F.3d 1249, 1268 (11th Cir. 2012) (quoting Waters v. Thomas, 46 F.3d 1506, 1512 (11th Cir. 1995) (en banc); citing Cook v. Warden, 677 F.3d 1133, 1137 (11th Cir. 2012); Allen v. Sec'y, Fla. Dep't of Corr., 611 F.3d 740, 759 (11th Cir. 2010)). In the instant case, the petitioner called Ms. Irby (and not Ms. Hill) as an alibi witness at trial. The petitioner has not shown that counsel rendered ineffective assistance in failing to call Ms. Hill as a defense witness. To the extent the petitioner maintains that the strategy or tactics employed by counsel cannot be ascertained absent an evidentiary hearing, that argument has been rejected. The Eleventh Circuit has instructed that "[t]o uphold a lawyer's strategy, [the Court] need not attempt to divine the lawyer's mental processes underlying the strategy." Chandler v. United States, 218 F.3d 1305, 1316 n.15 (11th Cir. 2000).

In applying Strickland, "[t]he relevant question is not whether counsel's choices were strategic, but whether they were reasonable." Roe v. Flores-Ortega, 528 U.S. 470,

138

481 (2000). In the instant case, counsel's decision to call Ms. Irby and not Ms. Hill falls well within "the wide range of reasonable professional assistance." <u>Strickland</u>, 466 U.S. at 689. Additionally, the petitioner cannot show prejudice because the jury heard from Ms. Irby that the petitioner was with her on the day of the robbery until approximately 10:42 p.m. <u>See</u> Trial Transcript (Ex. BBB at 321).

In sum, the petitioner has failed to show constitutionally deficient performance or prejudice based on counsel's failure to call Ms. Hill as an alibi witness at trial. Ground Five should be **DENIED**.

**RECOMMENDATION**

Based on the foregoing, the undersigned respectfully **RECOMMENDS** that the Petition for Relief from a Conviction or Sentence by a Person in State Custody (DE# 1, 8/4/15) be **DENIED** for the reasons stated herein.

The parties have fourteen (14) days from the date of receipt of this Report and Recommendation within which to serve and file written objections, if any, with the Honorable Cecilia M. Altonaga, United States District Court Judge. Failure to file timely objections shall bar the parties from attacking on appeal the factual findings contained herein. <u>See</u> <u>LoConte v. Dugger</u>, 847 F.2d 745, 750 (11th Cir. 1988); <u>Resolution Trust Corp. v. Hallmark Builders, Inc.</u>, 996 F.2d 1144, 1149 (11th Cir. 1993).

RESPECTFULLY SUBMITTED in Chambers at Miami, Florida, this **28th** day of January, 2016.

JOHN J. O'SULLIVAN
UNITED STATES MAGISTRATE JUDGE

Copies provided to:
United States District Judge Altonaga
All counsel of record